Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


TRACY D. LAMPKIN,              }
                               )
              Plaintiff,  )   Civil Action File
                               )
      vs.                  )  No: CV 1:06cv538-WKW
                               )
UNITED PARCEL SERVICE,         }
                               )
          Defendant.  )
_____)



DEPOSITION OF TRACY DEBOSE LAMPKIN

VOLUME 1


Thursday, August 30, 2007

9:51 a.m. - 1:42 p.m.


8451 South Cherokee Boulevard

Douglasville, Georgia



REPORTED BY:

Mary Ann Hanham, CCR

Notary Public, State of Georgia

Esquire Deposition Services

Atlanta Office    Job # 658875-01

Phone - 800.787.5302

        404.872.7890

**Esquire Corporate Services**
**(888)486-4044**

```
 1      IN THE UNITED STATES DISTRICT COURT
 2      FOR THE MIDDLE DISTRICT OF ALABAMA
 3              SOUTHERN DIVISION
 4
 5 TRACY D. LAMPKIN,        }
                            )
 6      Plaintiff,  )  Civil Action File
                            )
 7      vs.         )  No: CV 1:06cv538-WKW
                            )
 8 UNITED PARCEL SERVICE,   }
                            )
 9      Defendant.  )
   _____}
10
11
12
13      The deposition of TRACY DEBOSE
14 LAMPKIN, taken on behalf of the Defendant,
15 before Mary Ann Hanham, CCR, Certified
16 Court Reporter and Notary Public, at 8451
17 South Cherokee Boulevard, Douglasville,
18 Georgia, on Thursday, the 30th day of
19 August, 2007, commencing at the hour of
20 9:51 a.m.
21
22
23
24 FILE NO.  658875-01
25
                                      Page  2
```

```
 1              I N D E X
 2
 3
 4      WITNESS:  TRACY DEBOSE LAMPKIN
 5
 6
 7
 8      EXAMINATION:      PAGE
 9 BY MR. TUCKER: ............................  6
10 BY MS. JAMES: ............................ 286
11
12
13
14      EXHIBITS:
15 DEFENDANT'S      DESCRIPTION      PAGE
16
17    1    Employment application, Bates   75
         Stamped UPS-0040 and UPS-0041
18    2    Charge of discrimination,       103
         consisting of four pages
19
20    3    Amended complaint, consisting  115
         of twelve pages
21    4    Management assessment and      125
         promotion process, letter of
22       interest cover sheet,
         consisting of one page
23
24    5    Annualized impact of your      180
         salary increase, consisting
25       of one page
                                      Page  4
```

```
 1      APPEARANCES OF COUNSEL:
 2
 3 On Behalf of the Plaintiff:
 4    CRYSTAL M. JAMES, Esquire
         Crystal James & Associates, LLC
 5       8451 South Cherokee Boulevard
         Suite F
 6       Douglasville, Georgia 30134
         770.489.9898
 7       770.489.5602 fax
 8
 9 On Behalf of the Defendant:
10    JEREMY TUCKER, Esquire and
      LISA H. CASSILLY, Esquire
11       Alston & Bird, LLP
         One Atlantic Center
12       1201 West Peachtree Street
         Atlanta, Georgia 30309-3424
13       404.881.7000
         404.253.8651 fax
14
15
              - - -
16
17
18
19
20
21
22
23
24
25
                                      Page  3
```

```
 1
 2    6    Multi-page document, Bates    235
         Stamped UPS-0051 through
 3       UPS-0084
 4
 5       (Exhibits attached hereto.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                      Page  5
```

2   (Pages 2 to 5)

1 DOUGLASVILLE, GEORGIA; THURSDAY, AUGUST 30, 2007
2          9:51 A.M.
3
4          P R O C E E D I N G S
5
6      MR. TUCKER:  Ms. James, would she
7 like to read and sign afterwards?
8      MS. JAMES:  Yes.
9      MR. TUCKER:  Okay.  This will be the
10 deposition of Tracy Lampkin taken pursuant
11 to notice and agreement of counsel.  This
12 deposition is taken for all purposes
13 permitted by law including the Federal
14 Rules of Civil Procedure and the Federal
15 Rules of Evidence.
16
17 Thereupon --
18      TRACY DEBOSE LAMPKIN,
19 called as a witness, having been first duly
20 sworn, was examined and testified as follows:
21          EXAMINATION
22 BY MR. TUCKER:
23   Q    Ms. Lampkin, my name is Jeremy
24 Tucker.  We met just a few minutes ago.  I'm one
25 of the lawyers representing United Parcel

Page 6

1   A    No.
2   Q    Have you ever been a -- and when I
3 say "given a deposition," in either a criminal or
4 a civil case of any sort?
5   A    No.
6   Q    Have you ever been a juror in a
7 trial?
8   A    No.
9   Q    Have you ever been a witness in a
10 trial?
11   A    No.
12   Q    Before we get into other questions, I
13 want to say just a few words about the procedures
14 that we'll follow today as we go through your
15 deposition.  I'm going to ask a series of
16 questions obviously that you will answer under
17 oath.  I'll try to make my questions as clear as
18 possible but if you don't understand a question
19 that I ask at any point, please just let me know,
20 I'll rephrase it and try to make the question
21 clearer, okay?
22   A    Okay.
23   Q    If you do answer a question that I
24 ask, however, I will assume that you understood
25 it, is that fair?

Page 8

1 Service, the defendant in this lawsuit.  With me
2 today is Lisa Cassilly, my co-counsel, another
3 lawyer for UPS.  We --
4      MR. TUCKER:  I want to put on the
5 record that we got about fourteen pages of
6 documents from plaintiff's counsel
7 yesterday.  We appreciate you sending those
8 over.  We have not received all of the
9 other documents in response to our
10 discovery request yet and, therefore, UPS
11 reserves the right, if needed, when we
12 receive those documents to continue Ms.
13 Lampkin's deposition at another date if
14 needed.
15   Q    Will you, please, state your full
16 name for the record?
17   A    Tracy Debose Lampkin.
18   Q    Thank you.  Ms. Lampkin, in this
19 deposition, I'll refer to UPS for short for
20 United Parcel Service.  Do you understand when I
21 say "UPS" that that's what I'm referring to,
22 United Parcel Service?
23   A    Yes.
24   Q    Thank you.  Ms. Lampkin, have you
25 ever given a deposition before?

Page 7

1   A    Okay.
2   Q    And as you're doing now, please
3 continue to answer my questions verbally.  The
4 court reporter can't take down a head shake or a
5 nod so please continue to speak your answers as
6 you're doing --
7   A    Okay.
8   Q    -- and speak clearly as you're doing
9 too.  Thank you.
10   A    Okay.
11   Q    I will try not to speak while you're
12 speaking, while you're giving me your answers and
13 I ask that you do the same and please let me
14 finish my question before you begin your answer,
15 is that fair?
16   A    That's fair.
17   Q    If you need a break at any point in
18 the deposition, please let me know and I'll do my
19 best to accommodate you at that time.  If we do
20 take a break, I will only ask that if there's a
21 question pending at that time that you answer the
22 question before we take the break, okay?
23   A    Okay.
24   Q    And finally, just to confirm, you
25 understand that you're under oath and, therefore,

Page 9

3  (Pages 6 to 9)

1 you're subject to the penalties of perjury just
2 as if you were testifying in court?
3    A    Okay, I understand.
4    Q    Ms. Lampkin, are you under the
5 influence of any drugs, medication or alcohol or
6 any substance that would impair your ability to
7 understand my questions today?
8    A    No.
9    Q    Are you under the influence of any
10 drugs, medication or substance that would impair
11 your ability to remember and recall today?
12    A    No.
13    Q    Is there any reason you can think of
14 why you would not be able to understand my
15 questions or answer or recall things today?
16    A    No.
17    Q    Ms. Lampkin, Ms. James sitting to
18 your left is your lawyer in this case; is that
19 right?
20    A    Yes.
21    Q    When did you hire Ms. James to
22 represent you regarding the claims you have
23 against UPS?
24    A    I don't remember the date exactly but
25 it was this year.

Page 10

1 her.
2    Q    Do you remember the month roughly?
3    A    I do not remember the month.
4    Q    Okay.  And Ms. Crook is no longer
5 representing you in --
6    A    No, she's not.
7    Q    Okay.  And neither is Ms. Robertson?
8    A    No.
9    Q    Ms. Lampkin, have you prepared for
10 your deposition today with Ms. James?
11    A    As briefly like now, yes.
12    Q    Today?
13    A    Today.
14    Q    Okay.  Did you prepare with Ms. James
15 at any time prior to today?
16    A    No.
17    Q    And without telling me what you
18 discussed with Ms. James, about how long did you
19 prepare or talk about the deposition?
20    A    Briefly, just before coming here.
21    Q    Okay.  Less than an hour?
22    A    Not even an hour.
23    Q    Have you prepared for your deposition
24 with anyone else that works with Ms. James which
25 I think is just Ms. Grigsby?

Page 12

1    Q    In 2007?
2    A    Yes.
3    Q    Okay.  Did you consult with any other
4 lawyers before you hired Ms. James?
5    A    Yes.
6    Q    And who were those?
7    A    Bobbie Crook.
8    Q    Is that C-r-o-o-k?
9    A    C-r-o-o-k.
10    Q    Okay.  Is Mr. Crook the only other
11 lawyer that you consulted?
12    A    She.
13    Q    I'm sorry, is Ms. Crook the only
14 other lawyer?
15    A    Yes.  Well, she was with Ann
16 Robertson, yes.  They're together but yes.
17    Q    Okay.  And where is their law office
18 located?
19    A    Dothan, Alabama.
20    Q    And is Ann Robertson another lawyer
21 in her office?
22    A    Yes.
23    Q    And when did you first consult with
24 Ms. Crook regarding your claims against UPS?
25    A    It was in '05 when I went to talk to

Page 11

1    A    No.
2    Q    Okay.  Was anyone else -- when you
3 prepared with Ms. James this morning, was anyone
4 else present with you and her?
5    A    No.
6    Q    Okay.  Other than Ms. James, have you
7 talked with anyone else about your deposition
8 that you would be giving today?
9    A    No.
10    Q    Not your husband?
11    A    No.
12    Q    Anybody at work?
13    A    No.
14    Q    Okay.  Ms. Lampkin, did you review
15 any documents to refresh your recollection and
16 get ready for your deposition today?
17    A    Well, I reviewed my documents.  I
18 always look over my documents but as far as like
19 what I have, that's it.
20    Q    Can you tell me which documents that
21 you reviewed in preparation for today?
22    A    I read over the first page of the
23 EEOC complaint I made.
24    Q    The charge that you filed at EEOC?
25    A    The charge.

Page 13

4  (Pages 10 to 13)

**Esquire Corporate Services**
**(888)486-4044**

| | | |
|---|---|---|
| 1 | Q | Only the first page? |
| 2 | A | Yes. |
| 3 | Q | Okay. What else did you look at? |
| 4 | A | That was it. |
| 5 | Q | No other documents? |
| 6 | A | No. |
| 7 | Q | Okay. And did you review that first |

8 page of the EEOC charge to refresh your
9 recollection about the contents of the charge?
10 A   Just a little bit, the top of it, the
11 charge of discrimination and put it back into my
12 folder.
13   Q   Okay. And you provided a lot of
14 documents to Ms. James, right?
15 A   Yes.
16   Q   What documents, to the best of your
17 memory, have you given to Ms. James?
18 A   The EEOC charge, the pay raise, an
19 affidavit from Sylvester Whiters.
20   Q   Can you spell his last name, please?
21 A   W-h-i-t-e-r-s.
22   Q   Thank you. Please go on.
23 A   A letter from one of my co-workers
24 and phone numbers of co-workers.
25   Q   And which co-worker was that letter

Page 14

1 from?
2 A   Jason Jones.
3   Q   And is that letter dated?
4 A   Yes.
5   Q   What's the date on the letter?
6 A   I do not remember.
7   Q   Okay. Do you remember when Mr. Jones
8 gave you the letter?
9 A   I don't remember.
10   Q   Has it been this year?
11 A   It wasn't this year.
12   Q   Do you have the letter with you?
13 A   I don't have it with me.
14   Q   But you've given a copy to Ms. James
15 at some point in the past?
16 A   Yes.
17   Q   Okay. What other documents do you
18 remember giving to Ms. James?
19 A   The affidavit from Sylvester Whiters.
20   Q   I've got that.
21 A   And just the list of names of
22 employees from UPS.
23   Q   And why did you give her a list of
24 names, what do those people represent?
25 A   Regarding the discrimination file

Page 15

1 that I filed with UPS.
2   Q   Are these employees that work at the
3 Dothan center also?
4 A   It is, Dothan and Enterprise center.
5   Q   And is that a list of names that you
6 prepared yourself?
7 A   Yes.
8   Q   Are those people you consider to be
9 potential witnesses in your case?
10 A   Yes.
11   Q   Do you remember how many names were
12 on the list?
13 A   Somewhere in between seven or more.
14   Q   The pay raise document you
15 referenced, can you tell me a little bit more
16 about what that is?
17 A   The pay raise sheet is the pay raise
18 where the center manager will go over with us and
19 tell us how much money or how much the raise was.
20   Q   And this was a sheet for a raise that
21 you received?
22 A   Yes.
23   Q   Do you remember the date or what
24 year?
25 A   It was in '04.

Page 16

1   Q   And that's a document that the center
2 manager gave you?
3 A   Uh-huh, yes.
4   Q   Which center manager?
5 A   Robert Icenogle.
6   Q   Could you spell his last name,
7 please?
8 A   I-c-e-n-o-g-l-e.
9   Q   Thank you. Ms. Lampkin, have you
10 kept all documents that you have obtained during
11 your employment with UPS?
12 A   No, I haven't, not all documents, no.
13   Q   Okay. Do you recall any of the
14 documents that you haven't kept that you got rid
15 of in some way?
16 A   Well, I didn't get rid of it. The
17 important documents which are the QPR's, I asked
18 for them but we couldn't find them. They -- I
19 don't know what they did with them but I don't
20 know where they're at.
21   Q   So you never had them?
22 A   No, he went over them with me but
23 then he was supposed to put them in my file but
24 we could not locate them.
25   Q   And who is "he" there?

Page 17

5 (Pages 14 to 17)

**Esquire Corporate Services**
**(888)486-4044**

1    A    Robert Icenogle.
2    Q    Okay.  Are there any documents that
3 you -- relating to your employment with UPS that
4 you have had in your possession that you no
5 longer have?
6    A    No, not to my recollection.
7    Q    Okay.  Have you at any point in time
8 prepared notes relating in any way to your
9 employment with UPS?
10    A    When you say "notes," are you saying
11 as things that have happened to me while I was at
12 UPS?
13    Q    Sure, any kind of notes that you
14 prepared in some way regarding your employment at
15 UPS.
16    A    Yes.
17    Q    Okay.
18    A    As far as a letter that's stating --
19    Q    No, just notes.  It doesn't have to
20 be anything formal.
21    A    Let me ask you this again.
22    Q    Sure.
23    A    When you're saying letters, are you
24 saying basically have I kept a record of things
25 that happened to me or dates that I've kept?

Page 18

1    Q    When I say "notes," I would include
2 that, yes.
3    A    No, I haven't turned in anything, any
4 notes or --
5    Q    Well, just have you made any?  Even
6 if you didn't give them to anybody or show them
7 to anybody, have you made any notes?
8    A    I have.
9    Q    Okay.  And when did you make those
10 notes, if you remember?
11    A    The notes were from -- they were from
12 -- I don't have the exact date but it was in '06,
13 last year, '06.
14    Q    You didn't make any notes before
15 2006?
16    A    No.
17    Q    Okay.  And those notes that you made
18 in 2006, have you given those to Ms. James?
19    A    No.
20    Q    But you still have them in your
21 possession?
22    A    I've moved but yes, I do.
23    Q    Okay.  Have you given them to anybody
24 else?
25    A    No way.

Page 19

1    Q    At some point in time after you hired
2 Ms. James, did you go through all of the
3 documents in your possession and search for
4 documents, look for documents that you were going
5 to give to Ms. James?
6    A    As far as the documents like with my
7 charge is what you're talking about?
8    Q    Sure, but even broader than that, any
9 kind of documents that you felt like you needed
10 to give to Ms. James.
11    A    Yes.
12    Q    Okay.  And did you -- when you
13 searched for those documents, did you
14 specifically look to see if you had any documents
15 you received from the EEOC?
16    A    Yes.
17    Q    Okay.  And what documents were you
18 able to find, if any, in that regard?
19    A    The letter that I submitted to the
20 EEOC, the charge.
21    Q    What about any -- just right now, I'm
22 talking about just documents you might have
23 gotten from the EEOC that they sent to you.  Did
24 you find any documents like that?
25    A    Nothing but the letter of discharge.

Page 20

1    Q    "Letter of discharge," was that a
2 letter of dismissal from the EEOC?
3    A    Yes, from the investigation.
4    Q    Okay.  And that's the only document
5 that you had that the EEOC sent you?
6    A    Yes.
7    Q    And you gave that document to
8 Ms. James?
9    A    Yes.
10    Q    And then the next question, what you
11 were just telling me, did you look to see if you
12 had copies of documents that you had given to the
13 EEOC?
14    A    Yes.
15    Q    Okay.  And what kind of documents did
16 you find in your possession?
17    A    Just the letters that I had faxed to
18 the EEOC, to Ms. Barreas for investigation.
19    Q    Do you remember how many letters that
20 you sent to her?
21    A    I don't remember.
22    Q    Do you remember roughly when you sent
23 them?
24    A    No, I don't.
25    Q    And that was Ms. Barreas?

Page 21

6  (Pages 18 to 21)

1    A    Yes.
2    Q    Could you spell her last name,
3 please?
4    A    I think it's B-a-r-r-e-a-s.
5    Q    Okay.  And did you give those letters
6 to Ms. James as well?
7    A    Yes.
8    Q    When you were looking for documents
9 to give to Ms. James, did you look to see if you
10 had any documents reflecting any communications
11 you had with other UPS employees regarding your
12 claims against UPS?
13    A    Could you read that again, please?
14    Q    Sure.  Did you look to see if you had
15 in your possession any documents reflecting
16 communications that you had with other UPS
17 employees regarding your claims?
18    A    No, because it was basically about my
19 charge but no.
20    Q    Okay.  Did you look to see if you had
21 any documents in your possession regarding UPS
22 employment policies, handbooks, policies,
23 statements, anything like that?
24    A    Yes.
25    Q    And did you find any such documents

Page 22

1 in your possession?
2    A    Yes.
3    Q    What documents did you have in that
4 regard?
5    A    UPS policy book.
6    Q    Okay.  Anything else?
7    A    That's it.
8    Q    And did you give that policy book to
9 Ms. James?
10    Q    Just a copy of it.
11    Q    A copy of it?
12    A    Yes.
13    Q    Okay.
14    A    Not of the book, it was just a copy
15 of a page out of it.  It's not the book.  It was
16 just a copy of a page, I'm sorry.
17    Q    Is it just one page?
18    A    Just one page, yes, that was it.
19    Q    Do you remember in particular what
20 that page was, what it was about?
21    A    No.
22    Q    Okay.  Did you look to see if you had
23 documents in your possession reflecting your job
24 performance at UPS such as the QPR's, any
25 discipline records, awards, that kind of thing?

Page 23

1    A    Did I look and see if I had in my
2 possession?
3    Q    Yes, ma'am.
4    A    Yes, I did.
5    Q    And did you find any of those kinds
6 of documents?
7    A    No.
8    Q    Not at all?
9    A    No.
10    Q    Did you mention earlier something --
11 you mentioned QPR earlier to me?
12    A    Uh-huh.
13    Q    QPR stands for what?
14    A    Quality performance review.
15    Q    Okay.  But you're saying you have not
16 had at any time in your possession any QPR's?
17    A    I've had it but it was at the center.
18 They normally keep it.  The only thing I have
19 this year doesn't reflect what has happened --
20 the QPR's that I was looking for happened
21 previously in '04 and '05 so I have a QPR but
22 it's for this year, not -- it doesn't have
23 anything to do with this case.
24    Q    The only one you got in your
25 possession is for 2007?

Page 24

1    A    Yes.
2    Q    And the others you're referring to
3 are in UPS' files?
4    A    Well, we couldn't find them.  We
5 don't know where they're at.  They were misplaced
6 I assume.
7    Q    Do you know whether QPR's are
8 normally kept at the Dothan center?
9    A    They're supposed to be kept in the
10 file, in each employee file.
11    Q    And how do you know they're supposed
12 to be kept in the file there?
13    A    Because that's normally what...
14    Q    You said you were looking for those
15 QPR's with someone else at UPS?
16    A    Yes.
17    Q    Who was the person that was helping
18 you to look for them?
19    A    Well, I asked for them.  I had went
20 to Henry Hall and asked can I, please, receive my
21 QPR and we looked in my file and they was not
22 there.
23    Q    You said Henry Hall?
24    A    Henry Hall.
25    Q    Is he the only person you asked for

Page 25

7 (Pages 22 to 25)

1 the QPR's?
2    A    Well, I asked Badrig as well. He's
3 another supervisor there. Henry Hall and Badrig
4 are the supervisors, full-time supervisors.
5    Q    Can you give me Mr. Badrig's full
6 name?
7    A    Badrig Palanjian.
8    Q    Could you help us with the spelling
9 there?
10   A    P-a-l-a-n-j-i-a-n.
11   Q    And the first name?
12   A    B-a-d-r-i-g.
13   Q    And Mr. Hall and Mr. Palanjian are
14 full-time supervisors at the Dothan center?
15   A    Yes.
16   Q    Anybody other than those two
17 gentlemen that you asked for your QPR's from?
18   A    No.
19   Q    Can you remember when you asked
20 Mr. Hall for your QPR's?
21   A    I don't.
22   Q    Do you remember when you asked
23 Mr. Palanjian for your QPR's?
24   A    I don't.
25   Q    Do you think it was this year?

Page 26

1    A    I don't remember. I just asked them
2 for it. I don't remember.
3    Q    Okay. But the only QPR's you ever
4 had in your possession and I'm talking about
5 outside of UPS files is for this year, 2007?
6    A    Yes.
7    Q    Okay. Have you ever had any QPR's in
8 your possession for some other employee, somebody
9 other than you?
10   A    Yes, we always look at each other's
11 QPR. I mean -- well, each employee, we go back
12 and review our QPR.
13   Q    You do that at work?
14   A    Yes.
15   Q    Have you ever had copies of those
16 that you took home with you or took away from
17 work?
18   A    No.
19   Q    Okay. Ms. Lampkin, have you ever
20 been a -- ever kept a diary or a journal?
21   A    I have.
22   Q    When was the last time you kept a
23 diary or a journal?
24   A    I don't remember.
25   Q    Have you ever kept a diary or a

Page 27

1 journal since you've been employed at UPS?
2    A    Yes.
3    Q    But you don't remember the last time
4 that you made any --
5    A    I've written, right.
6    Q    Have you made entries in a diary or a
7 journal since you've been a part-time supervisor
8 at UPS?
9    A    Yes.
10   Q    Do you have that diary or journal
11 still in your possession?
12   A    No.
13   Q    Do you remember what you did with it?
14   A    I moved and it's still packed or
15 trashed.
16   Q    So you haven't looked for it?
17   A    No, I haven't looked for it.
18   Q    So I don't forget later, Henry Hall
19 that you mentioned, the full-time supervisor, do
20 you report to Mr. Hall?
21   A    Yes.
22   Q    How long have you reported to him?
23   A    He's been back and forth but I've
24 been reporting to Henry -- I went into management
25 in '01 and I've been reporting to Henry, it's

Page 28

1 '07, for over five years.
2    Q    Okay. Ever since you became a
3 part-time supervisor?
4    A    Yes.
5    Q    Have you ever reported to
6 Mr. Palanjian?
7    A    No.
8    Q    Did you ever, at any point during
9 your employment with UPS, receive a copy of your
10 QPR for 2004?
11   A    I had it at the center. When he
12 printed it off, he gave it to us at the center
13 and evidently I left it there and it was supposed
14 to be put into my file because I don't have it
15 now because that's -- I was looking for it, my
16 '04 QPR so I know I didn't bring it with me
17 because I don't have it.
18   Q    Was it in 2004 when you saw it?
19   A    Yes.
20   Q    Who was it that showed it to you?
21   A    Robert Icenogle.
22   Q    Okay. And you didn't make a copy of
23 it at that time for your own personal records?
24   A    I did not make a copy of it.
25   Q    But he printed it off and gave it to

Page 29

8  (Pages 26 to 29)

1 you?
2   A    Yes, he printed it off and gave it to
3 us.  He -- normally, he says he's going to put it
4 into our file because it's supposed to be kept in
5 our file.
6   Q    And you don't know what happened to
7 it after he gave it to you?
8   A    I do not know what happened to it.
9   Q    And he was giving you a copy of
10your --
11  A    No, he did not give me anybody else's
12QPR.
13  Q    It was just yours?
14  A    Yes.
15  Q    Okay.  Did you mention us earlier
16getting a copy just to make clear?  Was there
17somebody else that was getting a copy of it?
18  A    No, it was Ryan Brown and once you go
19over your QPR's, we just basically, hey, we did
20this, we did that.  It wasn't, you know, he
21didn't -- Robert didn't give me anyone else's
22QPR.
23  Q    Did you see Robert give Mr. Brown
24Mr. Brown's QPR?
25  A    No.

                                    Page 30

1   Q    Okay.  In -- I'm sorry.
2   A    It's each individual.  He don't, you
3 know, bring everybody in there at one time,
4 individual.
5   Q    Okay.  So you wouldn't know if
6 Mr. Icenogle gave somebody else their QPR?
7   A    No.
8   Q    Okay.  In 2005, did Mr. Icenogle give
9 you a copy of your QPR for that year?
10  A    You know what, I do not recall that
11and I really, truly don't think he did review the
12QPR with me in 2005 because in '05 is when he was
13moved.  I don't recall him going over my quality
14performance review with me in '05.
15  Q    But you've seen a copy of your 2005
16QPR, right?
17  A    No.
18  Q    Okay.
19  A    No.
20  Q    Okay.
21  A    We have a QPR and we have a basic --
22no, I don't recall that.
23  Q    You don't know what your QPR rating
24was for 2005?
25  A    No.

                                    Page 31

1   Q    Have you written any letters to
2 friends or family members regarding UPS since
3 you've been employed there?
4   A    No.
5   Q    Have you ever made any audiotape
6 recordings in the workplace at UPS?
7   A    No.
8   Q    Do you know of any other employees in
9 the Dothan center that have made tape recordings
10at work, at UPS?
11  A    No.
12  Q    Did you ever try to get a written
13statement from anyone regarding your experience
14at UPS or your employment with UPS?
15  A    Yes.
16  Q    And is that Sylvester Whiters?
17  A    Sylvester Whiters, Jason Jones,
18Cynthia Debose, Michael Lightner, Jennifer Bass.
19  Q    Anyone else?
20  A    I think that's all.
21  Q    And which one of those people
22actually gave you a written statement?
23  A    Sylvester Whiters, Jason Jones.
24  Q    Anybody else?
25  A    No.

                                    Page 32

1   Q    Okay.  When did you ask Mr. Whiters
2 for a written statement?
3   A    Back in '05.
4   Q    When did he give you -- did he only
5 give you the written affidavit?
6   A    Yes.
7   Q    Did he give you anything else in
8 writing?
9   A    No.
10  Q    When did he give you that written
11affidavit?
12  A    In '05.
13  Q    Did you ask him for that after you
14had filed your EEOC charge?
15  A    Yes.
16  Q    Do you recall when you asked
17Mr. Jason Jones for a written statement?
18  A    I don't recall.
19  Q    Mr. Jones gave you a letter; is that
20correct?
21  A    Yes.
22  Q    Was it only the one letter?
23  A    Yes.
24  Q    Do you remember when he gave it to
25you?

                                    Page 33

                        9  (Pages 30 to 33)

1    A    I do not remember.
2    Q    Do you remember if you asked him for
3 it after you filed the EEOC charge?
4    A    That was after.
5    Q    It was after you filed the charge?
6    A    It was after.
7    Q    Do you remember when you asked
8 Michael Lightner to give you a written statement?
9    A    I don't remember.
10   Q    Do you remember if that was -- if you
11 asked him after you filed your EEOC charge?
12   A    It was after the EEOC charge.
13   Q    Okay.  And Mr. Lightner never gave
14 you any kind of a written statement?
15   A    He didn't give me a written
16 statement.
17   Q    You don't know whether he's ever
18 prepared a written statement that you've asked
19 for?
20   A    Well, he has told me that whenever,
21 you know, I get ready for him to give it to me to
22 come to Enterprise and he would give it to me.
23   Q    So he has told you he's got one, a
24 written statement?
25   A    I'm pretty sure it's not written but

Page 34

1 he has told me whenever I need it, he would have
2 it for me.
3    Q    Okay.  Do you remember when you asked
4 Jennifer Bass for a written statement?
5    A    In '05.
6    Q    But she's never given you a written
7 statement?
8    A    No.
9    Q    And did you ask Ms. Bass for that
10 statement after you filed your EEOC charge?
11   A    Yes.
12   Q    Do you remember when you asked
13 Cynthia Debose for a written statement?
14   A    I don't remember.  I do not remember.
15   Q    Do you remember if you asked
16 Ms. Debose for the statement after you filed your
17 EEOC charge?
18   A    After the EEOC charge, yeah.
19   Q    Ms. Debose has never given you a
20 written statement?
21   A    No.
22   Q    Is Ms. Debose white or black?
23   A    She's black.
24   Q    Are you related to Ms. Cynthia
25 Debose?

Page 35

1    A    She's married to my first cousin.
2    Q    So you're related to her only by
3 marriage?
4    A    Only by marriage.
5    Q    And Michael Lightner, is he white or
6 black?
7    A    Black.
8    Q    Are you related to Mr. Lightner in
9 any way, blood or marriage?
10   A    None whatsoever.
11   Q    And is Jennifer Bass white or black?
12   A    White.
13   Q    Are you related to Ms. Bass in any
14 way, blood or marriage?
15   A    No.
16   Q    Is Jason Jones white or black?
17   A    White.
18   Q    Are you related to Mr. Jones in any
19 way, by blood or marriage?
20   A    No.
21   Q    And is Sylvester Whiters white or
22 black?
23   A    Black.
24   Q    Are you related to Mr. Whiters in any
25 way, blood or marriage?

Page 36

1    A    No.
2    Q    And just so I'm clear, when you asked
3 these five individuals that we've just talked
4 about for written statements, you were asking
5 them for statements regarding your employment at
6 UPS or your experiences in your employment at
7 UPS; is that right?
8    A    No.
9    Q    Okay.  Tell me why --
10   A    You said my experiences at UPS?
11   Q    Uh-huh.
12   A    Yes, my experiences at UPS.
13   Q    Okay.  Did you ask any of those
14 individuals for a statement regarding their
15 experience at UPS or their employment?
16   A    Yes.
17   Q    Was that part of the same request
18 regarding your experience or did you separately
19 ask them for a statement regarding their
20 experiences?
21   A    Part of my experience.
22   Q    Okay.  Why were you asking them about
23 their experiences at UPS?
24   A    The reason I asked them for theirs at
25 UPS is because I wanted to make sure that I

Page 37

10  (Pages 34 to 37)

1 wasn't -- I wanted to make sure physically that I
2 wasn't just like when I was saying that I was
3 being discriminated against so by me asking these
4 people at UPS their experience, that showed me
5 that I was being discriminated against at UPS.
6     Q     Okay.
7         MR. TUCKER:  Could we just take a
8 real quick break?
9         MS. JAMES:  Sure.
10        (Whereupon, a short recess was
11 taken.)
12        MR. TUCKER:  Back on the record.
13    Q     Ms. Lampkin, can you tell me,
14 please, Sylvester Whiters' position at UPS, his
15 job?
16    A     At the time, he's retired, he was a
17 full-time package car driver.
18    Q     Do you know when he retired?
19    A     No, I do not.
20    Q     But he was a full-time package car
21 driver in 2005?
22    A     He was.
23    Q     In the Dothan center?
24    A     Yes.
25    Q     He didn't retire in 2003 from UPS?

Page 38

1     A     I don't remember.  The charge was
2 filed in '05 so he wasn't a package car driver in
3 '05, he had retired.
4     Q     I'm going to show you --
5         (Handing document.)
6         (Witness reviewing document.)
7     A     Is that what this thing is?  Yes, he
8 gave me this statement in '05 so he had retired,
9 you know, prior to this.
10    Q     Is that document I just handed you
11 the affidavit that Mr. Whiters gave you?
12    A     Uh-huh.
13    Q     You recognize that document?
14    A     Uh-huh.
15        MS. JAMES:  Yes or no.
16        THE WITNESS:  Yes.
17    Q     Thank you.  Have you read that
18 affidavit before?
19    A     Yes, I have.
20    Q     And that affidavit reflects that
21 Mr. Whiters retired in 2003, correct?
22    A     Yes.
23    Q     And Mr. Whiters, prior to retirement,
24 was a full-time package car driver in Dothan?
25    A     Yes.

Page 39

1     Q     What did you ask him for specifically
2 to put in a statement for you, a written
3 statement?
4     A     Well, I didn't ask him to put
5 anything in the statement for me.  I asked him
6 have you ever been discriminated against from the
7 Dothan center, anyone in the Dothan center and he
8 specifically told me yes and I asked him if he
9 would go and give his statement to my attorney.
10    Q     So you asked him for any
11 discrimination that he believes he suffered while
12 at UPS?
13    A     Yes.
14    Q     Did you ask him for anything else?
15    A     No.
16    Q     And so is Mr. Whiters' knowledge, in
17 this case, limited to what he -- what
18 discrimination he believes he suffered at UPS?
19    A     Yes.
20    Q     Okay.  What is Jason Jones' job
21 position at UPS?
22    A     At the time --
23    Q     I'm sorry, go ahead.
24    A     At the time, he was OMS but now he is
25 a package car driver.

Page 40

1     Q     You say Mr. Jones is a package car
2 driver now.  Do you know when he became a package
3 car driver?
4     A     It was in '04.
5     Q     You said he was OMS?
6     A     OMS.
7     Q     What does OMS stand for?
8     A     Operational management specialist.
9     Q     Have you ever -- have Mr. Jones ever
10 -- Jason Jones ever supervise you at UPS?
11    A     No.
12    Q     Is he an hourly union employee?
13    A     No, he is now.
14    Q     He was not?
15    A     He was not.  He was a manager, a
16 part-time supervisor.
17    Q     When was he a part-time supervisor,
18 Mr. Jones?
19    A     I know he was one in '03 and the
20 middle or earlier part of '04.
21    Q     And what specific area was he a
22 part-time supervisor over?
23    A     Preload.
24    Q     In the Dothan center?
25    A     Yes.

Page 41

11 (Pages 38 to 41)

1 Q    And after he was a part-time
2 supervisor in preload, what position do you think
3 he went to after that?
4    A    Before he went to preload, he was an
5 OMS, operational management specialist.
6    Q    But after -- so he went from OMS to
7 part-time supervisor in preload?
8    A    Yes.
9    Q    And then from part-time supervisor in
10 preload to package car driver?
11    A    Yes.
12    Q    Okay.  But he has never supervised
13 you?
14    A    No.
15    Q    And you never supervised him?
16    A    No.
17    Q    What specific information did you ask
18 Mr. Jones to put in a written statement?
19    A    I asked Jason, when he changed from
20 OMS to preload supervisor, was there a pay
21 increase and he told me no.
22    Q    Did you ask him for any other
23 information for his written statement that you
24 asked him for?
25    A    I asked him was he for sure and did

Page 42

1 he have his check stubs to verify this.
2    Q    And what did he tell you?
3    A    Yes.
4    Q    Did he show those to you?
5    A    No.
6    Q    Was Mr. Jones' knowledge or
7 information regarding your claims limited to what
8 his pay was or any change in his pay from --
9 while he's been at UPS?
10    A    I have no knowledge of it, of his
11 pay.
12    Q    But is it your -- is that the only
13 information that you are aware of that Mr. Jones
14 has regarding your claims?
15    A    Yes.
16    Q    Is just about his pay?
17    A    Yes.
18    Q    Nothing else?
19    A    Nothing else.
20    Q    And Mr. Jones told you that when he
21 went from the OMS position to part-time
22 supervisor that his pay did not change, correct?
23    A    It did not change.
24    Q.    Okay.  Back on Mr. Whiters for just a
25 second, Sylvester Whiters.  Mr. Whiters, has he

Page 43

1 ever supervised you at UPS?
2    A    No.
3    Q    Have you ever supervised him?
4    A    No.
5    Q    Was he, before he retired in 2003, a
6 union hourly employee?
7    A    He was.
8    Q    Do you know if he ever served in
9 management at UPS?
10    A    No.
11    Q    He did not?
12    A    No.
13    Q    Okay.  Ms. Jennifer Bass, what
14 position, job position does she have at UPS?
15    A    She was an OMS.
16    Q    She's in an OMS position now?
17    A    No, she quit.
18    Q    Do you know when she quit her
19 employment at UPS?
20    A    I don't remember.
21    Q    Do you remember when she was in an
22 OMS position, a year, month, year, if you know?
23    A    I don't.
24    Q    You said you asked her in 2005 after
25 you filed your EEOC charge for the written

Page 44

1 statement; is that right?
2    A    Yes.
3    Q    At the time that you asked her for
4 the written statement, do you remember what job
5 position she was in at that time?
6    A    OMS.
7    Q    Did Ms. Bass ever supervise you at
8 UPS?
9    A    No.
10    Q    Did you ever supervise Ms. Bass?
11    A    Yes.
12    Q    When did you supervise her?
13    A    In '01, '02.
14    Q    And no time after 2002?
15    A    No, not that I remember.
16    Q    Okay.  What was Ms. Bass' job
17 position when you supervised her?
18    A    She was a sorter.
19    Q    As a sorter, was she an hourly union
20 worker?
21    A    Yes.
22    Q    Was she a part-time employee as a
23 sorter?
24    A    Yes.
25    Q    Did Ms. Bass move from the sorter

Page 45

12  (Pages 42 to 45)

1 position to the OMS position?
2    A    Yes.
3    Q    And when she moved, you no longer
4 supervised her; is that correct?
5    A    Correct.
6    Q    Michael Lightner, what's his -- what
7 specifically did you ask Ms. Bass to put in a
8 written statement for you?
9    A    Jennifer wanted to come to the local
10 sort as a part-time supervisor and she was in OMS
11 so I asked was there a different, you know, a
12 pay increase for her and she told me no, that
13 Robert Icenogle told her that we're all
14 supervisors and the pay stays the same.
15    Q    Now, was Ms. Bass a part-time
16 supervisor at some point?
17    A    She was OMS.
18    Q    You said she wanted to move --
19    A    Come to the local sort.
20    Q    -- to part-time supervisor?  But she
21 didn't?
22    A    She didn't because --
23        MS. JAMES:  You guys need to let each
24    other finish.
25        THE WITNESS:  Okay.
                                    Page 46

1    Q    So she was OMS, she wanted to move
2 to part-time supervisor?
3    A    She wanted to come to the local sort.
4    Q    She told you that?
5    A    Yes.
6    Q    And to your knowledge, she did not
7 move to the local sort?
8    A    She did not move to the local sort.
9    Q    Okay.  What other -- what information
10 do you think she has that's relevant to your
11 claims in this suit?
12    A    It's relevant because at the time
13 Robert was telling me that OMS was a different
14 category and he said that he was -- he said that
15 the local sort supervisor is a different category
16 so I said is -- I always assumed then by reading
17 my handbook that it was all the same and by me
18 going to ask her to see if she received a higher
19 pay raise, then that would tell me that it was,
20 you know, a promotion for her so it wasn't a
21 promotion, it was just a lateral move.
22    Q    Why did you ask her about a pay
23 raise?
24    A    Because if she received a pay raise,
25 then that would have been, you know, it was a
                                    Page 47

1 promotion so it wasn't a promotion, it was a
2 lateral movement.
3    Q    If she received a pay raise, from
4 what position to what position?
5    A    OMS to a local sort supervisor.
6    Q    But she never moved to local sort
7 supervisor?
8    A    Right, she never moved because the
9 pay was the same.  We were all supervisors,
10 part-time supervisors.
11    Q    So did you ask Ms. Bass what her
12 understanding -- whether she understood that she
13 would receive a pay raise if she moved from OMS
14 to local sort supervisor?
15    A    Yes, I did.
16    Q    And she told you she would not?
17    A    She told me no, it's all the same.
18 We were all part-time supervisors.
19    Q    Okay.  And is that the only
20 information you believe that Ms. Bass has is
21 relevant in any way regarding your claims?
22    A    Yes, that I know of.
23    Q    Okay.  And she's never given you a
24 written statement?
25    A    No.
                                    Page 48

1    Q    Michael Lightner, what is his job
2 position at UPS?
3    A    Michael Lightner works in the
4 Enterprise center.
5    Q    Do you know what his job position
6 there is?
7    A    He is -- he works on the local sort.
8    Q    Is he an hourly union employee?
9    A    He's an hourly union employee.
10    Q    How do you know Mr. Lightner since he
11 doesn't work in your center?
12    A    I had to go over to Enterprise one
13 night and do some training and when I was over
14 there, I verbally spoke with him a short, brief
15 time.
16    Q    Do you remember when that was?
17    A    I do not remember.
18    Q    Was that in 2005?
19    A    I don't remember.
20    Q    So the first time you met him is when
21 you went to Enterprise to do some training?
22    A    Yes.
23    Q    Is that the only occasion, time when
24 you personally met with Mr. Lightner?
25    A    Yes.
                                    Page 49

                          13  (Pages 46 to 49)

**Esquire Corporate Services**
**(888)486-4044**

1  Q    And is that the occasion then when
2 you asked him for a written statement?
3  A    No.
4  Q    When did you ask him for a written
5 statement?
6  A    I don't remember exactly when it was
7 but it was after the fact.
8  Q    So Mr. Lightner has never supervised
9 you?
10  A    No.
11  Q    You never supervised him?
12  A    No.
13  Q    You never worked in the same center
14 with Mr. Lightner?
15  A    No.
16  Q    What did you ask Mr. Lightner to put
17 in a written statement for you?
18  A    I asked Mr. Lightner was he ever or
19 has he ever been discriminated against by UPS and
20 he specifically told me yes and I asked him by
21 whom and he told me Robert Icenogle.
22  Q    Did Mr. Lightner tell you whether he
23 ever worked in the Dothan center?
24  A    No.
25  Q    Is the only information then that
Page 50

1  A    No.
2  Q    What information did you ask
3 Ms. Debose to put in a written statement for you?
4  A    I asked Ms. Debose does she feel like
5 she's been discriminated against by UPS and Ms.
6 Debose told me yes, because she had applied for
7 an OMS position and she had to take a test when
8 someone else didn't have to take a test.
9  Q    Did she tell you who that someone
10 else was?
11  A    Angie Blessman.
12  Q    Did Ms. Debose tell you when she
13 applied for this OMS position?
14  A    Well, she didn't apply for it.  She
15 told me that Alicia Palauchi, our HR rep came and
16 asked her was she interested in it.
17  Q    What else did Ms. Debose tell you?
18  A    She told me that Angie Blessman
19 didn't take the test and several others didn't
20 take the management placement test.
21  Q    Who else did she name?
22  A    She named Ryan Brown which he had to
23 come in to take it later on when she was taking
24 it because she states they couldn't find it, they
25 lost his and Jamie Stephens had to come in and
Page 52

1 Mr. Lightner has relevant to your claims
2 information regarding discrimination he believes
3 he suffered at UPS?
4  A    Yes.
5  Q    What job position does Cynthia Debose
6 have?
7  A    At the time, she was a CHSP clerk.
8 She covered for OMS and customer counter.
9  Q    And when you say "at the time," what
10 time are you referring to?
11  A    When she was there.  She's no longer
12 there.
13  Q    Has she left the company all
14 together?
15  A    Yes.
16  Q    Do you know when she left?
17  A    I don't remember if it was last year,
18 the end of last year.  I don't remember the time
19 exactly.
20  Q    You think it was at the end of 2006?
21  A    I don't remember.
22  Q    Okay.  Did Ms. Debose ever supervise
23 you?
24  A    No.
25  Q    Did you ever supervise Ms. Debose?
Page 51

1 take his as well and they were all in management
2 after the fact.
3  Q    After what fact?
4  A    After the fact that they were already
5 managers and they had to go back and take a
6 placement test that they should have taken before
7 they went into management.
8  Q    This is all what Ms. Cynthia Debose
9 is telling you or has told you?
10  A    Yes, and I asked to confirm this to
11 make sure that she wasn't lying.
12  Q    Who did you ask?
13  A    I did ask Ryan Brown did he have to
14 take the management placement test and he told me
15 he did not.  He just recently took it.  I don't
16 remember what the date was but it hasn't been
17 that long but before he moved to his other
18 position.
19  Q    How do you know Mr. Brown took this
20 management test?
21  A    He told me.
22  Q    Do you have any other evidence
23 supporting your belief that he took this test?
24  A    I don't.
25  Q    When did he tell you that he took the
Page 53

14  (Pages 50 to 53)

1 test?

2    A    It was in September, September, gosh,

3 I don't remember, maybe September '05.

4    Q    Is when he told you that he took the

5 test?

6    A    No, I don't remember.

7    Q    What job position does Mr. Brown have

8 currently?

9    A    He's a package car driver.

10    Q    What position did he tell you that he

11 took a management test for?

12    A    It wasn't a management test. It was

13 a placement test that they could not find on him.

14    Q    Did he tell you why he took that

15 placement test?

16    A    No.

17    Q    Do you know what position Mr. Brown

18 was in before he became a package car driver?

19    A    He was a part-time supervisor with

20 me.

21    Q    In the local sort?

22    A    Yes.

23    Q    Is there any other information you

24 believe Cynthia Debose has regarding any of your

25 claims other than the position, the OMS position

Page 54

---

1 in front of Tammy Nelson?

2    A    Yes, in front of Tammy and Tammy is

3 aware of Ryan -- Ryan told me and Tammy also,

4 Tammy Nelson that he did not take the management

5 placement test, that Robert just put him in there

6 and he had to take it before he moved to the next

7 level because they could not find his test.

8    Q    So you don't remember when Ms. Brown

9 told you that she took the test?

10    A    Ms. Debose.

11    Q    Ms. Debose, I'm sorry.

12    A    No.

13    Q    Okay. Do you know when -- did

14 Mr. Brown tell you when he took the test?

15    A    I don't remember. I do not remember

16 the date exactly but he told me, Tracy, I had to

17 take the test and he felt as if that Tammy told

18 because he had to take the test because he told

19 me and Tammy that he did not have to take the

20 management placement test.

21    Q    And you lost me there, I'm sorry.

22 You were talking with Mr. Brown and Tammy Nelson?

23    A    Yes.

24    Q    And what did he say regarding Tammy?

25    A    Well, at the time that me and Ryan

Page 56

---

1 that she was interested in and the other people

2 that she thinks were also interested in or got

3 that position?

4    A    Not that I'm aware of.

5    Q    And Ms. Debose has never given you a

6 written statement, right?

7    A    No.

8        MR. TUCKER: Let's take a break.

9        (Whereupon, a short recess was

10 taken.)

11        MR. TUCKER: Back on the record.

12    Q    Back to Cynthia Debose. When did

13 Ms. Debose tell you that she had to take a

14 management placement test?

15    A    I do not remember the exact date. I

16 don't remember the exact date. I do not

17 remember. I know she came out to UPS through

18 Kelly's Temporary Services and she wanted to

19 become a UPS employee and she told me that Alicia

20 Palauchi informed her on taking the management

21 placement test and that she had to take it and

22 Ryan Brown was out there to take it and me and

23 Tammy Nelson was there. She told me in front of

24 Tammy Nelson.

25    Q    Ms. Debose told you this information

Page 55

---

1 was talking, Tammy wasn't there but he told me

2 that he had to take the management placement test

3 and the reason being he had to take the test was

4 because he felt as if Tammy Nelson had went and

5 complained on him because he had told us that he

6 did not have to take the test because me and

7 Tammy had to take the management placement test

8 in order to be a supervisor at UPS.

9    Q    And Mr. Brown first told you that he

10 didn't have to take it and later told you that he

11 actually did take it?

12    A    No, he actually went back to take it.

13    Q    Did he -- so he always told you that

14 he did, in fact, take the test?

15    A    He did not take the test.

16    Q    I'm sorry. Mr. Ryan Brown told you

17 that he did not take the test?

18    A    Yes.

19    Q    Do you remember when he told you

20 that?

21    A    I don't remember when he told me. He

22 just always told me that he didn't have to

23 take the management placement test.

24    Q    And now are you saying that you

25 learned sometime after that that he did, in fact,

Page 57

15 (Pages 54 to 57)

1 take the management placement test?
2    A    After.  He just took this test maybe
3 -- I don't want to give you the wrong date but it
4 wasn't that long ago.  He had to go back to take
5 the test but he hadn't took the test prior to him
6 being in management.
7    Q    And the reason you know he went back
8 and took it is simply because he told you that he
9 did?
10    A    He told me.
11    Q    Okay.  So at one point in the past,
12 he told you he didn't have to take it and now
13 recently he's told you that he did take it?
14    A    He had to take it.
15    Q    Okay.  And is there anything that
16 Ms. Tammy Nelson told you in this regard about
17 Mr. Brown or Ms. Debose taking the test or not
18 taking the test?
19    A    No, she just -- she's aware of them,
20 you know, who took the test and who didn't take
21 the test.
22    Q    Okay.  She was present when you had
23 some conversations with Mr. Brown?
24    A    Yes, she was there when Ryan told us
25 that he didn't take the test.

Page 58

1    Q    Okay.  When you say that Mr. Brown
2 told you recently that he did take the test, do
3 you believe that that was in 2006 or later?
4    A    Or later.
5    Q    Okay.  Let me just shift gears here,
6 Ms. Lampkin, just for a second and get some
7 general information from you so I don't forget.
8         Is your full legal name Tracy Debose
9 Lampkin?
10    A    Yes.
11    Q    Is Debose your maiden name?
12    A    Yes.
13    Q    Do you have a middle name?
14    A    Yvette.
15    Q    Have you ever gone by -- I'm sorry.
16    A    Go ahead.
17    Q    Have you ever gone by any other name
18 other than Tracy Yvette Debose Lampkin?
19    A    No.
20    Q    Is your social security number
21
22    A    Yes.
23    Q    Is your date of birth May 24, 1970?
24    A    Yes.
25    Q    Were you born in Dothan, Alabama?

Page 59

1    A    Yes.
2    Q    Is your current address still
3         n Cottonwood, Alabama?
4    A    Yes.
5    Q    And is the zip code there 36320?
6    A    Yes.
7    Q    Is your residence there on Trapper
8 Ridge a house or an apartment?
9    A    A house.
10    Q    Do you own the house or rent?
11    A    No.
12    Q    You rent it?
13    A    Well, I'm buying it, me and my
14 husband.
15    Q    You have a mortgage on the house?
16    A    Yes.
17    Q    How long have you lived there on
18 Trapper Ridge?
19    A    Two years.
20    Q    What was your address just prior to
21 living on Trapper Ridge?
22    A
23    Q    Is that D-o-n-n-i-e?
24    A    M-a-e Drive.
25    Q    Is that in Dothan?

Page 60

1    A    Yes.
2    Q    How long did you live there on
3
4    A    '94 until two years ago.
5    Q    And do you remember your address
6 before living on
7    A
8    Q    Is that S-a-u-n-d-e-r-s?
9    A    Yes.
10    Q    Is that in Dothan?
11    A    Yes.
12    Q    And do you remember the years that
13 you lived there on
14    A    No.
15    Q    Do you recall if that
16         the only address you lived at after high
17 school, after graduating high school?
18    A    I don't remember.
19    Q    Okay.
20    A    I don't remember the address.
21    Q    And you are currently married,
22 correct?
23    A    Yes.
24    Q    What is your husband's name?
25    A    Kim Lampkin.

Page 61

16  (Pages 58 to 61)

1  Q    Is that K-e-n?
2  A    K-i-m.
3  Q    I'm sorry.  And when were you married
4 to Mr. Lampkin?
5  A    March 12, '98.
6  Q    What is Mr. Lampkin's, your husband's
7 occupation?
8  A    Pressure washing.
9  Q    Does he work for a company or his own
10business?
11  A    Own company.
12  Q    What's the name of that company?
13  A    Lampkin Pressure Service.
14  Q    Is that company located in Dothan?
15  A    Yes.
16  Q    Is that a corporation?
17  A    No.
18  Q    Just a sole proprietorship?
19  A    Yes.
20  Q    And your husband is the only owner?
21  A    Yes.
22  Q    Do you have any ownership interest in
23Lampkin Pressure Service yourself?
24  A    No.
25  Q    How long has your husband had the

Page 62

1 Lampkin Pressure Service business?
2  A    Over ten years.
3  Q    How many employees does he have?
4  A    One.
5  Q    Just him?
6  A    Well, two, I'm sorry.
7  Q    And that's your husband and someone
8 else?
9  A    Yes.
10  Q    Who is the other employee?
11  A    James Walker.
12  Q    Have you ever been married prior to
13your marriage to Mr. Kim Lampkin?
14  A    No.
15  Q    Do you have children?
16  A    Yes.
17  Q    How many?
18  A    Two.
19  Q    Their ages?
20  A    Eighteen, fourteen.
21  Q    Do they both live with you?
22  A    Yes.
23  Q    Are both of those children Mr. Kim
24Lampkin's?
25  A    Yes.

Page 63

1  Q    Anyone other than your husband and
2 your two children that lives with you?
3  A    No.
4  Q    What other family members either by
5 blood or marriage do you have in the Dothan area?
6  A    My mother, father, brothers and
7 sisters.
8  Q    Can I have your mother's and father's
9 name, please?
10  A    Graham Debose.
11  Q    Could you spell that, please?
12  A    G-r-a-h-a-m Debose and Sarah Debose.
13  Q    And your brothers and sisters, could
14I have their names, please?
15  A    Yes, Billy Debose, Tony Debose,
16Alexander Debose, John Debose, Al Debose, Dexter
17Debose, Letecia Debose.
18  Q    Could you spell that, please?
19  A    I'm sorry, Letecia is L-e-t-e-c-i-a
20and she is a Wheford, W-h-e-f-o-r-d.
21  Q    That's her married name?
22  A    Yes.
23  Q    Okay.
24  A    Tomeka Webb, T-o-m-e-k-a.
25  Q    W-e-b-b?

Page 64

1  A    W-e-b-b and Pamela Debose.
2  Q    And they all live in the Dothan area?
3  A    Yes, I'm sorry, Al lives in
4 Montgomery.
5  Q    Okay.  Any grandparents in the Dothan
6 area?
7  A    No.
8  Q    Any aunts or uncles in the Dothan
9 area?
10  A    Yes.
11  Q    Can I have their names, please?
12  A    Fannie Ash, F-a-n-n-i-e H-a-s-h,
13A-s-h; Josephine Debose, Lula Victors, Charles
14Victors, Christine Doss, Billy Ray Doss, Helen
15Dawsay, Wiley Dawsay.
16  Q    Could you spell that name, please?
17  A    W-i-l-e-y, Dawsay, D-a-w-s-a-y.
18  Q    And Christine's husband's name was?
19  A    Billy Ray.  Ruby Nell Griffin and
20Robert Griffin.
21  Q    Any other family members other than
22second cousins, third cousins, people that are
23extended that live in the Dothan area?
24  A    You want first cousins?
25  Q    No.  Outside of Dothan but still in

Page 65

17  (Pages 62 to 65)

1 the Montgomery area, Montgomery being where this
2 case is pending, any other family members in that
3 area other than the ones that you named?
4    A
5    Q    Who is she?
6    A    She's my niece.
7    Q    Anyone else?
8    A    No.
9    Q    And how old is
10   A
11   Q    Were you raised in Dothan, Alabama?
12   A    Uh-huh, yes.
13   Q    Did you graduate from Rehobeth High
14 School in Dothan?
15   A    Yes.
16   Q    Did I pronounce that correctly?
17   A    Yes.
18   Q    Did you graduate from Rehobeth in
19 1989?
20   A    Yes.
21   Q    And Rehobeth is in Dothan, Alabama,
22 right?
23   A    Rehobeth, Alabama.  It is its own
24 city now.
25   Q    Right next door to Dothan?

Page 66

1    A    Yes.
2    Q    Did you receive a standard diploma
3 from Rehobeth High School?
4    A    Yes.
5    Q    And you didn't attend college after
6 you graduated from Rehobeth, did you?
7    A    No.
8    Q    You don't have any college degree of
9 any sort?
10   A    No.
11   Q    You don't have an associate's degree?
12   A    No.
13   Q    You don't have a bachelor's degree?
14   A    No.
15   Q    You don't have a master's degree?
16   A    No.
17   Q    You haven't completed any other
18 formal education since high school such as a
19 technical school or a vocational school, have
20 you?
21   A    I have.
22   Q    Tell me about that.
23   A    Well, I was working with Meadow Gold
24 and they sent us to a technical school.  It was
25 brief before they closed down.

Page 67

1    Q    You were working with who, I'm sorry?
2    A    Meadow Gold.
3    Q    Okay.  I'm going to ask you about
4 your jobs in just a minute.
5        What kind of a school did Meadow Gold
6 send you to?
7    A    It was a technical school.
8    Q    Do you remember the name of the
9 school?
10   A    No, I don't because it's no longer
11 there.
12   Q    Where was it located, the technical
13 school?
14   A    The school was on Ross Clark Circle.
15   Q    In Dothan?
16   A    Yes.
17   Q    Do you remember, approximately, the
18 year and/or month when you went to this technical
19 school in Dothan?
20   A    No.
21   Q    How long did you go there?
22   A    I don't remember.
23   Q    Was it less than a year?
24   A    Yes.
25   Q    Were you working full-time at the

Page 68

1 time you went there?
2    A    Yes.
3    Q    How often did you go per week if you
4 remember?
5    A    I don't remember.  I just know it was
6 after work.
7    Q    Did you get any kind of degree from
8 that technical school?
9    A    No, basic training.
10   Q    Basic training on -- tell me --
11   A    Basic training on computer skills,
12 working as a machine operator so it was basic
13 skills on machines, computers.
14   Q    What type of machines?
15   A    Ice cream sandwich machine and push
16 up.
17   Q    No other kind of training?
18   A    No.
19   Q    Did you receive any kind of a
20 certificate from that technical school?
21   A    I don't remember.
22   Q    Okay.  Since high school, any other
23 education or training at a technical or a
24 vocational school?
25   A    No.

Page 69

18  (Pages 66 to 69)

1  Q    Have you ever served in the U.S.
2 Armed Forces?
3  A    No.
4  Q    Aside from the charge that you filed
5 with the EEOC against UPS, have you ever filed a
6 charge of discrimination with the EEOC or any
7 other agency?
8  A    No.
9  Q    Have you filed only the one charge
10 against UPS?
11  A    Only the one charge.
12  Q    Other than the current lawsuit that
13 we're here talking about today that you have
14 against UPS, have you ever filed a lawsuit
15 against any entity or person?
16  A    No.
17  Q    Have you ever participated in any
18 other way in any other lawsuit?
19  A    No.
20  Q    Have you ever been sued yourself?
21  A    Yes.
22  Q    By who?
23  A    I was -- Joann Bell, Joann Powe.
24  Q    I'm sorry.
25  A    Joann Powe.

Page 70

1 actually file something with the court?
2  A    She did.
3  Q    And you got a copy of it?
4  A    I don't have a copy of it.
5  Q    But you did at that time?
6  A    But we did go to court, yes.
7  Q    Do you remember what year that was?
8  A    No, I don't.
9  Q    Was that before you began working for
10 UPS?
11  A    No.
12  Q    It was since?
13  A    Was it before I worked for UPS, it
14 was before.
15  Q    Okay.  Was the only thing at issue
16 then this car accident?
17  A    Yes.
18  Q    Was Ms. Powe the only -- to your
19 knowledge, the only other party in the suit?
20  A    Her daughter.
21  Q    Her daughter also?
22  A    Yes.
23  Q    Do you remember her name?
24  A    I don't remember her name.
25  Q    Were you the only person that

Page 72

1  Q    Could you spell that, please?
2  A    P-o-w-e.
3  Q    Is Bell also part of her name?
4  A    Yes.
5  Q    Is it Joann Bell Powe?
6  A    She's married, that's a maiden --
7 married name.
8  Q    Okay.
9  A    And when you said "sued," are you
10 referring to -- she tried to sue me.
11  Q    Someone actually sued you in some
12 court somewhere?
13  A    It was an attempt but it was thrown
14 out.
15  Q    So tell me a little bit more about --
16 I'll refer to her as Ms. Joann Powe.
17  A    Yeah, Powe.
18  Q    What did she do to attempt to sue
19 you?
20  A    Her daughter ran into my vehicle and
21 hit it on the right side and it was right at
22 dusk, dawn and she felt as if I was responsible
23 for it but I wasn't.  It was thrown out of the
24 court system.
25  Q    But to your knowledge, Ms. Powe did

Page 71

1 Ms. Powe sued?
2  A    Yes.
3  Q    And you say the court threw that case
4 out?
5  A    Yes.
6  Q    Do you remember the court it was in?
7 Was it in Dothan?
8  A    It was in the Houston County Court
9 System and she was actually suing the insurance
10 company but I was involved with it.
11  Q    Who was your insurance company?
12  A    I do not remember.
13  Q    Did you pay any money out in that
14 suit?
15  A    None.
16  Q    Do you know if there was any judgment
17 entered against you personally?
18  A    None.
19  Q    Have you ever participated in a
20 lawsuit in any way regarding your husband's
21 business?
22  A    No.
23  Q    Do you know if his business has ever
24 been involved in any lawsuits?
25  A    None.

Page 73

19 (Pages 70 to 73)

**Esquire Corporate Services**
**(888)486-4044**

1    Q    Have you ever filed for bankruptcy?
2    A    No.
3    Q    Has your husband ever filed for
4 bankruptcy?
5    A    No.
6    Q    Have you ever been convicted of any
7 crime other than --
8    A    No.
9    Q    -- speeding or traffic --
10    A    No.
11    Q    Have you ever pled guilty to any kind
12 of a crime?
13    A    No.
14    Q    Have you ever pled no contest to any
15 type of a criminal charge?
16    A    No.
17    Q    Have you ever been arrested?
18    A    No.
19    Q    Have you ever been charged with any
20 kind of a criminal offense other than a traffic
21 violation?
22    A    No.
23    Q    Okay. Let's talk about your
24 employment now, Ms. Lampkin. What I want to talk
25 about is your employment both before and any

Page 74

---

1    A    Yes.
2    Q    Is that --
3    A    Correction. This was submitted to
4 the unemployment office and they gave it to UPS.
5    Q    Which unemployment office?
6    A    In Dothan.
7    Q    And you submitted it to that office
8 in January of 1997?
9    A    Yes.
10    Q    Is everything you wrote on the
11 application truthful?
12    A    Yes.
13    Q    And did you provide the full and
14 complete information asked for on the
15 application?
16    A    Yes.
17    Q    Immediately before beginning work for
18 UPS in January of 1997, did you work for a
19 company called Aladan?
20    A    Aladan.
21    Q    Aladan?
22    A    Yes.
23    Q    A-l-a-d-a-n?
24    A    Yes.
25    Q    And did you work for Aladan in

Page 76

---

1 employment you had during the time you've been at
2 UPS.
3    A    Yes.
4    Q    You began working for UPS in January
5 of 1997, correct?
6    A    Yes.
7       MR. TUCKER: Can we mark this as
8 Exhibit 1, please, ma'am?
9       (The document referred to was marked
10 as Defendant's Exhibit 1 and is attached
11 hereto.)
12       (Handing document.)
13       (Witness reviewing document.)
14    Q    Please look at Exhibit 1, Ms.
15 Lampkin. Do you recognize that document marked
16 as Exhibit 1?
17    A    Yes.
18    Q    Is this the application you submitted
19 to UPS for a part-time employment position?
20    A    Yes.
21    Q    And is that your signature on the
22 second page of the application?
23    A    It is.
24    Q    Did you submit this application to
25 UPS on January 13th, 1997?

Page 75

---

1 Dothan?
2    A    Yes.
3    Q    Does Aladan have any locations
4 outside of Dothan?
5    A    I don't know.
6    Q    What type of a business is Aladan?
7    A    It was a condom and glove
8 manufacturer.
9    Q    Condom and glove manufacturer?
10    A    Yes.
11    Q    And did you work for Aladan from 1994
12 through January of 1997?
13    A    Yes.
14    Q    What did you do for Aladan when you
15 first began working there?
16    A    I was a condom -- put condoms on a
17 mold.
18    Q    Okay. Was there a job title for
19 that?
20    A    No.
21    Q    You were working with a machine
22 called a mold or several molds?
23    A    It was several molds in there.
24    Q    And you worked with those molds
25 making or shaping the condoms?

Page 77

---

20 (Pages 74 to 77)

**Esquire Corporate Services**
**(888)486-4044**

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | What was your position when you left |
| 3 Aladan? Was it the same position? | | |
| 4 | A | When I left Aladan? |
| 5 | Q | Uh-huh. |
| 6 | A | When I left Aladan, I worked for |
| 7 Wesley Manor for a month. | | |
| 8 | Q | Do you remember was that like the end |
| 9 of '96? | | |
| 10 | A | No, it was after I left Aladan so it |
| 11 was probably around -- gosh, I don't remember | | |
| 12 this. It wasn't long. I don't remember. | | |
| 13 | Q | But you went to work for UPS in |
| 14 January of '97? | | |
| 15 | A | '97, right so it was in the later |
| 16 part or -- gosh, '96. It was in '96 but briefly | | |
| 17 a month so it had to be then. I don't know. | | |
| 18 | Q | What is Wesley Manor, what kind of a |
| 19 company is that? | | |
| 20 | A | It's a retirement home. |
| 21 | Q | Right before you went to Wesley |
| 22 Manor, before you left Aladan, what was your last | | |
| 23 position at Aladan? | | |
| 24 | A | Glove, I was in glove packing. |
| 25 | Q | And why did you leave Aladan? |

Page 78

| | | |
|---|---|---|
| 1 you left Aladan, at the time you left or just | | |
| 2 before you left? | | |
| 3 | A | Yes. |
| 4 | Q | Did you have any disciplinary |
| 5 write-ups of any kind while you were at Aladan? | | |
| 6 | A | No. |
| 7 | Q | Did you receive performance |
| 8 evaluations at Aladan? | | |
| 9 | A | No. |
| 10 | Q | And you never served in any |
| 11 supervisor or management position while at | | |
| 12 Aladan, did you? | | |
| 13 | A | No. |
| 14 | Q | And what was your -- when you left |
| 15 Aladan, then you went to Wesley Manor for about | | |
| 16 one month or less? | | |
| 17 | A | Yes. |
| 18 | Q | What did you do at Wesley Manor? |
| 19 | A | I worked in the kitchen. |
| 20 | Q | Were you a cook? |
| 21 | A | I was a prep. |
| 22 | Q | And how much were you paid in that |
| 23 position at Wesley Manor? | | |
| 24 | A | I don't remember. |
| 25 | Q | Were you paid by the hour? |

Page 80

| | | |
|---|---|---|
| 1 | A | I just wanted a change, a change in |
| 2 job. | | |
| 3 | Q | So you wanted something new? |
| 4 | A | Yes. |
| 5 | Q | Was your employment at Aladan |
| 6 full-time or part-time? | | |
| 7 | A | Full-time. |
| 8 | Q | The whole time you were there? |
| 9 | A | Yes. |
| 10 | Q | When you left Aladan, were you being |
| 11 paid six dollars and nineteen cents per hour? | | |
| 12 | A | I don't remember but it says it on |
| 13 here, yes (indicating). | | |
| 14 | Q | Is that what you wrote on your |
| 15 employment application for UPS? | | |
| 16 | A | Yes. |
| 17 | Q | Would that be correct? |
| 18 | A | Yes, if I wrote it, yes. |
| 19 | Q | Okay. And since you were a full-time |
| 20 worker on a full-time basis, six dollars and | | |
| 21 nineteen cents per hour, you were earning, | | |
| 22 approximately, thirteen thousand dollars per | | |
| 23 year; is that right? | | |
| 24 | A | Yes. |
| 25 | Q | Was Rick Carr your supervisor when |

Page 79

| | | |
|---|---|---|
| 1 | A | Hour. |
| 2 | Q | Do you remember who your supervisor |
| 3 was there? | | |
| 4 | A | I don't. |
| 5 | Q | And were you working full-time for |
| 6 Wesley Manor in the short time that you were | | |
| 7 there? | | |
| 8 | A | It was part-time. |
| 9 | Q | And you didn't serve in any |
| 10 supervisor or management position at Wesley | | |
| 11 Manor, did you? | | |
| 12 | A | No. |
| 13 | Q | Why did you leave Wesley Manor? |
| 14 | A | A better job. |
| 15 | Q | That being UPS? |
| 16 | A | Yes. |
| 17 | Q | At the time you submitted this |
| 18 application, Exhibit 1, to the unemployment | | |
| 19 office, you were working at Wesley Manor? | | |
| 20 | A | No, I wasn't working at that time. |
| 21 | Q | You weren't working anywhere? |
| 22 | A | No. |
| 23 | Q | Do you remember, approximately, how |
| 24 long you had been unemployed at that time? | | |
| 25 | A | No, I don't. |

Page 81

21 (Pages 78 to 81)

**Esquire Corporate Services**
**(888)486-4044**

1  Q    So when you left Wesley Manor, you
2 didn't know that -- you had not even submitted an
3 application --
4    A    I had put in an application at UPS.
5 I had went to the unemployment office and put the
6 application in and prior to the application, I
7 had -- I went ahead and left the job.  I quit the
8 job actually.
9    Q    At Wesley Manor?
10   A    At Wesley Manor.
11   Q    And the application you had put in
12before you quit Wesley Manor is Exhibit 1, the
13one in front of you?
14   A    Yes.
15   Q    Did you have any disciplinary
16write-ups of any kind while you were at Wesley
17Manor?
18   A    None.
19   Q    Did you get any performance
20evaluations at Wesley Manor?
21   A    None.
22   Q    Prior to working for Aladan, did you
23work -- immediately prior to working for Aladan,
24did you work for Meadow Gold?
25   A    Yes.

Page  82

1  Q    Did you work for Meadow Gold in
2 Dothan, Alabama?
3    A    Yes.
4    Q    And what type of a business is Meadow
5 Gold?
6    A    Ice cream operation.
7    Q    They have plants all over?
8    A    Well, they did at once upon a time.
9    Q    They don't now?
10   A    No, they closed down.
11   Q    The whole company is closed?
12   A    Well, just the one in Dothan is
13closed.  I don't know about other states.
14   Q    You only worked in Dothan for your
15time there?
16   A    Yes.
17   Q    And did you work for Meadow Gold in
18Dothan from, approximately, January 1990 through
191994?
20   A    I don't remember when they closed.
21It was '93, that's what I put on here
22(indicating).
23   Q    Okay.  So you worked there from 1990
24through 1993, Meadow Gold?
25   A    Yes.

Page  83

1  Q    When you first started working for
2 Meadow Gold in 1990, what was your job there?
3    A    I was a machine operator.
4    Q    What kind of a machine did you
5 operate or machines?
6    A    The ice cream sandwich machine and
7 the push up machine.
8    Q    The push up, is that the neat little
9 ice cream treat that you --
10   A    Yes.
11   Q    I remember those.  And did you work
12as a machine operator throughout your employment
13at Meadow Gold?
14   A    Yes.
15   Q    You worked on those same two machines
16the whole time?
17   A    I worked on the nutter butter machine
18every now and then, not every day.
19   Q    Any other machines that you operated?
20   A    That was all.
21   Q    And did you work full-time or
22part-time for Meadow Gold?
23   A    Full-time.
24   Q    And when you left Meadow Gold, were
25you being paid nine dollars and seventy-one cents

Page  84

1 per hour?
2    A    Yes.
3    Q    And on a full-time basis, that's,
4 approximately, twenty thousand dollars per year;
5 is that right?
6    A    Yes.
7    Q    Who was your supervisor when you --
8 right before you left Meadow Gold?
9    A    I do not remember his name.
10   Q    Okay.  Did you receive any
11disciplinary write-ups of any kind while you were
12at Meadow Gold?
13   A    No.
14   Q    Did you get any performance
15evaluations while you were at Meadow Gold?
16   A    No.
17   Q    Why did you leave Meadow Gold?
18   A    They closed down.
19   Q    I'm sorry, you told me that.  Was
20there a -- strike that.  You didn't serve in any
21supervisor or management position while at Meadow
22Gold, did you?
23   A    No.
24   Q    Was there a period of time after the
25Meadow Gold plant closed and before you went to

Page  85

22  (Pages  82 to 85)

1 work for Aladan that you were unemployed?

2 A    It was a period of time. I don't

3 remember when but it was -- they closed down in

4 '93 and I started working for Aladan in -- I

5 don't remember the time but it was a time frame.

6 Q    Was Meadow Gold the first place you

7 worked after you graduated from high school?

8 A    No.

9 Q    What was the first place after high

10 school?

11 A    The first place after high school was

12 Hardies.

13 Q    The fastfood restaurant?

14 A    Yes.

15 Q    And which particular Hardies

16 restaurant did you work at?

17 A    Northside Hardies.

18 Q    Is that near Dothan?

19 A    Yes, it's in the Dothan -- by the

20 hospital, it's near Southeast Medical Center.

21 Q    Okay. And what did you do in your

22 job at Hardies?

23 A    I was a cashier.

24 Q    Do you remember how long you worked

25 for that Hardies?

Page 86

1 Q    Is Hardies the only place you worked

2 after high school before going to Meadow Gold?

3 A    McDonald's.

4 Q    Okay. This is also after high

5 school, right?

6 A    Well, it was during and after, yes,

7 McDonald's.

8 Q    Okay. Anywhere else?

9 A    Goody's.

10 Q    You worked in a McDonald's fastfood

11 restaurant?

12 A    Yes.

13 Q    What was your position there?

14 A    I was a cashier, cook.

15 Q    Did you work part-time or full-time

16 for McDonald's?

17 A    Part-time.

18 Q    Did you work in any supervisor or

19 management positions at McDonald's?

20 A    No.

21 Q    Did you have any disciplinary

22 write-ups while you were at McDonald's?

23 A    No.

24 Q    Did you get any performance

25 evaluations at McDonald's?

Page 88

1 A    No.

2 Q    Were you full-time or part-time at

3 Hardies?

4 A    Full-time.

5 Q    Do you remember what your pay was at

6 Hardies?

7 A    I don't remember.

8 Q    Did you work in any supervisor or

9 management positions at Hardies?

10 A    No.

11 Q    Did you receive any kind of

12 disciplinary write-ups of any kind while you were

13 at Hardies?

14 A    No.

15 Q    Did you receive any performance

16 evaluations while you were at Hardies?

17 A    No.

18 Q    Did you leave Hardies to take a

19 better job with better goals?

20 A    Yes.

21 Q    Do you remember who your supervisor

22 was at Hardies?

23 A    Susie Danzey.

24 Q    Spell her last name, please.

25 A    D-a-n-z-e-y.

Page 87

1 A    No.

2 Q    Goody's is a clothing store, right?

3 A    Goody's was a hair -- it dealt with

4 hair accessories.

5 Q    It sold hair accessories?

6 A    Yes.

7 Q    Did it sell anything else?

8 A    No, it wasn't selling, we made them,

9 Goody's manufacturer.

10 Q    Okay. In Dothan?

11 A    Yes.

12 Q    Was your specific job at Goody's to

13 make these accessories?

14 A    I was packing.

15 Q    You were packing. Did you work

16 full-time or part-time for Goody's?

17 A    Full-time.

18 Q    Do you remember what your pay was

19 there at Goody's?

20 A    I don't remember.

21 Q    Do you remember what your pay was at

22 McDonald's?

23 A    Well, McDonald's, when I first got a

24 job so it was three dollars or so.

25 Q    You were paid by the hour?

Page 89

23  (Pages 86 to 89)

```
1   A   Yes.
2   Q   Were you paid by the hour by Goody's?
3   A   Yes.
4   Q   You were paid by the hour by Hardies
5 too?
6   A   Yes.
7   Q   Did you have any supervisor or
8 management positions while you were at Goody's?
9   A   No.
10  Q   Did you receive any disciplinary
11write-ups of any kind while you were at Goody's?
12  A   No.
13  Q   Did you receive any performance
14evaluations at Goody's?
15  A   No.
16  Q   Other than the companies and
17businesses that we just talked about, have you
18ever applied for work at any other places since
19high school?
20  A   I applied for full-time management at
21UPS.
22  Q   Prior to UPS, any other places?
23  A   None.
24  Q   So all of your employment prior to
25going to UPS was hourly paid jobs, right?
                                    Page 90
```

```
1   A   No.
2   Q   Since you began working at UPS, have
3 you sought employment anywhere else?
4   A   No.  Yes, I have.  Since I've been
5 employed with UPS now?
6   Q   Yes, ma'am.
7   A   Yes, I have.
8   Q   Who did you seek employment with?
9   A   FedEx.
10  Q   When did you seek employment with
11FedEx?
12  A   Two years ago.
13  Q   Do you remember the month in 2005?
14  A   No, I don't.
15  Q   But it was 2005?
16  A   Yes.
17  Q   Did you submit a job application to
18FedEx?
19  A   I did.
20  Q   And which particular FedEx location
21did you submit that application?
22  A   Ground.
23  Q   In Dothan?
24  A   Yes.
25  Q   Does FedEx have a package center
                                    Page 92
```

```
1   A   Yes.
2   Q   And at the time you started working
3 for UPS, you didn't have any management
4 experience, did you?
5   A   No, I was hourly first.
6   Q   And was the highest hourly rate that
7 you earned in your employment prior to UPS nine
8 dollars and seventy-one cents an hour?
9   A   Yes.
10  Q   And the hourly rate in your last job,
11just before you began working for UPS, Aladan,
12was six dollars and nineteen cents an hour?
13  A   Yes.
14  Q   Since you began working for UPS in
15January of '97, have you worked anywhere else
16other than UPS?
17  A   Besides Aladan?
18  Q   No, since you're -- you're a
19part-time worker at UPS, right?
20  A   Yes.
21  Q   And you've been part-time ever since
22you've been with UPS?
23  A   Yes.
24  Q   Since you've been working at UPS
25part-time, have you worked anywhere else?
                                    Page 91
```

```
1 there in Dothan?
2   A   Yes.
3   Q   Why did you submit a job application
4 to FedEx ground there in Dothan in 2005?
5   A   I wanted different scenery as well.
6   Q   And what position did you apply for?
7   A   I just applied for any of the
8 positions that was available.
9   Q   You didn't list any specific
10position?
11  A   Management wise.  I specifically told
12them management, if they had anything available
13in management.
14  Q   Did you keep a copy of the
15application that you gave to FedEx?
16  A   No.
17  Q   Did they -- did FedEx interview you?
18  A   They talked with me.  I don't
19remember his name.  He talked with me.
20  Q   Over the phone or in person?
21  A   In person.
22  Q   And do you remember the job title of
23that person?
24  A   No.
25  Q   He was in management?
                                    Page 93
```

24 (Pages 90 to 93)

**Esquire Corporate Services**
**(888)486-4044**

1   A    Yes.
2   Q    Did FedEx ever offer you a job?
3   A    No.
4   Q    After you talked with the gentleman
5 in the interview, did you have any other
6 communication with FedEx after that?
7   A    No.
8   Q    You haven't pursued a job with FedEx
9 since that time?
10  A    No.
11  Q    Any other places other than FedEx
12 that you sought employment since you've been
13 working with UPS?
14  A    I sought unemployment -- I had went
15 down to take fingerprints for the Houston County
16 School System but I haven't turned in my
17 paperwork.
18  Q    What paperwork, like an application?
19  A    You have to have fingerprints and
20 they have to -- you have to submit them and turn
21 them in to the state.
22  Q    Have you submitted anything to the
23 Houston County School System or the state
24 regarding a job with the Houston County Schools?
25  A    No, I haven't turned it in.

                                        Page 94

1   Q    You haven't submitted an application?
2   A    No.
3   Q    You just went out on your own and got
4 the fingerprints to prepare?
5   A    Well, I got the application from
6 them, I'm sorry.
7   Q    Okay.
8   A    I did get the application from them.
9   Q    When did you get this application
10 from the Houston County School System?
11  A    Over two years ago.
12  Q    So in 2004 or earlier?
13  A    No, it was in '05.
14  Q    And what position were you interested
15 in applying for in the Houston County School
16 System?
17  A    Substitute teaching.
18  Q    Any particular subject?
19  A    Elementary, no subjects, just
20 elementary school.
21  Q    Anywhere else other than FedEx and
22 the Houston County School System that you applied
23 in any way for a job while at UPS?
24  A    No.
25  Q    And you haven't formally applied with

                                        Page 95

1 the Houston County School System?
2   A    Right, correct.
3   Q    Okay. Have you ever been
4 self-employed, working for yourself?
5   A    I have cleaned houses before.
6   Q    When was that?
7   A    Before UPS in '06.
8   Q    Just on a part-time basis?
9   A    Yes.
10  Q    Did you actually ever have any kind
11 of business name or business organization for the
12 work that you did?
13  A    No.
14  Q    Have you ever been fired from a job?
15  A    No.
16  Q    At any time in your life?
17  A    No.
18  Q    When you went to work for UPS in
19 January of 1997, was your first position there as
20 a part-time loader and unloader?
21  A    I was actually working in the small
22 sort area.
23  Q    In the Dothan center?
24  A    Yes.
25  Q    You were a part-time sorter in small

                                        Page 96

1 sorts?
2   A    Yes, I was a bagger.
3   Q    Tell me what you mean by "small
4 sorts," what is that area?
5   A    Small sorts is where you containerize
6 all small packages under a certain weight at that
7 time and I had a sorter and I was the person that
8 was bagging the small -- putting them down into
9 the bags.
10  Q    Okay. And as a bagger, you were an
11 hourly employee?
12  A    I was.
13  Q    You were a union employee?
14  A    I was.
15  Q    How long did you work as a bagger in
16 the small sorts area?
17  A    I don't remember the exact time.
18  Q    Do you think it was a year?
19  A    It was a year.
20  Q    And after you worked as a part-time
21 bagger for that year or so, what was your next
22 position?
23  A    I became a sorter then.
24  Q    Still in small sorts?
25  A    Yes, I was a skilled sorter.

                                        Page 97

                        25 (Pages 94 to 97)

**Esquire Corporate Services**
**(888)486-4044**

1   Q    Is that an hourly union position?

2   A    Yes.

3   Q    And just so I don't keep asking you,

4 all of your employment with UPS has been at the

5 Dothan center, right?

6   A    Yes.

7   Q    Okay.  When you were -- let's strike

8 that.  How long did you work as a part-time

9 skilled sorter in the small sorts department?

10  A    Over a year.

11  Q    And what was your next job after

12 that?

13  A    Clerk position.

14  Q    A part-time clerk?

15  A    Yes.

16  Q    Was it just clerk or was there any

17 other name?

18  A    It was multi.  It was clerk position

19 air.  I worked in the air position and I also

20 worked with the DIAD clerk position.

21  Q    So you were a part-time clerk that

22 worked in the function regarding air packages and

23 with the DIADs?

24  A    Yes.

25  Q    And the DIADs are the computer --

Page 98

1 loader or an unloader?

2   A    No, but when you're hired, that's

3 what they used to say, load and unload.

4   Q    Okay.  In the time that you worked in

5 small sorts both as the bagger and the skilled

6 sorter, did you ever supervise anyone?

7   A    No.

8   Q    Did you have the authority to hire or

9 fire anyone in small sorts?

10  A    No.

11  Q    Did you have the authority to give

12 anybody any raises in small sorts?

13  A    No.

14  Q    Do you remember who your immediate

15 supervisor was in small sorts?

16  A    At the time it was Henry Hall.

17  Q    And was he your supervisor both as a

18 bagger and when you were a skilled sorter?

19  A    Yes.

20  Q    And Mr. Hall was -- is his job title

21 full-time supervisor?

22  A    Yes.  I'm sorry, before Henry Hall,

23 it was also Larry Skeen, S-k-e-e-n.

24  Q    Do you remember, approximately, when

25 Mr. Hall became your supervisor?

Page 100

1   A    Yes.

2   Q    Do you know what DIAD stands for

3 because I don't?  If you don't, that's okay.

4   A    No.

5   Q    As a part-time clerk, were you an

6 hourly union employee?

7   A    Yes.

8   Q    And how long did you work as a

9 part-time clerk?

10  A    Until December '01.

11  Q    Did you ever work as a part-time

12 loader or unloader?

13  A    That was the title.  I have helped

14 them out unloading but it wasn't a -- I wasn't

15 there permanently.  I have helped out.  At the

16 end of the night, I would go up and help unload,

17 help them out but basically I was mainly in the

18 small sort and the air and clerk positions.

19  Q    So you just temporarily, occasionally

20 while you were in small sorts in the clerk

21 position --

22  A    Go help out.

23  Q    -- helped out loading and unloading?

24  A    Yes.

25  Q    But you never had a job title as a

Page 99

1   A    I don't remember.

2   Q    But it was while you were still in

3 small sorts?

4   A    Yes.

5   Q    And was Mr. Skeen also a full-time

6 supervisor?

7   A    Yes.

8   Q    And when you were a part-time clerk

9 after you left small sorts, did you supervise

10 anyone in that position?

11  A    No.

12  Q    Did you have the authority to hire or

13 fire anyone as a part-time clerk?

14  A    No.

15  Q    Did you have the authority to give

16 anyone raises as a part-time clerk?

17  A    No.

18  Q    Who was your supervisor when you were

19 a part-time clerk?

20  A    Henry Hall.

21  Q    Okay.  I don't know if I asked you

22 this before, is Mr. Hall white or black?

23  A    Black.

24  Q    Is Mr. Skeen black or white?

25  A    White.

Page 101

26  (Pages 98 to 101)

**Esquire Corporate Services**
**(888)486-4044**

1  Q    In December of 2001, you were
2 promoted to a part-time supervisor position in
3 the local sort, right?
4  A    Yes.
5  Q    And at the time you were promoted,
6 you were working as a part-time clerk?
7  A    Yes.
8  Q    And Mr. Hall was your immediate
9 supervisor when you were promoted to part-time
10 supervisor?
11  A    Yes.
12  Q    And was Mr. Icenogle, Robert Icenogle
13 the center manager at the time you were promoted
14 to part-time supervisor?
15  A    No.
16  Q    Who was the center manager?
17  A    Burt Flood.
18  Q    Was Mr. Flood also the center manager
19 when you were a part-time clerk?
20  A    Yes.
21  Q    Was Mr. Flood also the center manager
22 when you were working in small sorts?
23  A    Yes.
24  Q    Did you know or remember when
25 Mr. Icenogle became the center manager?

Page 102

1  A    I don't remember exactly.
2  Q    And Mr. Flood is a black male, right?
3  A    Yes.
4  Q    As a part-time supervisor, you're not
5 an hourly employee, right?
6  A    Right.
7  Q    And you're not a union employee?
8  A    Right.
9  Q    And you have continuously worked as a
10 part-time supervisor in the local sort since
11 December of 2001?
12  A    Yes.
13  Q    And you're still employed by UPS in
14 that position today?
15  A    Yes.
16  Q    Have you now told me all of the
17 positions that you've held at UPS?
18  A    Yes.
19     MS. CASSILY: Go off-the-record for
20 a moment.
21     (Whereupon, an off-the-record
22 discussion was held.)
23     (Whereupon, a lunch recess was
24 taken.)
25     (The document referred to was marked

Page 103

1 as Defendant's Exhibit 2 and is attached
2 hereto.)
3     MR. TUCKER: Back on the record.
4  Q    Ms. Lampkin, you understand you're
5 still under oath?
6  A    Yes.
7  Q    All right. I want to show you what's
8 been marked as Exhibit 2.
9     (Handing document.)
10     (Witness reviewing document.)
11  Q    If you would take a look at that,
12 please and tell me if you recognize it.
13  A    Yes, I do.
14  Q    What is that, please, ma'am?
15  A    A charge of discrimination.
16  Q    All right. Is that your signature on
17 the bottom of the first page?
18  A    It is.
19  Q    Is this a charge of discrimination
20 you filed on November 3rd, 2005?
21  A    Yes.
22  Q    And did you file this with the EEOC?
23  A    Yes.
24  Q    Did you file it with the EEOC office
25 in Birmingham?

Page 104

1  A    Yes.
2  Q    And on the first page there, do you
3 see where it says cause of discrimination based
4 on?
5  A    Yes.
6  Q    It's marked race, color, sex and
7 retaliation; is that correct?
8  A    Yes.
9  Q    Did you draft this charge,
10 Ms. Lampkin, yourself?
11  A    My attorney drew it up for me at that
12 time.
13  Q    Okay. Was that Ms. Crook?
14  A    Yes.
15  Q    And do you recall when Ms. Crook
16 prepared the charge for you? Was it on November
17 3rd or just before then?
18  A    Just before then.
19  Q    Okay. How did you come about filing
20 this charge with the EEOC?
21  A    I had first called and spoke with
22 Ms. Crook about it and then she informed me that
23 I have to make a complaint with the EEOC.
24  Q    Okay. And you gave Ms. Crook the
25 information that she typed into this charge?

Page 105

27  (Pages 102 to 105)

1  A   Yes.
2  Q   Including everything on Page 2 and 3?
3  A   Yes.
4  Q   Okay.  And then on Page 3, there is
5 -- that's your signature on the line that says
6 charging party?
7  A   It is.
8  Q   And did you date it November 3rd,
9 2005?
10  A   Yes.
11  Q   Okay.  When did you first, you
12 yourself first talk with someone at the EEOC?
13  A   I do not remember.
14  Q   Was it before you filed this charge
15 or after?
16  A   I don't remember.
17  Q   Okay.  And you told me earlier you
18 talked with a -- was it Ms. Barreas --
19  A   Ms. Barreas.
20  Q   -- at the EEOC?  Is she the only
21 person at the EEOC that you talked with?
22  A   Yes.
23  Q   How many times have you talked with
24 Ms. Barreas?
25  A   More than five.

Page 106

1  Q   And Ms. Barreas is an investigator at
2 the EEOC?
3  A   Yes.
4  Q   Were those -- had you talked with Ms.
5 Barreas in person or has it all been over the
6 phone?
7  A   Over the phone.
8  Q   On the times when you talked with
9 Ms. Barreas, was your lawyer, Ms. Crook, also on
10 the phone?
11  A   No.
12  Q   What did you talk about with
13 Ms. Barreas on those telephone conversations?
14  A   To see if she received documentation
15 that I sent to her.
16  Q   Okay.  And what documents did you
17 send to her?
18  A   I sent to her a letter, my pay raise
19 difference.
20  Q   A letter that contained information
21 about a pay raise?
22  A   Yes.
23  Q   Okay.  Was that a letter from -- who
24 was that letter from?
25  A   From me.

Page 107

1  Q   From you?
2  A   Yes.
3  Q   It was a letter that you just typed
4 up to the investigator and in it you put some pay
5 raise information?
6  A   Yes, and a letter asking or
7 requesting for her to come down and do a physical
8 investigation of the center.
9  Q   Any other documents that you sent to
10 the EEOC?
11  A   No.
12  Q   Just those two letters?
13  A   No, it was more than two but that's
14 all that I could recall right now, those two
15 letters.
16  Q   Okay.  Do you recall when you sent
17 those two letters to the EEOC?
18  A   I don't recall.
19  Q   Do you still have a copy of those two
20 letters?
21  A   Yes.
22  Q   Have you given Ms. James a copy of
23 those letters?
24  A   I don't remember if I did or not.
25  Q   Do you remember the -- the first

Page 108

1 letter regarding your pay raise, do you remember
2 any more specifics about was it a pay raise for a
3 certain year or --
4  A   Yes, it was a pay raise for Year
5 2004.
6  Q   Okay.  And did you tell the EEOC in
7 that letter what exactly -- what raise you got in
8 2004?
9  A   Yes.
10  Q   And do you remember how much that
11 was?
12  A   Yes.
13  Q   How much was it?
14  A   Fifty dollars.
15  Q   Per day, week?
16  A   Month.
17  Q   Per month.  Are you paid in your job
18 as a part-time supervisor just once per month?
19  A   Twice.
20  Q   Twice per month.  Any other
21 information in that first letter you sent to the
22 EEOC other than telling the investigator about
23 your 2004 pay raise?
24  A   Well, it was basically comparing my
25 raise against Ryan Brown's raise --

Page 109

28  (Pages 106 to 109)

**Esquire Corporate Services**
**(888)486-4044**

1  Q    Okay.
2  A    -- is what was in the letter. I
3 specifically printed on a sheet that UPS had sent
4 back to the EEOC stating that Ryan Brown -- I
5 received a higher raise than Ryan Brown and I
6 sent the letter back to her stating that that was
7 incorrect, that I did not receive a higher raise
8 in '04, that Ryan Brown actually received a
9 higher raise than me in '04.
10  Q    And what's the sheet from UPS that
11 you're referring to?
12  A    A pay increase sheet.
13  Q    And did you see this pay increase
14 sheet?
15  A    Uh-huh.
16  Q    And where did you get it?
17    MS. JAMES:  Yes or no.
18    THE WITNESS:  Yes, I'm sorry, yes, I
19 did.
20  Q    And where did you get that?
21  A    From UPS.
22  Q    And did you say that you had talked
23 with the EEOC about this pay raise sheet that you
24 got from UPS?
25  A    Yes.  Sorry, I didn't talk.  Well, I

Page 110

1  A    It was correct.
2  Q    And it showed that you received a
3 higher raise than Mr. Brown in 2004?
4  A    No, it shows that Ryan received a
5 higher raise than me in 2004.
6  Q    And what did it show that Mr. Brown
7 received as a raise for 2004?
8  A    I think seventy dollars.
9  Q    Per month?
10  A    Yes.  Yes, I did give it to
11 Ms. James.
12  Q    Okay.  So you sent a copy of that pay
13 raise sheet along with your letter to the EEOC
14 regarding these 2004 pay raises?
15  A    Yes.
16  Q    Anybody in that letter that you
17 discussed other than you and Mr. Brown?
18  A    No.
19  Q    And the only thing you discussed
20 about you and Mr. Brown in the letter was the
21 2004 pay raises?
22  A    Yes.
23  Q    And the other letter that you recall
24 sending to the EEOC requesting an investigation
25 at the center, was there anything else in that

Page 112

1 faxed it to her and then I later called her and
2 told her about this sheet, how can it be true
3 when the sheet is saying different.
4  Q    But you didn't send the EEOC that UPS
5 sheet?
6  A    I faxed it to her.
7  Q    You did send that as well?
8  A    I did.
9  Q    Okay.  Do you still have a copy of
10 that UPS pay raise sheet that has Mr. Brown's
11 information on it?
12  A    Yes.
13  Q    Did you give a copy of that to
14 Ms. James?
15  A    I don't remember if I did or not.
16  Q    And who at UPS gave you that pay
17 raise sheet?
18  A    Ryan did.
19  Q    Mr. Brown?
20  A    Yes.
21  Q    And did you say that the information
22 on that sheet that Mr. Brown gave you was
23 incorrect?
24  A    No, it was correct.
25  Q    It was correct?

Page 111

1 letter other than that request?
2  A    No.
3  Q    Okay.  Did you receive a response in
4 writing from the EEOC regarding those two
5 letters, either one of them?
6  A    No.
7  Q    But you've talked with Ms. Barreas
8 over the phone about them?
9  A    Yes.
10  Q    What did she tell you on the phone,
11 anything about your request for them to come to
12 the Dothan center?
13  A    She didn't say any -- no.
14  Q    Did she tell you anything about I
15 talked with you specifically about the letter
16 regarding the 2004 pay raises?
17  A    No.
18  Q    What did you all talk about on the
19 phone?
20  A    Well, I much more did the talking.
21 She would only just listen and just say, you
22 know, a thorough investigation was done and that
23 was it.
24  Q    She told you that their investigation
25 was done?

Page 113

29  (Pages 110 to 113)

**Esquire Corporate Services**
**(888)486-4044**

```
1   A   Yes.
2   Q   By the EEOC?
3   A   Yes.
4   Q   Did you give Ms. Barreas or anyone
5 else at the EEOC names of potential witnesses?
6   A   I don't remember but I have a --
7 gosh, I don't remember.
8   Q   You don't remember if you did or
9 didn't?
10  A   I don't remember if I did or didn't.
11  Q   Did you give anyone at the EEOC any
12 written statements that anyone else had made or
13 given you?
14  A   No.
15  Q   Did you give the EEOC Mr. Sylvester
16 Whiters' affidavit?
17  A   No.
18  Q   Did you give the EEOC that letter
19 from Mr. Jones, I believe Jason Jones?
20  A   No.
21  Q   Have you seen UPS' written response
22 to your EEOC charge?
23  A   Yes.
24  Q   When did you see that?
25  A   When my attorney sent it to me.
```
                                        Page 114

```
1       as Defendant's Exhibit 3 and is attached
2       hereto.)
3           (Handing document.)
4           (Witness reviewing document.)
5   Q   Take a look at that, please.  Do you
6 recognize that document, Ms. Lampkin?
7   A   Yes.
8   Q   What is that document?
9   A   An amended complaint from Ms. James.
10  Q   Is this the amended complaint that
11 you had filed in this case?
12  A   Yes.
13  Q   Did you review this amended complaint
14 before it was filed?
15  A   As far as the allegations, yes.
16  Q   Did you review just a certain portion
17 of it or the whole thing?
18  A   The whole thing.
19  Q   Are the allegations and statements
20 contained in this amended complaint true and
21 correct?
22  A   Yes.
23  Q   And do you still intend to pursue all
24 of the claims in this amended complaint?
25  A   Yes.
```
                                        Page 116

```
1   Q   Ms. Crook?
2   A   It was after the investigation was
3 complete.
4   Q   Ms. Crook sent it to you?
5   A   Yes.
6   Q   Was it after -- did she send it to
7 you after the EEOC had actually closed its case,
8 to your knowledge?
9   A   I don't remember.
10  Q   Okay.  Did you keep a copy of that
11 response from UPS?
12  A   Yes.
13  Q   Did you give a copy of that to
14 Ms. James?
15  A   Yes.
16  Q   So Ms. Barreas is the only person at
17 the EEOC that you talked with, right?
18  A   That I remember, yes.
19  Q   Okay.  And you did not meet with Ms.
20 Barreas in person?
21  A   No.
22  Q   Do you recall meeting with anyone
23 else at the EEOC in person?
24  A   No.
25      (The document referred to was marked
```
                                        Page 115

```
1   Q   I want to review with you,
2 Ms. Lampkin, the claims that you are making in
3 the amended complaint and discuss them in more
4 detail as well as the facts that support those
5 claims.
6       First, as I understand it, you're
7 claiming in your suit that UPS denied you job
8 changes to which you believe you were entitled
9 and they did so because of your race and gender;
10 is that correct?
11  A   Yes.
12  Q   And you're also claiming in your suit
13 that UPS has given you lower pay raises than male
14 employees and white employees; is that correct?
15  A   Yes.
16  Q   And you're also claiming that UPS
17 unfairly disciplined you because of your race?
18  A   Yes.
19  Q   And finally, you are claiming that
20 UPS retaliated against you for complaining about
21 this alleged discrimination; is that right?
22  A   The retaliation part was during the
23 suit.  Well, I mean, sorry, the retaliation part
24 was actually before I filed this suit.
25  Q   You're saying --
```
                                        Page 117

30 (Pages 114 to 117)

**Esquire Corporate Services**
**(888)486-4044**

1   A   As far as the write-ups, as the
2 write-ups go.
3   Q   I'm just asking are you claiming in
4 your amended complaint in this lawsuit that UPS
5 retaliated against you for complaining about race
6 and gender discrimination?
7   A   Yes.
8   Q   Are those all of the claims you're
9 asserting in this lawsuit, the ones that I've
10 just listed out?
11   A   Lateral movements.
12   Q   I'm sorry, lateral movements?
13   A   Yes.
14   Q   Is that part of your claim about job
15 changes?
16   A   Yes.
17   Q   Okay. Anything other than the job
18 changes, pay raises, discipline and the
19 retaliation?
20   A   No. I'm sorry, there is one. Having
21 a degree, would that be considered as one?
22   Q   Tell me what you mean by that.
23   A   Robert Icenogle has always told me
24 that I have to have a degree in order to go to
25 certain positions out there but later we found

                                    Page 118

1 out that you don't have to have a degree to go to
2 certain positions or different positions at UPS.
3   Q   So are you claiming as part of your
4 claim about the job changes you allege that you
5 were denied that part of that is --
6   A   Because I don't have a degree.
7   Q   -- not having a degree?
8   A   Uh-huh.
9   Q   And you claim that those statements
10 were made by Mr. Icenogle?
11   A   Yes.
12   Q   About the degree?
13   A   Robert Icenogle and Chris Borden.
14   Q   Who's Chris Borden?
15   A   Chris Borden was the center manager
16 for a short, brief -- months, the beginning of
17 '06, beginning of '06.
18   Q   Did Mr. Borden become center manager
19 after Mr. Icenogle was center manager?
20   A   After he did, he was the center
21 manager.
22   Q   And how long was Mr. Borden center
23 manager?
24   A   I don't remember how long but it
25 wasn't long.

                                    Page 119

1   Q   Mr. Borden wasn't your immediate
2 supervisor, was he?
3   A   No.
4   Q   Is Mr. Borden white or black?
5   A   He's white.
6   Q   Anybody else other than Mr. Borden
7 and Mr. Icenogle tell you that you needed a
8 degree for certain positions?
9   A   No one else has told me but Icenogle
10 and Borden has told Tammy Nelson and Jamie
11 Stephens that they had to have a degree in order
12 to go to a driver position or any other full-time
13 management position.
14   Q   How do you know they told Ms. Nelson
15 and Mr. Stephens that?
16   A   They told me.
17   Q   Who told you?
18   A   Ms. Nelson and Mr. Stephens told me.
19   Q   What position did Mr. Borden tell you
20 you needed a -- told you that you needed a
21 college degree for to move into that position?
22   A   A package car position.
23   Q   A package car driver?
24   A   Yes.
25   Q   Any other position Mr. Borden told

                                    Page 120

1 you that you needed a college degree for?
2   A   No.
3   Q   What position or positions did
4 Mr. Icenogle tell you you needed a college degree
5 for you to move into?
6   A   To move up in UPS in any position,
7 full-time position.
8   Q   He told you that you needed that for
9 any full-time position?
10   A   Yes.
11   Q   And no one other than Mr. Borden or
12 Mr. Icenogle told you you needed a college degree
13 for any particular position?
14   A   Yes.
15   Q   Who else?
16   A   On July -- in the month of July of
17 this year, I was approached by Guy Sciro and I
18 don't remember the other guy's name and they came
19 and talked with me briefly and was basically
20 telling me that UPS is looking for people -- they
21 are looking for people with degrees and it would
22 be better if you had a degree because when you're
23 put into a pool, UPS is going to look for the
24 person that has a degree.
25   Q   But you don't remember who this other

                                    Page 121

31  (Pages 118 to 121)

**Esquire Corporate Services**
**(888)486-4044**

1 person was?
2    A    I don't remember the other guy's
3 name.
4    Q    Did Mr. Sciro and this other person
5 tell you that a degree would be beneficial or did
6 they tell you that it was absolutely required?
7    A    Well, what he specifically said
8 UPS would look at the person with the degree
9 before they considered anyone else.
10    Q    And for what position was Mr. Sciro
11 and this other person talking about?
12    A    Anything that's going full-time.
13    Q    Management?
14    A    Yes, management.
15    Q    Management only?
16    A    Well, they didn't specifically say
17 what.  They just said anything full-time.
18    Q    Who is Mr. Sciro, do you know?
19    A    He's out of Birmingham.
20    Q    Do you know if he works in human
21 resources in Birmingham for the Alabama district?
22    A    I know he works for the Alabama
23 district but I don't know what.
24    Q    And you said he came to the Dothan
25 center around July of this year?

Page 122

1 was being discriminated against and can we settle
2 this within this center.
3    Q    Was Jeff Poulter that other gentleman
4 that you were speaking of?
5    A    Jeff Poulter.
6    Q    Jeff Poulter is the HR manager for
7 all of UPS' Alabama district, isn't he?
8    A    Yes.
9    Q    And so he came with Mr. Sciro in 2007
10 and spoke with you?
11    A    Yes.
12    Q    And they met with you regarding any
13 interest you might have in other job positions,
14 right?
15    A    Yes.
16    Q    Have you told me everybody now that
17 has told you that you needed a college degree for
18 any particular position at UPS?
19    A    Alicia Palauchi told me that UPS is
20 big on degrees now as well and she is the human
21 resource.
22    Q    Did she just tell you that UPS was
23 big on degrees or that you had to have a college
24 degree for a certain position?
25    A    She didn't.  She just said they're

Page 124

1    A    Yes.
2    Q    Why did you meet -- how did you come
3 about meeting with him?
4    A    I'm sorry, it was not July of this
5 year.  This is '07.  It was -- I don't remember
6 the exact date.  I wrote it down but I don't
7 remember the exact date but it wasn't July.  It
8 was not July.
9    Q    Was it 2007?
10    A    Yes.
11    Q    Where did you write them down?
12    A    At home on paper.
13    Q    On some notes that you kept?
14    A    Yes.
15    Q    Do you still have those notes?
16    A    Yes.
17    Q    Did you give a copy of them to
18 Ms. James?
19    A    No, not that I remember.  I called
20 her and told her about it but I don't think I
21 gave her no letter.
22    Q    And why was it that you were meeting
23 with Mr. Sciro?
24    A    They wanted to come up and talk with
25 me about what was going on, why do I feel like I

Page 123

1 big on degrees.  She didn't say you have to have.
2    Q    When did Ms. Palauchi tell you that?
3    A    The first of the year, the first of
4 this year.
5    Q    And how did you come about talking
6 about that with Ms. Palauchi?
7    A    Because when I turned in a letter for
8 full-time management and I only turned in one
9 letter so she called me back and told me that I
10 had to have three separate letters for three
11 different positions and we basically just started
12 talking.
13    Q    Was that a letter of interest for
14 management positions?
15    A    Yes.
16    Q    That you completed?
17    A    Yes.
18    Q    And you submitted that letter in
19 early 2007?
20    A    January of 2007, not January.  I
21 think it was January.
22       (The document referred to was marked
23    as Defendant's Exhibit 4 and is attached
24    hereto.)
25       (Handing document.)

Page 125

32  (Pages 122 to 125)

1      (Witness reviewing document.)
2   Q    Is that the letter of interest you're
3 referring to, Ms. Lampkin?
4   A    Yes.
5   Q    Exhibit 4?
6   A    Yes.
7   Q    And you submitted that in January of
8 2007?
9   A    Yes.
10   Q    And you submitted -- did you submit
11 that to Ms. Palauchi, Alicia Palauchi?
12   A    Yes.
13   Q    And did you indicate on this letter
14 that you were interested in full-time supervisor
15 and full-time specialist positions?
16   A    Yes, sir.
17   Q    And you didn't indicate any interest
18 in any other positions on here, did you?
19   A    No.
20   Q    At the time you submitted this in
21 January of 2007, was David Ray the Dothan center
22 manager?
23   A    Yes.
24   Q    Is he still the Dothan center
25 manager?

Page 126

1   A    Yes.
2   Q    Did he become the Dothan center
3 manager after Chris Borden?
4   A    Chris Borden, yes.
5   Q    Ms. Lampkin, as I understand from
6 your amended complaint which is Exhibit 3 I
7 believe, it should still be there by you, the
8 jobs which you claim you should have gotten at
9 UPS are a part-time OMS position in the Dothan
10 center that was filled in February of 2005; is
11 that correct?
12   A    Correct.
13   Q    And a part-time office supervisor
14 position that was filled in November of 2005?
15   A    Yes.
16   Q    And I think you told me earlier OMS
17 stands for operations management specialist?
18   A    Yes.
19   Q    Do you know at the time in early 2005
20 what the eligibility requirements were for the
21 OMS position?
22   A    No, sir.
23   Q    Have you ever seen the job
24 description or eligibility requirements in
25 writing for the OMS position?

Page 127

1   A    None.
2   Q    Who specifically do you accuse of
3 discriminating against you regarding change in --
4 your desire to change or move into those two
5 positions?
6   A    These two positions right here, I
7 accuse Robert of it because it occurred before
8 these two positions right here.  It was others
9 before this that led up to these two right here
10 (indicating).
11   Q    And when you say "Robert," you mean
12 Mr. Icenogle?
13   A    Yes.
14   Q    What other positions before these two
15 were you just referencing?
16   A    There was an OMS position that came
17 available in '03, he promised me the job and then
18 he told me there was a hold on moving supervisors
19 and so some months go by and then he put Tammy
20 Nelson in that position.
21   Q    What other position prior to this one
22 that you --
23   A    Preload supervisor.  When Ryan Brown
24 came to the local sort, I had to train him on the
25 local sort.  I asked if I could go to the preload

Page 128

1 in his position and I was told no.
2   Q    What other position prior to this
3 February 2005 OMS position?
4   A    Jason Jones became a driver in 2004
5 and I was overlooked on that position with Jason
6 Jones.
7   Q    Any other positions prior to February
8 2005?
9   A    Ryan Brown became a driver I want to
10 say it was last year or maybe --
11   Q    I'm talking about prior to February
12 of '05.
13   A    No, that's all I can recall.
14   Q    Let's go back to the OMS position in
15 2003 that you just referenced.  Do you remember
16 the month in 2003?
17   A    July.
18   Q    And how do you know that OMS position
19 was available in July of 2003?
20   A    Robert told me.
21   Q    Mr. Icenogle?
22   A    Yes.
23   Q    And when Mr. Icenogle told you that
24 position was available, did you express an
25 interest in it?

Page 129

33  (Pages 126 to 129)

**Esquire Corporate Services**
**(888)486-4044**

1   A    Yes.
2   Q    And how did you express an interest
3 in that position?
4   A    Well, he called me upstairs and --
5 into his office and we were talking about our
6 volume and he told me volume which is our
7 packages coming into the center and he told me
8 that he knew that I wanted the OMS position and
9 there was a hold on moving supervisors and I told
10 him yes, I did want that position.
11  Q    And at the time you were a part-time
12 supervisor of local sorts?
13  A    Yes.
14  Q    So you just told Mr. Icenogle
15 verbally in that meeting that you wanted that
16 position?
17  A    Yes.
18  Q    And he told you that there was a hold
19 on moving anybody into that position?
20  A    Any supervisors is what he told me.
21  Q    Any supervisors into the position?
22  A    Yes.
23  Q    And then you claim that Tammy Nelson
24 then was moved into that OMS position?
25  A    Tammy Nelson was my DIAD clerk and

Page 130

1 she moved into that position.
2   Q    When did she move into that position?
3   A    In July.
4   Q    July of '03?
5   A    Yes.
6   Q    And Ms. Nelson was a -- was she a
7 part-time DIAD clerk right before she moved into
8 that position?
9   A    She was a temporary, Kelly's temp.
10  Q    Like a leased employee from a company
11 named Kelly's?
12  A    Yes.
13  Q    And is Ms. Nelson a white female?
14  A    White, yes.
15  Q    Have you ever seen Tammy Nelson's
16 personnel file?
17  A    No.
18  Q    Have you ever seen any performance
19 evaluations for Tammy Nelson?
20  A    No.
21  Q    Do you know whether Ms. Nelson had --
22 before she moved into this OMS position in July
23 of 2003 whether she had any experience in
24 performing OMS functions?
25  A    Yes.

Page 131

1   Q    Did she or did she not?
2   A    She did.  Well, let me rephrase that.
3 She was a DIAD clerk on the local sort and when
4 you're a DIAD clerk on the local sort, the
5 function that she did on the local sort is
6 basically what she was going into, they just gave
7 her the name, OMS, same thing.
8   Q    So her functions really didn't change
9 when she moved into that position?
10  A    No.
11  Q    And the only person that you're
12 blaming, if you will, for not putting you into
13 that position in July of 2003 for OMS is
14 Mr. Icenogle?
15  A    Yes.
16  Q    Nobody else?
17  A    For the current --
18  Q    For that position.
19  A    Yes, that's it, Robert Icenogle.
20  Q    Do you think Mr. Icenogle did not put
21 you in that position because of your race or
22 gender?
23  A    Yes.
24  Q    And why do you think that?
25  A    I think that because it was just the

Page 132

1 way that he treated me.  Whenever I go to him and
2 just ask, you know, for anything from him, it
3 would always be no, but anybody else could go and
4 ask for different positions or ask to be moved to
5 a different position.  Max Reinhardt, Ryan Brown,
6 they could go and tell him that they want to go
7 to different positions and he moved them but when
8 it came to me, it was no, so that's why I feel
9 like he discriminated against me.
10  Q    Are you talking, all of those things
11 that you just said, about the time frame of July
12 of 2003 and earlier?
13  A    And earlier.
14  Q    And earlier?
15  A    Yes.
16  Q    So other people would go to Mr.
17 Icenogle for positions, other people --
18  A    That would ask, they would ask him
19 because I was reading the paperwork and UPS
20 states that they applied.  We never applied for
21 anything with Robert.  We didn't have to apply
22 with Robert or write letters with Robert.  We
23 physically, verbally went to him and asked him,
24 Robert, I want this position and Robert would
25 tell us yes or lie and say well, there's a hold

Page 133

34  (Pages 130 to 133)

1 and put someone else there and it's just how he
2 always moved other people and whenever it came
3 around to me, he would never move me. I always
4 stayed in the spot that I'm in now.
5     Q     How do you know Mr. Icenogle was
6 lying about some of that information?
7     A     Because I called Carl Jones. At that
8 time, he was the -- not the district, I think
9 it's district manager, Carl Jones was. It was
10 the district or division manager and he was in
11 Pensacola at the time and I called Mr. Jones and
12 I asked Mr. Jones was there a hold on moving any
13 supervisors and he specifically told me no and he
14 told me to go and ask Robert why didn't I get him
15 -- why didn't he give me this position and why
16 did he say that and Robert told me he don't
17 remember telling me that and this is his center.
18     Q     When did you call Mr. Jones, Carl
19 Jones?
20     A     That now I cannot give you. I don't
21 -- I called him -- it was after Tammy got the
22 position. It was -- it was afterwards. She was
23 put into the position that I called him. The
24 time, date, I cannot give you.
25     Q     She was put into the position in July
                                        Page 134

1     A     Yes.
2     Q     So you just testified, that for this
3 July of 2003 OMS position, that you believe
4 Mr. Icenogle didn't put you in it because of your
5 race or gender is because you believe he lied
6 about telling you there was a hold on part-time
7 supervisors moving, right?
8     A     Right.
9     Q     And you saw other people asking him
10 verbally for position changes and they received
11 such changes?
12     A     Yes.
13     Q     And when you asked to move into OMS
14 in July of 2003, he didn't let you move?
15     A     He did not.
16     Q     Did he ever say anything to you
17 regarding your race or gender?
18     A     He didn't ever say anything to me
19 about my race or gender but I took it as he was
20 discriminating me because he would never give me
21 any of those positions because he was always
22 putting my co-workers there over me and all of
23 the co-workers, they were white.
24     Q     Okay. So it was just because white
25 people were being moved into these positions that
                                        Page 136

1 of 2003, right?
2     A     Yes.
3     Q     Do you think you called him before
4 2003 ended, still in 2003?
5     A     Yes.
6     Q     Is Mr. Jones black or white?
7     A     He's black.
8     Q     You say you think he was the division
9 manager?
10     A     I don't remember. I don't know if it
11 was the division or district manager. It was
12 either or.
13     Q     Okay. And you called him to ask him
14 if there were any holds on supervisors moving
15 into OMS?
16     A     Yes, at the time, he was in
17 Pensacola, Florida.
18     Q     And he told you there were no holds
19 on supervisors moving into the OMS positions?
20     A     That's what he told me.
21     Q     And Ms. Nelson who got that position
22 in July of 2003, she was not a supervisor before
23 she moved into it, was she?
24     A     No, she was a Kelly temp.
25     Q     She was an hourly worker?
                                        Page 135

1 you assumed that they were being moved in there
2 because of their race?
3     A     Yes, and I had been there longer,
4 more senior than all of them.
5     Q     Okay. Now, I think you told me this
6 July of 2003 OMS position is the first position
7 about which you're complaining in this lawsuit
8 that you didn't get, right?
9     A     Yes, it's that one and there's others
10 as well.
11     Q     The others after that but is that the
12 first one in time?
13     A     Yes.
14     Q     You're not complaining in this suit
15 about not getting some position prior to that one
16 in July of '03, are you?
17     A     No.
18     Q     Okay. And I think you told me that
19 at the time that the OMS position was filled in
20 July of 2003, I want to make sure, you didn't
21 know what the eligibility requirements were for
22 that position?
23     A     There were none that I know of.
24     Q     That you know of. Well, certainly
25 there must have been some requirements. I mean
                                        Page 137

                                35 (Pages 134 to 137)

**Esquire Corporate Services**
**(888)486-4044**

1 they wouldn't hire just anybody into the position
2 off the streets, would they?
3     A     Yeah, they would. I mean it wasn't
4 no requirements. I mean, as I said before,
5 everything you come in to UPS and do, you're
6 trained on it so yes, they probably would have
7 filled it at the time with a temp person because
8 you come in there, I'm going to train you on DIAD
9 or whatever and when I train you on it, you're
10 there doing it. As a matter of fact, yes,
11 because Angie, she came in off the streets and
12 she was trained in that position and they hired
13 her, OMS.
14     Q     But Ms. Nelson, as I think you
15 testified, when she moved into that OMS position
16 in July of 2003, she was already performing those
17 functions, right?
18     A     She already performed the functions,
19 DIAD clerk. I performed the function, DIAD
20 clerk.
21     Q     After that OMS position in July of
22 2003, is the next position that you're
23 complaining about not getting the part-time
24 preload supervisor position?
25     A     Yes.

Page 138

1     Q     And what year was that when you --
2 when that position was filled?
3     A     '04.
4     Q     Do you remember a month in 2004?
5     A     It was the beginning of the year.
6     Q     And this was part-time supervisor
7 over the preload, correct?
8     A     Yes.
9     Q     You never worked in the preload at
10 UPS, have you?
11     A     Yes.
12     Q     When?
13     A     I've covered for call-ins but as far
14 as a supervisor, no, I'm sorry, I'm going back to
15 employee days, no.
16     Q     You've never been assigned or worked
17 in the preload on any kind of a permanent basis?
18     A     No.
19     Q     When you say "covered," you mean just
20 like if someone was out on a particular day, you
21 might go over there and fill in for them?
22     A     Yes, but that was just when I was an
23 hourly employee, not management.
24     Q     So that was prior to December of
25 2001?

Page 139

1     A     Yes.
2     Q     After you became a part-time
3 supervisor in December of 2001, you didn't do any
4 work in the preload, did you?
5     A     No.
6     Q     How did you know that in early 2004 a
7 part-time preload supervisor position was
8 available?
9     A     Robert came to me and told me that
10 Ryan Brown was coming to the local sort and I was
11 to train him.
12     Q     Did Mr. Icenogle tell you that
13 Mr. Brown was leaving the part-time preload
14 supervisor position?
15     A     Yes, he was coming to the local sort.
16     Q     And so Mr. Brown leaving the position
17 is what made the part-time preload supervisor
18 position open?
19     A     Yes.
20     Q     Okay. And Mr. Icenogle is --
21     A     Center manager.
22     Q     -- in charge of that?
23     A     Yes.
24     Q     Okay. Why did Mr. -- well, strike
25 that. Mr. Icenogle, when he told you that

Page 140

1 Mr. Brown was coming over to local sort, did he
2 ask you if you were interested in the part-time
3 preload supervisor position?
4     A     No, he did not. I asked him about
5 the part-time preload supervisor position.
6     Q     Was Mr. Brown -- when he came to the
7 local sort at that time in early 2004, was he
8 filling an open position in the local sort?
9     A     Well, Henry Hall was gone, going to
10 the preload. He's a full-time supervisor. I had
11 it by myself and it takes two people out there in
12 the local sort.
13     Q     So there was Mr. Hall as the
14 full-time supervisor?
15     A     Yes.
16     Q     And you were the only part-time
17 supervisor in local sort?
18     A     Yes.
19     Q     So was Mr. Brown coming in as a --
20 then as a new part-time supervisor in local sort
21 in addition to you, a new position, a new
22 part-time --
23     A     No, it wasn't a new position.
24     Q     It was already there?
25     A     The position was already there.

Page 141

36 (Pages 138 to 141)

**Esquire Corporate Services**
**(888)486-4044**

1   Q     Who was in it before Mr. --
2   A     Henry Hall.
3   Q     But Mr. Hall was full-time?
4   A     Right, you have to have two
5 part-timers on the local sort.
6   Q     Or at least one part-timer and one
7 full-timer?
8   A     Yes.
9         MR. TUCKER:  Could we take a brief
10 break?
11        MS. JAMES:  Yes.
12        (Whereupon, a short recess was
13 taken.)
14        MR. TUCKER:  Back on the record.
15   Q     Let me shift gears just a minute,
16 Ms. Lampkin.  We were talking about the part-time
17 preload supervisor position in early 2004.
18   A     Uh-huh.
19   Q     I think there was one other position,
20 and tell me if I'm right, in 2004 that you claim
21 you should have gotten and that was a package car
22 driver position?
23   A     Yes.
24   Q     Is that the one Jason Jones got?
25   A     Yes.

                                      Page 142

1   Q     Do you remember when in 2004 he got
2 that position, Mr. Jones?
3   A     I don't remember when but I know
4 Jason told me that it was in April that he became
5 a driver.
6   Q     April of 2004?
7   A     Yes.
8   Q     And how did you learn that position
9 became available at that time in '04?
10   A     We had a business meeting with
11 all of the center managers and part-timers there
12 and the only reason that I know there was a
13 position coming available because as we were
14 walking out of our meeting, I heard Jason state
15 that if he didn't get this position, the package
16 car driver position, he was gone, he was going to
17 quit in other words.
18   Q     So Mr. Jones then is the only person
19 that made you aware that the position was
20 available?
21   A     Just by me overhearing the
22 conversation.
23   Q     He wasn't even talking to you?
24   A     He wasn't even talking to me.
25   Q     Okay.  And this package car driver

                                      Page 143

1 position, that's an hourly union position, right?
2   A     Yes.
3   Q     And this particular one, it was a
4 full-time package car driver?
5   A     Yes.
6   Q     And after you overheard Mr. Jones
7 mention the position after that meeting, did you
8 go to someone and express an interest in the
9 position?
10   A     I did not.
11   Q     You didn't talk with Mr. Icenogle
12 about it?
13   A     I didn't.
14   Q     So why do you think you should have
15 gotten that position?
16   A     Well, just looking at -- well, just
17 from previous drivers that was local sort
18 supervisors are in the management position, they
19 were approached and asked for the position, you
20 know, when their time was near and what I'm
21 saying is, for instance, you and I have been at a
22 company at a certain length of time and I had
23 more seniority than you, they would come to me
24 and ask me for the position before they
25 approached you for it.

                                      Page 144

1   Q     Do you know whether anyone approached
2 Mr. Jones about this full-time package car driver
3 position?
4   A     He had to because he got the
5 position.
6   Q     But do you know whether he, you know,
7 applied for it or expressed interest in it?
8   A     Well, I know he told me he didn't
9 apply for it.  He -- because I went back and I
10 asked him about the position and he told me he
11 did not apply for it and he did say Robert came
12 up to him and asked him.
13   Q     When did he tell you that he didn't
14 apply for it?
15   A     After the fact.  After all of this
16 happened, I started asking questions and that's
17 what he told me.
18   Q     And "all of this," you mean after
19 like -- after you filed your lawsuit?
20   A     Yes.
21   Q     Okay.  You asked Mr. Jones then about
22 the position and he told you that he didn't apply
23 for it?
24   A     Yes.
25   Q     And he told you that Mr. Icenogle

                                      Page 145

                              37 (Pages 142 to 145)

**Esquire Corporate Services**
**(888)486-4044**

1 asked him about his interest in the position?
2  A    Yes.
3  Q    And at that time when Mr. Jones moved
4 into the package car driver position, what was
5 Mr. Jones' job at the time?
6  A    He was a preload supervisor.
7  Q    Part-time?
8  A    Part-time.
9  Q    Have you ever seen Mr. Jones'
10 personnel file?
11  A    No.
12  Q    Have you ever seen any performance
13 evaluations of Mr. Jones?
14  A    No.
15  Q    Do you know whether Mr. Jones, prior
16 to moving into this package car driver position
17 in early '04, had any driving experience?
18  A    I don't know.
19  Q    You don't know.  Do you know how long
20 he had been a part-time preload supervisor?
21  A    I don't know the length of it.  I
22 don't know the length of it.  I don't know.
23  Q    Okay.  Is Mr. Jones still with UPS?
24  A    Yes.
25  Q    And still in the package car driver

Page 146

1 position?
2  A    Yes.
3  Q    And is Mr. Icenogle the only person
4 that you're blaming, if you will, for not putting
5 you in that package car driver position in 2004?
6  A    Yes.
7  Q    And tell me, regarding that position
8 only, why do you think Mr. Icenogle denied you
9 the position because of your race or gender.
10  A    If it wasn't race or gender, he would
11 have, at least, came to me and asked me of the
12 position.  He didn't even come to me and ask me
13 or anything about this position.
14  Q    And why do you think that the reason
15 he didn't ask you about it was because of your
16 race or gender?
17  A    Because of my race or gender because
18 I was a black female and he didn't want me in
19 that position, he put who he wanted to in that
20 position.
21  Q    And you think if you were a white
22 female, he would have came and asked you about
23 this?
24  A    Yes.
25  Q    Tell me specifically what evidence

Page 147

1 that you have that tells you that if you had been
2 white, he would have came and asked you about
3 that position.
4  A    There I'm just going by past
5 practices because I hold him to that because of
6 the previous position that I asked for, he didn't
7 give it to me and so it seemed like okay, now,
8 it's beginning to be a pattern because this OMS
9 position, I was turned down and then the preload
10 position, I was turned down and then the driver
11 position, I was turned down so it was a pattern
12 so I was black and female and being discriminated
13 against.
14  Q    But you didn't ask Mr. Icenogle for
15 the package car driver position in 2004, did you?
16  A    I didn't ask him.
17  Q    You didn't tell him that you wanted
18 the job, did you?
19  A    I didn't tell him.
20  Q    Do you know if other employees in the
21 Dothan center went to Mr. Icenogle and told him
22 they wanted that package car driver position in
23 2004?
24  A    I don't know.
25  Q    Didn't you say with the OMS position

Page 148

1 in 2003 that Mr. Icenogle was the one that told
2 you that it was open?
3  A    Yes.
4  Q    And he asked you at that point
5 whether you were interested in that position?
6  A    Actually, it was up in his office.
7  Q    Right.
8  A    Yes, and he said I know that you want
9 that position.  He knew that I wanted the
10 position but there was a hold on moving
11 supervisors.
12  Q    So at the time that Mr. Jones got the
13 package car driver position in 2004, the only
14 thing that led you to believe that you didn't get
15 it -- Mr. Icenogle didn't give it to you because
16 of your race and gender is because you had seen
17 in the past that you had not gotten any other
18 positions?
19  A    That I asked for, correct.
20  Q    Okay.  You didn't hear any --
21 Mr. Icenogle make any statements about your race
22 or gender regarding that 2004 package car driver
23 position, did you?
24  A    Not in '04.
25  Q    Did you hear him make any statements

Page 149

38  (Pages 146 to 149)

**Esquire Corporate Services**
**(888)486-4044**

1 about your race or gender prior to 2004?
2    A    After -- well, not about my race or
3 gender. Basically, when Robert had said to me,
4 to my face was this is his center and he puts
5 whomever he wants to put.
6    Q    Okay. Other than Mr. Jones -- excuse
7 me, Mr. Icenogle telling you about this being his
8 center, do you have any other evidence suggesting
9 that Mr. Icenogle made the decision to put
10 Mr. Jones in the package car driver position in
11 '04?
12    A    I don't have any evidence or anything
13 but he is the center manager and he does choose
14 and pick who goes into the next slot because
15 there was a -- they call it an outside hire and
16 so an outside hire is when your management can
17 fill this slot, fill this position so he had all
18 -- he could make the choice and he picked who he
19 wanted to pick.
20    Q    How do you know it was the center
21 manager's choice to make, did somebody tell you
22 that?
23    A    I don't really have any evidence but
24 just by hearing former employees say that it's up
25 to Robert who he wants to put into the driver

Page 150

1 position because an on car supervisor can't make
2 that decision, they're not over the center.
3    Q    Who were the former employees that
4 told you that it was Mr. Icenogle's decision
5 specifically?
6    A    Jason himself told me it was his
7 decision.
8    Q    Jason Jones?
9    A    Jason Jones. Tammy Nelson told me.
10    Q    Anybody else?
11    A    No.
12    Q    And you mentioned outside hire, when
13 you say "outside hire," do you mean somebody
14 coming into UPS for the first time?
15    A    No, as management.
16    Q    So it's not in management moving --
17    A    It's management. It's management.
18 It's management. When a driver -- or a driver
19 position comes in, they have, you know, where
20 your cover driver becomes a full-time driver and
21 then it's called an outside hire when a
22 supervisor moves into a full-time driver
23 position.
24    Q    Okay. So when a supervisor moves to
25 full-time driver, that's outside hire?

Page 151

1    A    Yes.
2    Q    Okay. Any other kind of outside
3 hire, moves or anything?
4    A    Not that I know of.
5    Q    Okay. Any other information that you
6 have other than what you just told me that leads
7 you to believe that Mr. Icenogle made the
8 decision to put Ms. Nelson in the OMS position in
9 2003?
10    A    None.
11    Q    After Mr. Jones got the package car
12 driver position in early 2004, was the next
13 position that you're claiming you should have
14 gotten the OMS position in February of 2005?
15    A    Yes.
16    Q    And how did you learn that that OMS
17 position became available?
18    A    It was just talk around the center
19 that they were getting ready to create another
20 OMS position and I went upstairs and asked Robert
21 about the position, was it true and at the time,
22 Henry Hall was in his office with him.
23    Q    With Mr. Icenogle?
24    A    Yes, with Mr. Icenogle and Robert
25 told me that the position was coming available

Page 152

1 and that it would be a six hundred dollar pay cut
2 for me.
3    Q    At that time, you were a part-time
4 local sort supervisor?
5    A    Yes.
6    Q    And the OMS position at that time was
7 not a supervisor position, was it?
8    A    It was a supervisor position. He
9 said it was all the same.
10    Q    Who said it was all the same?
11    A    Robert did.
12    Q    And what did he say it was the same
13 as?
14    A    As a local sort supervisor, preload
15 supervisor.
16    Q    Was this February of 2005 when you
17 expressed this interest to Mr. Icenogle in that
18 position?
19    A    Yes.
20    Q    And Mr. Icenogle told you that the
21 OMS position was exactly the same as your
22 part-time local sort supervisor position?
23    A    Yes, he did. He had told me that
24 previously but when we was up in his office this
25 particular time, he told me that it would be a

Page 153

39 (Pages 150 to 153)

1 six hundred dollar pay cut in order for me to
2 take this OMS position.
3     **Q**     Why did you want that OMS position in
4 **February of 2005?**
5     A     The OMS position to learn something
6 different out there at UPS to -- in order to go
7 to the next level out there. It's good that you
8 know everything out there, about every position
9 out there and work all of the positions out
10 there.
11     **Q**     But you just told me it was the exact
12 **same position as what you were already doing as a**
13 **part-time supervisor?**
14     A     No, no, no, no, no. No, sir, it's
15 not the exact same position. What I'm saying
16 when I say "exact same," I mean exact pay. The
17 local sort is when you're dealing with all of the
18 drivers coming in and moving out packages. In
19 OMS is when you're dealing on the computers with
20 all of the packages and everything that's coming
21 into the center. Those two is -- they're the
22 same as pay scale but they're different tasks
23 that you're doing.
24     **Q**     So the OMS position at that time in
25 **February of 2005, the one that you wanted, didn't**
                                                    Page 154

1 involve any supervision?
2     A     It is a supervisor position.
3     **Q**     At that time, who did the OMS people
4 **at that time supervise?**
5     A     The incoming volume in the center.
6 You don't -- OMS, a supervisor position, you just
7 don't supervise people out there, it's other
8 management skills and stuff out there that you
9 have to do.
10     **Q**     And when I say "supervise," I'm
11 **talking about supervising people so tell me who**
12 **in February of 2005, in the OMS positions, what**
13 **people those OMS positions supervised.**
14     A     An OMS position, management
15 specialist position does not supervise the
16 people. There's other duties and tasks that
17 you're doing, management qualifications that
18 you're doing.
19     **Q**     But not supervising people?
20     A     No.
21     **Q**     And you as a part-time preload
22 **supervisor were supervising people at that time?**
23     A     Yes.
24     **Q**     And you still are?
25     A     Yes.
                                                    Page 155

1     **Q**     And you told me that, at that time in
2 **February of '05, it was your understanding that**
3 **the pay for the OMS position was the same as your**
4 **pay that you were getting as a part-time preload**
5 **supervisor?**
6     A     It was -- the pay scale was supposed
7 to be the same but when I went upstairs to ask
8 Robert, he told me that it was a six hundred
9 dollar pay difference.
10     **Q**     What made you believe that the pay
11 **scale was supposed to be the same? Why did you**
12 **think that?**
13     A     Why did I think that?
14     **Q**     Yes.
15     A     Because previously asking former
16 people that was OMS that moved to different
17 positions, they told me that the pay scale was
18 the same.
19     **Q**     Who were those people then?
20     A     Jason Jones, Jennifer Bass, Tammy
21 Nelson have all been told as well as I that the
22 pay scales were the same but then he wants to
23 change it when I asked for a position again.
24     **Q**     Jason Jones, as of February '05, he
25 **never held an OMS position at that time, had he?**
                                                    Page 156

1     A     No, it was prior, before that. Jason
2 was an OMS before he became a preload supervisor.
3     **Q**     Okay. Do you remember when that was
4 **year wise?**
5     A     It had to be around '03, early in
6 '03. I don't remember the exact date but I can
7 get the information for you but I don't have the
8 exact date on hand with me.
9     **Q**     Where would you get that information?
10     A     From Jason Jones himself.
11     **Q**     So you believe in early '03 Mr. Jones
12 **was in an OMS position?**
13     A     I know he was in an OMS position.
14     **Q**     And when did Mr. Jones tell you that
15 **that pay scale in OMS was the same as the**
16 **part-time supervisor pay scale?**
17     A     When I went to ask him, after I had
18 filed my charge with the EEOC.
19     **Q**     In the past year or so?
20     A     Yes.
21     **Q**     So as of February 2005, had Mr. Jones
22 **told you at that time that the pay scales for OMS**
23 **and part-time supervisor were the same?**
24     A     Yes.
25     **Q**     But you hadn't filed your charge in
                                                    Page 157

                              40 (Pages 154 to 157)

**Esquire Corporate Services**
**(888)486-4044**

1 February of 2005?
2   A   After -- right.  Hold up.  Jason
3 Jones -- when I asked Jason Jones to -- when he
4 wrote me the letter when I asked -- when I filed
5 this charge in '05, okay, after the fact, after
6 all of this happened is when I went to Jason and
7 asked him about the pay scales.
8   Q   After November of '05?
9   A   After I filed this charge with the
10 EEOC and I asked him to state -- write me a
11 letter is when I asked Jason.  It was not -- he
12 was a driver in '05.  He was already driving and
13 I did go to him and ask him after I had filed my
14 complaint with the EEOC.
15   Q   And you filed that charge in November
16 of 2005?
17   A   Right.
18   Q   Did Jennifer Bass tell you before
19 February of 2005 that the pay scales for OMS and
20 part-time supervisor were the same?
21   A   It was after that I asked him about
22 the pay scales.
23   Q   That you asked her?
24   A   I asked Jennifer.
25   Q   You're talking about Jennifer Bass?
                                                    Page 158

1   A   No, she quit.
2   Q   When she quit, she was still in the
3 OMS position?
4   A   Yes.
5   Q   And she quit before you filed your
6 EEOC charge in November of 2005?
7   A   Yes.
8   Q   Did Tammy Nelson tell you before you
9 filed your EEOC charge that the pay scales for
10 OMS and part-time supervisors were the same?
11   A   It was all after that I would ask
12 them questions about it.
13   Q   So Ms. Nelson told you only after you
14 filed your EEOC charge about the pay scales?
15   A   Yes.
16   Q   When did Ms. Nelson move into the OMS
17 position?
18   A   In July '03.
19   Q   Do you know if Ms. Nelson has moved
20 into any other position after taking the OMS
21 position?
22   A   Uh-uh, she's still there.
23   Q   Still in the OMS position?
24   A   Yes.
25   Q   So at the time in February of 2005
                                                    Page 160

1   A   Yes, Jennifer was trying to come to
2 the local sort.
3   Q   You first spoke with Ms. Bass about
4 the pay scales after you filed your EEOC charge?
5   A   It was when I was going -- yeah, it
6 was after.
7   Q   After November of 2005?
8   A   Yes.
9   Q   Do you know whether Ms. Bass ever
10 served in an OMS position?
11   A   Yes, she was OMS.
12   Q   And when was that?
13   A   It was -- I don't recall but I know
14 it was -- I don't remember.
15   Q   Was it while you were a part-time
16 preload supervisor?
17   A   Yes, I was a local sort supervisor.
18   Q   Was Ms. Bass still in the OMS
19 position when you filed your EEOC charge in
20 November of 2005?
21   A   She had quit.
22   Q   She left the company all together?
23   A   Yes.
24   Q   Did Ms. Bass move into any other job
25 after going into the OMS position?
                                                    Page 159

1 when Mr. Icenogle told you that it would be a six
2 hundred dollar pay cut if you moved into the OMS
3 position, at that time you didn't have any other
4 information disputing what he told you, right?
5   A   No, besides asking different
6 employees, has he ever told them that it was the
7 same pay or, you know, more.
8   Q   And that the other employees told you
9 at that time that it was the same pay in February
10 of 2005?
11   A   Nothing but Jason.
12   Q   Didn't you just tell me that
13 Mr. Jones didn't tell you that until
14 after November of 2005?
15   A   Right.
16
17      (Whereupon, the deposition concludes
18   on the following page for Volume 1.)
19
20
21
22
23
24
25
                                                    Page 161

                                        41  (Pages 158 to 161)

```
1   Q    I'm talking about as of February of
2  '05 and I know it's not very many months there
3  but as of February of '05, had any other
4  employees told you that the pay was the same for
5  OMS and part-time supervisor?
6   A    No, just -- no.
7       MR. TUCKER:  Break, please.
8       (Whereupon, a short recess was
9  taken.)
10      (Whereupon, the deposition continues
11 in Volume 2.)
12
13             * * *
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 162

```
1         ERRATA SHEET
2
3      Pursuant to Rule 30(7)(e) of the
   Federal Rules of Civil Procedure and/or Georgia
4  Code Annotated 81A-130(B)(6)(e), any changes in
   form or substance which you desire to make to
5  your deposition testimony shall be entered upon
   the deposition with a statement of the reasons
6  given for making them.
      To assist you in making any such
7  corrections, please use the form below. If
   supplemental or additional pages are necessary,
8  please furnish same and attach them to this
   errata sheet.
9
        ---
10
      I, the undersigned, TRACY DEBOSE
11 LAMPKIN, do hereby certify that I have read the
   foregoing deposition, and that to the best of my
12 knowledge, said deposition is true and accurate
   (with the exception of the following corrections
13 listed below).
14
15 Page_____ Line_____ should read:_____
16 Reason for change:_____
17
18 Page_____ Line_____ should read:_____
19 Reason for change:_____
20
21 Page_____ Line_____ should read:_____
22 Reason for change:_____
23
24 Page_____ Line_____ should read:_____
25 Reason for change:_____
```

Page 164

```
1
2  September 17, 2007
3  Crystal M. James, Esquire
   Crystal James & Associates, LLC
4  8451 South Cherokee Boulevard
   Suite F
5  Douglasville, Georgia 30134
6
7     RE:  Lampkin vs United Parcel Service
         Deposition of Tracy Debose Lampkin -
8         Volume 1
         Taken on August 30, 2007
9
10 Dear Ms. James:
11 Having received a copy of the deposition in the
   above-captioned matter, please have the deponent
12 execute the attached Errata Sheet.
13 Upon execution, please return same to our office
   so that we may furnish the Original deposition
14 transcript and the executed Errata Sheet.  If we
   do not receive an executed Errata Sheet within
15 thirty (30) days from the date of this letter,
   the Original deposition transcript will be
16 forwarded to counsel of record.
17 If you have any questions, please do not hesitate
   to contact me.
18
19 Sincerely,
20
   Mary Hanham
21 Esquire Deposition Services, LLC
22
23 cc:  Jeremy Tucker, Esq.
24
25
```

Page 163

```
1  Page_____ Line_____ should read:_____
2  Reason for change:_____
3
4  Page_____ Line_____ should read:_____
5  Reason for change:_____
6
7  Page_____ Line_____ should read:_____
8  Reason for change:_____
9
10 Page_____ Line_____ should read:_____
11 Reason for change:_____
12
13 Page_____ Line_____ should read:_____
14 Reason for change:_____
15
16 Page_____ Line_____ should read:_____
17 Reason for change:_____
18
19
20
21 _____
22       Signature
23
24
25
```

Page 165

42 (Pages 162 to 165)

```
 1      DISCLOSURE
 2
 3 STATE OF GEORGIA    )    DEPOSITION OF:
 4 FULTON COUNTY:      )    TRACY DEBOSE LAMPKIN
 5
          Pursuant to Article 8.B of the Rules
 6 and Regulations of the Board of Court Reporting
   of the Judicial Council of Georgia, I make the
 7 following disclosures:
 8
          I am a Georgia Certified Court
 9 Reporter.  I am here as a representative of
   Esquire Deposition Services.
10
11        Esquire Deposition Services was
   contacted by the offices of Alston & Bird
12 to provide court reporting services for this
   deposition.  Esquire Deposition Services will
13 not be taking this deposition under any contract
   that is prohibited by O.C.G.A. 15-14-37(a) and
14 (b).
15
          Esquire Deposition Services has no
16 contract or agreement to provide court reporting
   services with any party to the case, or any
17 reporter or reporting agency from whom a
   referral might have been made to cover the
18 deposition.
19
          Esquire Deposition Services will
20 charge its usual and customary rates to all
   parties in the case, and a financial discount
21 will not be given to any party in this
   litigation.
22
23
24        MARY ANN HANHAM, CCR-B-2109
          Certified Court Reporter
25        and Notary Public.
                              Page  166
```

```
 1
 2      C E R T I F I C A T E
 3
 4 STATE OF GEORGIA:
 5 FULTON COUNTY:
 6        I hereby certify that the foregoing
 7 deposition was reported, as stated in the
 8 caption, and the questions and answers thereto
 9 were reduced to the written page under my
10 direction, that the preceding pages represent a
11 true and correct transcript of the evidence
12 given by said witness.
13        I further certify that I am not of
14 kin or counsel to the parties in the case, am not
15 in the regular employ of counsel for any of said
16 parties, nor am I in any way financially
17 interested in the result of said case.
18
19        Dated this 17th day of September,
20 2007.
21
22
23        _____
24        MARY ANN HANHAM, CCR-B-2109
          Certified Court Reporter
25        and Notary Public.
                              Page  167
```

43  (Pages 166 to 167)

**Esquire Corporate Services**
**(888)486-4044**

Page 168

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


TRACY D. LAMPKIN,           }
                            )
              Plaintiff,  )  Civil Action File
                            )
      vs.                   ) No: CV 1:06cv538-WKW
                            )
UNITED PARCEL SERVICE,      }
                            )
          Defendant.  )
_____)



DEPOSITION OF TRACY DEBOSE LAMPKIN

VOLUME 2


Thursday, August 30, 2007

1:46 p.m. - 4:50 p.m.


8451 South Cherokee Boulevard

Douglasville, Georgia




REPORTED BY:

Mary Ann Hanham, CCR

Notary Public, State of Georgia

Esquire Deposition Services

Atlanta Office    Job # 658875-02

Phone - 800.787.5302

        404.872.7890

**Esquire Corporate Services**
**(888)486-4044**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3              SOUTHERN DIVISION
4
5  TRACY D. LAMPKIN,        }
                            )
6        Plaintiff,  ) Civil Action File
                            )
7        vs.         ) No: CV 1:06cv538-WKW
                            )
8  UNITED PARCEL SERVICE,    }
                            )
9        Defendant.  )
   _____)
10
11
12
13
14        The deposition of TRACY DEBOSE
15    LAMPKIN, taken on behalf of the Defendant,
16    before Mary Ann Hanham, CCR, Certified
17    Court Reporter and Notary Public, at 8451
18    South Cherokee Boulevard, Douglasville,
19    Georgia, on Thursday, the 30th day of
20    August, 2007, commencing at the hour of
21    1:46 p.m.
22
23
24
25  FILE NO.  658875-02

Page 169

---

1              I N D E X
2
3
4    WITNESS:  TRACY DEBOSE LAMPKIN
5
6
7
8      EXAMINATION:         PAGE
9  BY MR. TUCKER: ............................  6
10 BY MS. JAMES: .............................. 286
11
12
13
14      EXHIBITS:
15 DEFENDANT'S      DESCRIPTION      PAGE
16
17    1    Employment application, Bates    75
          Stamped UPS-0040 and UPS-0041
18    2    Charge of discrimination,        103
          consisting of four pages
19
20    3    Amended complaint, consisting   115
          of twelve pages
21    4    Management assessment and       125
22        promotion process, letter of
          interest cover sheet,
23        consisting of one page
24    5    Annualized impact of your       180
          salary increase, consisting
25        of one page

Page 171

---

1   APPEARANCES OF COUNSEL:
2
3  On Behalf of the Plaintiff:
4    CRYSTAL M. JAMES, Esquire
        Crystal James & Associates, LLC
5        8451 South Cherokee Boulevard
         Suite F
6        Douglasville, Georgia 30134
         770.489.9898
7        770.489.5602 fax
8
9  On Behalf of the Defendant:
10   JEREMY TUCKER, Esquire and
     LISA H. CASSILLY, Esquire
11        Alston & Bird, LLP
          One Atlantic Center
12        1201 West Peachtree Street
          Atlanta, Georgia 30309-3424
13        404.881.7000
          404.253.8651 fax
14
15            ---
16
17
18
19
20
21
22
23
24
25

Page 170

---

1
2      6    Multi-page document, Bates      235
          Stamped UPS-0051 through
         UPS-0084
2
3
4
5        (Exhibits attached hereto.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 172

2  (Pages 169 to 172)

**Esquire Corporate Services**
**(888)486-4044**

1  DOUGLASVILLE, GEORGIA; THURSDAY, AUGUST 30, 2007
2           1:46 P.M.
3
4        P R O C E E D I N G S
5
6      (Whereupon, the deposition continues
7   from Volume 1.)
8      MR. TUCKER:  Back on the record,
9   please.
10    Q    Ms. Lampkin, in February of '05, the
11 OMS position that we were just talking about, is
12 that the position that Angie Blessman was placed
13 in?
14    A    Yes.
15    Q    And Ms. Blessman was performing --
16 what was Ms. Blessman's job at the time she was
17 put into that OMS position in February of '05?
18    A    She was a Kelly temp.  She worked
19 under preload.
20    Q    Wasn't she performing OMS functions
21 in that temporary capacity?
22    A    I don't recall but she was trained.
23 I don't know.
24    Q    Do you know how much Ms. Blessman was
25 earning before she was placed into that OMS

Page 173

1  position in February of '05?
2    A    I don't know.
3    Q    Has UPS -- do you know how much Ms.
4  Blessman was earning after she moved into the OMS
5  position in February of 2005?
6    A    I don't know.
7    Q    Ms. Blessman never reported to you,
8  did she, Ms. Lampkin?
9    A    No.
10    Q    She never worked for you on the local
11 sort, did she?
12    A    No.
13    Q    And you never saw Ms. Blessman's
14 personnel files?
15    A    No.
16    Q    You never saw any performance
17 evaluations for Ms. Blessman, did you?
18    A    No.
19    Q    So if UPS has evidence that for you
20 to have moved into that OMS position in February
21 of '05 -- if UPS says that Ms. Blessman earned
22 substantially less than you when she moved into
23 that OMS position in February of '05, do you have
24 any evidence to dispute that?
25    A    I don't.

Page 174

1    Q    Let's just go back briefly,
2  Ms. Lampkin.  The part-time preload supervisor
3  position in early 2004 that you said you should
4  have gotten, tell me again who was it that
5  actually got that position and this is early 2004
6  I believe.
7    A    I don't recall who was placed into
8  the position.
9    Q    Do you recall whether it was a man or
10 a woman?
11    A    I don't remember.  I don't remember.
12    Q    And you said when that position
13 became available that Ryan Brown moved into the
14 local sort with you?
15    A    Yes.
16    Q    And isn't it true Mr. Brown was an
17 hourly preload worker before he moved into local
18 sort?
19    A    No.
20    Q    What was he?
21    A    Preload supervisor.
22    Q    And how do you know that?
23    A    He told me he was a supervisor on the
24 preload.
25    Q    Mr. Brown told you?

Page 175

1    A    Yes.
2    Q    Do you have any other information
3  other than Mr. Brown telling you that he was a
4  supervisor that he was, in fact, a preload
5  supervisor?
6    A    No.
7    Q    Did you ever -- before he moved over
8  to local sort, did you supervise Mr. Brown?
9    A    No.
10    Q    After he moved into local sort, did
11 you supervise Mr. Brown?
12    A    No.
13    Q    Did Mr. Brown ever supervise you?
14    A    No.
15    Q    Have you ever seen Mr. Brown's
16 personnel records?
17    A    No.
18    Q    Have you ever seen any of his pay
19 records?
20    A    Yes.
21    Q    What pay records for Mr. Brown have
22 you seen?
23    A    '04 and I haven't seen it but he
24 called and told me about '05 it was.
25    Q    Mr. Brown called and told you

Page 176

3  (Pages 173 to 176)

**Esquire Corporate Services**
**(888)486-4044**

1 about it?

2  A    Yes.

3  Q    But you've just seen in writing from
4 Mr. Brown a document regarding his 2004 pay
5 raise?

6  A    Yes.

7  Q    Nothing else?

8  A    No.

9  Q    Have you ever seen any performance
10 evaluations for Mr. Brown?

11  A    We have looked at each other's
12 performance rating.

13  Q    When did you look at Mr. Brown's
14 documented performance evaluation?

15  A    '04.

16  Q    Did Mr. Brown show it to you in 2004?

17  A    Well, we went back up into the office
18 and just reviewed it with each other.

19  Q    And do you remember what month in
20 2004 that was?

21  A    No, I don't remember what month in
22 '04 it was.

23  Q    You and Mr. Brown went into the
24 center office and looked at Mr. Brown's --

25  A    Yes, Robert had just covered it with

Page 177

1 us.  We just had a business meeting and we went
2 over our pay raises and everything and we walked
3 back up to the center.  It was in a training
4 trailer.  We walked back up to the center and we
5 were discussing -- they were ahead of me, him,
6 Jason and Mark Schwartz was ahead of me.  We got
7 up there and we were talking about our
8 performance.

9  Q    Mr. Icenogle didn't meet with all of
10 you all at the same time, did he?

11  A    Yes.

12  Q    Did he?

13  A    But not to discuss -- we had a
14 building meeting --

15  Q    Okay.

16  A    -- and --

17  Q    And in that meeting, you didn't
18 discuss pay?

19  A    No.  Well, he gave us our monthly
20 pay.  He didn't tell us out loud or anything.  He
21 called us up there and did it decently and in
22 order.

23  Q    And in that meeting with
24 Mr. Icenogle, did he discuss performance reviews?

25  A    I don't remember.  He had to because

Page 178

1 we had our QPR.

2  Q    But didn't you tell me earlier that
3 when he discussed your QPR with you he did it
4 one-on-one?

5  A    Individual, yes, so it had to be
6 after that evening when we came in.

7  Q    After the individual meetings?

8  A    Yes.  Well, we came in early to go to
9 the meeting, the center meeting and then when we
10 came back in in the afternoon at around three is
11 when he called us up there, exactly, one-on-one
12 to talk with us about our QPR.

13  Q    And after the one-on-one
14 conversations is when you and Mr. Brown went back
15 to the --

16  A    Downstairs to setup for our sort and
17 we were going over our raises and our QPR.

18  Q    And you had your copy of your QPR at
19 that time?

20  A    I left it on his desk.  I left it on
21 his desk or left it downstairs because I can't --
22 I couldn't find it.

23  Q    Whose desk?

24  A    My desk downstairs.  I don't know if
25 Robert gave it to me or if I left it at the

Page 179

1 center.

2  Q    When you were talking with Mr. Brown,
3 you didn't have your QPR with you?

4  A    I didn't have it with me.  We were
5 just reviewing it over.

6  Q    But Mr. Brown had a copy of his?

7  A    He was looking at it and I don't want
8 to lie.

9  Q    Did Mr. Brown have his, to the best
10 of your knowledge, a copy of his QPR?

11  A    I want to say he had his QPR because
12 we were talking about it, about -- I was talking
13 about how lousy my review was.

14  Q    Did he, Mr. Brown, actually give you
15 a copy of his QPR or anything else that --

16  A    Not the QPR.

17  Q    But he showed it to you?

18  A    Yes.

19      (The document referred to was marked
20  as Defendant's Exhibit 5 and is attached
21  hereto.)

22      (Handing document.)

23      (Witness reviewing document.)

24  Q    Take a look at that, please, Ms.
25 Lampkin.

Page 180

4  (Pages 177 to 180)

**Esquire Corporate Services**
**(888)486-4044**

1   A   Uh-huh.
2   Q   **And tell me if you recognize that**
3 **document.**
4   A   Yes, this is Ryan's pay stub from
5 '04.
6   Q   **And this is a document you gave to**
7 **Ms. James, right?**
8   A   Uh-huh.
9   Q   **Where did you get this document?**
10   A   From Ryan.
11   Q   **And he didn't give it to you in that**
12 **meeting that we were just talking about in '04,**
13 **right?**
14   A   No, it was after.
15   Q   **When did he give you this document?**
16   A   Well, it was some weeks later. I was
17 going to go ask how did he get a higher raise
18 than I did and then we were like no, we can't
19 discuss each other's raise, we can't do this.
20   Q   **Mr. Brown told you that you couldn't**
21 **discuss --**
22   A   We're not supposed to discuss each
23 other's raises.
24   Q   **But then --**
25   A   But we did, the two of us, we did.
Page 181

1   Q   **And Mr. Brown gave you a copy of this**
2 **at that time?**
3   A   Uh-huh.
4   Q   **This was still in 2004?**
5   A   Uh-huh.
6   Q   **Why did he give you a copy of it?**
7   A   Well, I was going to ask Robert how
8 did Ryan get a higher raise than I did and I had
9 more better scores on my ballot scorecard than he
10 did.
11   Q   **And in this regard, you're talking**
12 **about the pay raise for 2004 only?**
13   A   Only.
14   Q   **Did you see Mr. Brown's scorecard**
15 **that you just mentioned for 2004?**
16   A   We just gave -- he just gave me the
17 number on it. You score like an eighty or so on
18 it and I know that I had the highest score
19 because we had just had a business meeting and my
20 sort was the only sort that met all of the
21 numbers on it, on the ballot scorecard. I was
22 the only one that met all of the numbers.
23   Q   **How do you know you were the only one**
24 **that met all of your numbers?**
25   A   Because Robert announced it at the
Page 182

1 meeting.
2   Q   **Mr. Icenogle did?**
3   A   Yes.
4   Q   **This was a meeting in 2004?**
5   A   Yes.
6   Q   **And these scorecards, is that the**
7 **same thing as the QPR?**
8   A   No.
9   Q   **Tell me what the difference is.**
10   A   A ballot scorecard is it has all of
11 your elements on it and it has your goal and your
12 actuals on it.
13   Q   **Your goal and actuals?**
14   A   Yes.
15   Q   **For -- is there a scorecard for each**
16 **department, like one for preload, one for local**
17 **sort?**
18   A   It's all the same but you just have
19 to know what are your elements on the card.
20   Q   **Okay. And does each employee get a**
21 **scorecard or only each supervisor?**
22   A   Only supervisors get it.
23   Q   **And did you say that you didn't see**
24 **Mr. Brown's scorecard for 2004 or you did?**
25   A   I know we discussed the numbers on
Page 183

1 it. We discussed the number that we made on it.
2   Q   **You and Mr. Brown discussed it?**
3   A   Yes, it's -- I don't know if you're
4 familiar with QPR's or not but you have like a
5 certain number, you go through and you're graded
6 by -- you're weighed by all of your elements on
7 there and then you can get a -- you can make a
8 forty or -- forty from all of your elements and
9 then you and I do an evaluation on each other and
10 we can grade it low so that's basically what
11 we're talking about, how, you know, other people
12 grading us and they may not be telling the truth
13 when they grade us.
14   Q   **Well, I was asking you about Mr.**
15 **Brown's scorecard. What's the difference between**
16 **the scorecard and the QPR?**
17   A   The scorecard is everybody's elements
18 on it, Mr. Brown's elements, my elements, all of
19 the elements on it, all of the full-time drivers
20 -- I mean full-time supervisor elements, that's
21 what's on the card.
22   Q   **And how does that then factor into**
23 **the QPR or it doesn't?**
24   A   It doesn't.
25   Q   **QPR's are totally separate?**
Page 184

5   (Pages 181 to 184)

**Esquire Corporate Services**
**(888)486-4044**

1    A    Yes, but it all reflects to this
2 right here, your pay increase (indicating).
3    Q    The scorecard and the QPR factor into
4 your pay increase?
5    A    Uh-huh.
6    Q    And just so I'm clear now, so you're
7 saying you didn't see Mr. Brown's scorecard for
8 2004; is that right?
9    A    We looked -- I looked at his QPR.
10    Q    But the QPR is different from the
11scorecard?
12    A    Right.
13    Q    So you're saying you saw his QPR?
14    A    I saw his number, eighty-six or
15something.
16    Q    On a piece of paper?
17    A    Yes.
18    Q    That Mr. Brown had?
19    A    Yes.
20    Q    And that was his QPR for '04?
21    A    Yes.
22    Q    But you didn't see Mr. Brown's
23scorecard for '04?
24    A    The scorecard was -- yes, I saw the
25scorecard because we all -- all of our elements

Page 185

1 dollar raise.
2    Q    In 2005?
3    A    Yes.
4    Q    We're going to talk about that in
5 detail in a minute so please keep that in mind
6 because I'm going to ask you about that.
7         The QPR for Mr. Brown that you saw in
8 2004 --
9    A    Uh-huh.
10    Q    -- you said you recall the number?
11    A    Yeah, I did say that.
12    Q    What was the number?
13    A    I thought it was an eighty something.
14I might have been wrong. I don't know but it was
15an eighty or fifty. I don't know but I know I
16saw the paper.
17    Q    And for what period of time was that
18number regarding Mr. Brown's performance? Was
19that for all of '04 or --
20    A    No, it was '03.
21    Q    It was for '03?
22    A    Yes.
23    Q    If you know, when would Mr. Brown
24have gotten that number?
25    A    In '04.

Page 187

1 is on the same scorecard.
2    Q    Everybody is listed on the same
3 scorecard?
4    A    Yes, everything is listed on the same
5 piece of paper.
6    Q    And how did you come about seeing
7 that in '04?
8    A    Because we all get one, all of the
9 supervisors get a scorecard.
10    Q    You all get a copy of it?
11    A    Yes.
12    Q    From Mr. Icenogle?
13    A    Yes.
14    Q    Did you keep your copy?
15    A    Yes.
16    Q    Have you given that to Ms. James?
17    A    I don't recall. I think -- I don't
18think so but I have it.
19    Q    You still have it?
20    A    Yes. And also -- I don't know if any
21-- well, also in '05, after the fact, after I had
22filed my complaint, I called Ryan and asked Ryan
23how was his raise in '05. I asked him. He
24didn't show me and he informed me that he got a
25ninety-eight dollar raise and I only got a fifty

Page 186

1    Q    Like in early '04?
2    A    I don't know.
3    Q    So it was actually his QPR number for
4 2003 but he didn't get the raise until 2004?
5    A    Right.
6    Q    And you think that number was about
7 eighty-six?
8    A    I think it was. I don't exactly
9 remember the number. I don't know.
10    Q    Do you remember what your QPR number
11was for 2003?
12    A    I don't know.
13    Q    Do you recall it being lower than
14Mr. Brown's eighty-six?
15    A    No, sir, it was higher. If he had an
16eighty-six, I know I had higher.
17    Q    How do you know?
18    A    Just from the review that we had.
19    Q    If you could remember Mr. Brown's
20number, surely you can remember yours.
21    A    If his was an eighty, eighty-six,
22that's what I'm saying, I know mine was higher
23and mine had to be higher than eighty-six or
24eighty-eight, surely, maybe that was mine, the
25eighty-six and I just don't quite remember his

Page 188

6  (Pages 185 to 188)

**Esquire Corporate Services**
**(888)486-4044**

1 number.

2  Q    Do you have a copy of your QPR for --

3  A    That's what I was asking them for, a
4 copy of the QPR.

5  Q    You didn't maintain a copy of it that
6 showed you that?

7  A    No, I didn't.

8  Q    Okay. Just so I'm sure, Ms. Lampkin,
9 please tell me what evidence that you rely on to
10 support your claim that there was a vacancy in a
11 part-time preload supervisor position created by
12 Mr. Brown's move to the part-time local sort
13 supervisor position in early 2004.

14  A    Because when I went to Robert and I
15 asked him about the position, he told me no, that
16 I could not go to the position, the part-time
17 supervisor position that was going to become
18 available.

19  Q    And that's it?

20  A    Yes.

21  Q    That's the only evidence that you
22 have to believe that there was a vacancy in that
23 position?

24  A    Yes, because he was coming to my sort
25 and there was a position available.

Page 189

1  Q    And Mr. Icenogle specifically told
2 you it was a part-time preload supervisor
3 position?

4  A    He told me it was a position but the
5 only thing that I knew was the local sort and
6 that's how it was going to be.

7  Q    But Mr. Icenogle didn't -- Mr.
8 Icenogle told you Mr. Brown was coming to the
9 local sort, right?

10  A    Yes.

11  Q    He didn't tell you what specific
12 position Mr. Brown was coming out of, did he?

13  A    Well, he didn't specifically have to
14 tell me because I know he was a supervisor, a
15 preload supervisor.

16  Q    And you told me earlier you knew that
17 because Mr. Brown told you that he was a
18 supervisor?

19  A    Yeah, he is a supervisor.

20  Q    But other than --

21  A    He was a supervisor.

22  Q    Other than him telling you that he
23 was a preload supervisor, how else do you know
24 that he was at that time?

25  A    Because he's in the part-time,

Page 190

1 full-time supervisor meetings.

2  Q    Okay. So are you saying --

3  A    So we have -- at that time, we were
4 having monthly meetings and Ryan was in the
5 meetings. Ryan and Jason Jones at that time they
6 were the preload supervisors.

7  Q    That was before or early 2004?

8  A    Yes.

9  Q    Before Mr. Brown came to the local
10 sort?

11  A    Exactly.

12  Q    Ms. Lampkin, if UPS' records show
13 that Mr. Brown became a part-time supervisor on
14 the local sort in August of 2003, do you have any
15 basis to dispute that?

16  A    It was August 2003 that Ryan became a
17 supervisor on the local sort?

18  Q    If UPS records show that, what do you
19 have as a basis to dispute it? You're telling me
20 he came to the local sort in --

21  A    In August of '04 is when I said.

22  Q    You said early 2004?

23  A    Right, early 200 -- gosh.

24  Q    You just don't remember the exact
25 date?

Page 191

1  A    I don't remember the exact date
2 exactly.

3  Q    Can you say for sure whether it was
4 2004 or 2003?

5  A    Max Reinhardt left in July of '03.

6      MS. JAMES: Let's take a small break.

7      MS. CASSILLY: Can she answer the
8 question though and then you guys could
9 have a break?

10  Q    The last question was can you
11 remember if it was 2004 or 2003?

12  A    I don't recall at this time.

13      MR. TUCKER: Okay.

14      (Whereupon, a short recess was
15 taken.)

16      MR. TUCKER: Back on the record,
17 please.

18  Q    Ms. Lampkin, we were just talking
19 about the 2004, 2003 time period and I was asking
20 you about your recollection regarding Mr. Brown's
21 move and my understanding from your testimony is
22 you don't have a perfect recall of when these
23 events regarding Mr. Brown's move occurred, do
24 you?

25  A    I don't.

Page 192

7  (Pages 189 to 192)

1    Q    And you don't have a perfect recall
2 of the times specifically when Mr. Brown started
3 working in the local sort with you, do you?
4    A    I don't.
5    Q    And you can't even testify with
6 certainty that that was 2003 or 2004, can you?
7    A    I can go home and get the documents.
8 I don't have them with me on hand or anything but
9 I can go back and research it to get
10 definitely --
11    Q    But as of today, based on your
12 memory --
13    A    As of today --
14    Q    -- you can't be certain?
15    A    -- I don't have it.
16        MS. JAMES:  You've got to let him
17    finish the question before you start
18    answering.
19        THE WITNESS:  I'm sorry.
20        MR. TUCKER:  I'm sorry, I may have
21    broken in on you so that was my fault.
22    Q    Were you finished talking about the
23 documents?
24    A    I don't have them with me today.
25    Q    Okay.  So based on just your memory

Page 193

1 today, you can't be certain whether those events
2 regarding Mr. Brown's move occurred in '03 or
3 '04?
4    A    I don't.
5    Q    And you don't remember specifically
6 sitting here today when you -- the time period
7 when you saw Mr. Brown in those supervisor
8 meetings?
9    A    I remember that time frame.  It was
10 in '04.  It was when we got -- it was when we got
11 the pay increase in '04.
12    Q    Okay.  And that pay increase you're
13 referencing there is the one shown on Exhibit 5?
14    A    Exhibit 5.
15    Q    Okay, thank you.  We talked just a
16 minute ago about the OMS position that
17 Ms. Blessman got in February of 2005.  Let me
18 make sure that, up until February of 2005, I've
19 talked about all of the positions that you claim
20 you should have gotten.  We got the February '05
21 OMS, right?
22    A    Yes.
23    Q    We got the April 2004 package car
24 driver, right?
25    A    Yes.

Page 194

1    Q    Mr. Jones got that position?
2    A    Right.
3    Q    We've got the part-time preload
4 supervisor sometime in early 2004?
5    A    Yes.
6    Q    You don't remember who got that
7 position?
8    A    I don't remember who got it.
9    Q    And then we got the OMS position in
10 2003 that Ms. Nelson got, right?
11    A    Yes.
12    Q    Any other positions prior to that
13 February 2005 time frame that you claim you
14 should have gotten?
15    A    Not prior, no.
16    Q    Okay.  With regard to that February
17 2005 OMS position that Ms. Blessman got, is it
18 only Mr. Icenogle that you are claiming denied
19 that position to you or is there someone else?
20    A    In '05?
21    Q    Yes, ma'am, in February of '05.
22    A    Yes, only Robert Icenogle.
23    Q    Okay.  And for that particular
24 position, that OMS position that Ms. Blessman
25 got, tell me for that position why do you think

Page 195

1 Mr. Icenogle denied it to you because of your
2 race or gender.
3    A    As I said before, it's just a
4 pattern.  It's from just going from all of the
5 other previous positions that I have asked for,
6 inquired about and he always told me -- always
7 gave me some kind of excuse or just makeup
8 excuses and tell me no and that's why I feel like
9 I have been discriminated against.
10    Q    And you think he was making up
11 excuses because he didn't put you in those jobs
12 and obviously you're a black female, right?
13    A    Yes.
14    Q    And the people who got those jobs
15 that we just talked about were white employees,
16 right?
17    A    Yes.
18    Q    That's the pattern you're talking
19 about?
20    A    Yes.
21    Q    After Ms. Blessman was placed in the
22 OMS position in February of 2005, the OMS
23 position itself went away and became a part-time
24 office supervisor position, didn't it?
25    A    Ms. Blessman is still in that

Page 196

8  (Pages 193 to 196)

**Esquire Corporate Services**
**(888)486-4044**

1 position today.
2    Q    But it's no longer called an OMS
3 position, is it?
4    A    No, it's not.
5    Q    It's now a part-time office
6 supervisor position?
7    A    Right, yes, exactly.
8    Q    And the next position after that one
9 in February of '05 that you claim you should have
10 gotten was this part-time office supervisor
11 position that came up in November of '05, right?
12   A    Yes.
13   Q    And are you claiming that Jennifer
14 Wesley was placed in that part-time office
15 supervisor position?
16   A    Yes.
17   Q    How do you know that part-time office
18 supervisor position became available in November
19 of '05?
20   A    Just from talk around the center,
21 listening to different -- Tammy informed me that
22 the position was coming available and I went,
23 at that time, Robert had retired and Castellanos
24 Williams, a black male full-time supervisor is
25 acting over the center until our supervisor,

Page 197

1 full-time supervisor -- I mean full center
2 manager come in and I had asked him about the
3 position.
4    Q    You asked Mr. Williams?
5    A    Yes.
6    Q    Mr. Williams told you that part-time
7 office supervisor position was available?
8    A    Yes.
9    Q    And did you tell Mr. Williams you
10 wanted it?
11   A    Yes.
12   Q    And what did Mr. Williams say in
13 response?
14   A    He would look into it for me.
15   Q    So at the time that position became
16 available, Mr. Icenogle was retired?
17   A    He had retired or was getting ready
18 to retire.
19   Q    But Mr. Williams is the only one that
20 you talked with regarding that part-time office
21 supervisor position?
22   A    In November, yes.
23   Q    Did you talk with anyone before
24 November about that position?
25   A    Nobody but Mr. Williams.  It was

Page 198

1 filled in November.
2    Q    Okay.  And you just talked with
3 Mr. Williams?
4    A    Yes.
5    Q    Is Jennifer Wesley a white female?
6    A    Yes.
7    Q    And you said Mr. Williams is a black
8 male?
9    A    Yes.
10   Q    Have you ever seen Ms. Wesley's
11 personnel file?
12   A    Yes.
13   Q    When did you see Ms. Wesley's
14 personnel file?
15   A    When you said "personnel file," her
16 employee record is because I used to supervise
17 her.
18   Q    Okay.  When did you supervise Ms.
19 Wesley?
20   A    I supervised her from '04 until she
21 was promoted.  I'm sorry, it was before then
22 because she was a temp and we eventually hired
23 all of the temps and she was my FDC clerk.  At
24 the time, she was working for Kelly, Kelly's.
25   Q    She was a leased employee?

Page 199

1    A    Yes, and then we hired her on with
2 the company.
3    Q    Do you remember when she was hired on
4 as a UPS employee?
5    A    I don't remember.
6    Q    But even as a temp employee, she was
7 working for you?
8    A    Yes.
9    Q    You said FDC clerk?
10   A    Yes, international clerk.
11   Q    That's what the FDC clerk is?
12   A    Yes.
13   Q    When Ms. Williams became a permanent
14 UPS employee, was she still doing the FDC clerk
15 duties?
16   A    Wesley, yes.
17   Q    Wesley, I'm sorry.  And that FDC
18 clerk position fell under the local sort?
19   A    Yes.
20   Q    So you were telling me that you saw
21 -- because you supervised Ms. Wesley, you saw her
22 employee record?
23   A    Yes.
24   Q    Tell me specifically what you saw in
25 her files or paper files.

Page 200

9 (Pages 197 to 200)

**Esquire Corporate Services**
**(888)486-4044**

1   A    Well, it was just documentation,
2 nothing -- no resume or anything.  It was just
3 her employee folder that I created with anything
4 that's a write-up or anything that I would put in
5 there, just documentation.  I would write-up a
6 documentation where I would cover something with
7 her.
8   Q    So was all of the paperwork in that
9 file documentation that you created?
10   A    No.
11   Q    What was the other paperwork in there
12 that you --
13   A    I don't recall.
14   Q    Have you ever seen any performance
15 evaluations on Ms. Wesley?
16   A    Yes.
17   Q    Did you ever see any of those
18 performance evaluations prior to November 2005?
19   A    Yes, her FDC evaluation.
20   Q    Did you complete that evaluation?
21   A    No, Tony Reynolds did.
22   Q    Tony Reynolds?
23   A    Yes.
24   Q    What was his position at that time?
25   A    Her position.

Page 201

1   Q    Her position.
2   A    She's over FDC out of Birmingham.
3   Q    Is she a supervisor in Birmingham?
4   A    She's IES.
5   Q    Industrial engineering?
6   A    Yes.
7   Q    Why was Ms. Reynolds -- Ms. Reynolds
8 didn't work in Dothan?
9   A    No.
10   Q    So why was she completing
11 Ms. Wesley's performance evaluation?
12   A    Well, she come down and review and
13 give the FDC clerks an audit and it's a yearly
14 audit that they do every year and she's the one
15 to do the audit on FDC.
16   Q    Is Ms. Reynolds white or black?
17   A    Black.
18   Q    And do you know what Ms. Wesley's --
19 what her pay was when she was working as an FDC
20 clerk for you just before she went into the OMS
21 position?
22   A    No.
23   Q    That wasn't in those files that you
24 had access to for Ms. Wesley?
25   A    No.

Page 202

1   Q    So you don't know if Ms. Wesley
2 received a pay increase when she moved into the
3 OMS position?
4   A    She did.  She told me she did receive
5 a pay increase but she did not tell me what.
6   Q    I'm sorry, I said OMS, I meant to say
7 when she moved into that -- because we're talking
8 about November of '05, the part-time office
9 supervisor position.
10   A    She did but she didn't tell me how
11 much it was.
12   Q    And how do you know that she received
13 a pay raise when she went into that position?
14   A    She told me.
15   Q    She told you but just not how much?
16   A    Right.
17   Q    I got you.  Did Ms. Wesley perform
18 any supervisory work prior to moving into this
19 part-time office supervisor position in November
20 of '05?
21   A    None.
22   Q    Prior to Ms. Wesley moving into this
23 part-time office supervisor position, had Ms.
24 Wesley performed any of the job functions that
25 are required for that position?

Page 203

1   A    No.
2   Q    You told me earlier that when the OMS
3 position existed that you had never seen the job
4 functions for that job, right?
5   A    Right.
6   Q    Have you ever seen the job functions
7 for the part-time office supervisor position that
8 Ms. Wesley got?
9   A    When you say that, the only answer
10 that I can give is the job function for OMS that
11 I have seen and because I have done this job is
12 the DIAD clerks basically would -- and basically
13 answering the phone and returning all of the
14 drivers' messages when they send you a message so
15 when you ask that question, I have seen it
16 because I have performed that job before and I
17 know Jennifer hadn't performed that job before
18 because she has always been my FDC clerk.
19   Q    You just said you have -- did you
20 just say you had at some point prior seen an OMS
21 job description on paper?
22   A    No, I hadn't seen it on paper.
23   Q    Okay.  And you have not seen on paper
24 any job -- essential job functions or job
25 description for the part-time office supervisor

Page 204

10 (Pages 201 to 204)

1 position?

2    A    No.

3    Q    The only reason you -- the only basis
4 for your knowledge about the duties is from what
5 you've seen in the workplace?

6    A    What I have performed in the
7 workplace.

8    Q    You haven't held a part-time office
9 supervisor position?

10    A    I hadn't held it but the same thing
11 that the part-time supervisor is doing now, I had
12 already performed all of those before this
13 position was even created.

14    Q    And you're basing that on what you
15 have seen Ms. Wesley do in that part-time office
16 supervisor position?

17    A    Not just Ms. Wesley, what I have seen
18 all of them do in the office.

19    Q    Who else is in the part-time office
20 supervisor position?

21    A    Tammy Nelson and that's it right now,
22 Tammy and Angie.

23    Q    Tammy Nelson went into an OMS
24 position in July of 2003?

25    A    Yes.

Page 205

1    Q    And that OMS position went away and
2 Ms. Nelson is now in the part-time preload --

3    A    She's doing the same thing she did,
4 OMS. She's doing the same exact job, nothing
5 different.

6    Q    But it's not an OMS job any more,
7 it's part-time, the title?

8    A    The title changed but the job is the
9 same.

10    Q    Ms. Nelson and Ms. Wesley, the
11 part-time office supervisors, they don't work in
12 the same area that you do in the center, right?

13    A    No, they work in the office and I
14 work on the outside.

15    Q    And when you say "the outside" --

16    A    Outside of the office.

17    Q    Out where the package cars are coming
18 in and where the packages being sorted and
19 loaded?

20    A    Yes.

21    Q    And Ms. Wesley and Ms. Nelson don't
22 work out there, right?

23    A    No, Ms. Wesley used to.

24    Q    Right. But as of November --

25    A    Not no more.

Page 206

1    Q    -- of 2005 no more?

2    A    No more.

3    Q    Since you're working outside around
4 the package cars and loading and sorting, you're
5 not in any position to observe on a daily basis
6 what Ms. Wesley and Ms. Nelson are doing in the
7 office, right?

8    A    Yes, I do because I work in the
9 office as well. I have all of my paperwork and
10 my computer is in there so I'm in and out of the
11 office all day every day when I'm at work.

12    Q    What percentage of your time do you
13 spend in the -- actually in the office versus
14 outside?

15    A    I can't really give you a percent on
16 that because I mean it's so -- it could be sixty,
17 forty some days, eighty, twenty some days. It
18 could be vice versa if I had an error some days
19 so I really can't give you a specific time or
20 percentage because I'm constantly in and out of
21 the office.

22    Q    But you spend most of your time
23 outside though because your job requires that,
24 right?

25    A    Yes.

Page 207

1    Q    You're a supervisor and not in the
2 office, are you?

3    A    Not all the time.

4    Q    Most of their time is outside of the
5 office, out where the packages and the package
6 cars are, right?

7    A    Yeah, but everything is right there.
8 I mean this is the office and that's the belt
9 right there so I'm in the office and I'm looking
10 out this window at my employees. A lot of times
11 I'm sitting down there at the computer just doing
12 e-mails, doing my paperwork, looking out at my
13 employees (indicating).

14    Q    So when you're in the office, you're
15 doing your work for your local sort supervisor
16 position?

17    A    Yes.

18    Q    You're not just sitting there
19 watching everybody else work?

20    A    Uh-uh --

21    Q    You --

22    A    -- but I can, but I'm -- I'm sorry,
23 I'm rushing you. Go ahead.

24        MS. JAMES: No, you need to answer
25    yes and no, not uh-uh.

Page 208

11 (Pages 205 to 208)

**Esquire Corporate Services**
**(888)486-4044**

1  Q    Just to confirm, Ms. Lampkin, you
2 never formally applied in writing for the OMS job
3 filled in February of 2005 or the part-time
4 office supervisor job filled in November of 2005,
5 right?
6  A    No one has.
7  Q    But you did not?
8  A    No.
9  Q    At that time in 2005 either for the
10 OMS position in February or the part-time office
11 supervisor position in November, for either
12 occasion, did you submit a letter of intent?
13  A    No.
14  Q    But you did submit a letter of intent
15 in January of 2007 that's marked as Exhibit --
16  A    4.
17  Q    -- 4, right?
18  A    Yes.
19  Q    That's the first letter of intent you
20 submitted at UPS, right?
21  A    Full-time management, yes.
22  Q    Or for any supervisory position,
23 right?
24  A    Well, this is for full-time
25 management (indicating).

Page 209

1 driver position?
2  A    Yes.
3  Q    February 2005, OMS position?
4  A    Yes.
5  Q    And November 2005, part-time office
6 supervisor position?
7  A    Yes.
8  Q    And there are no other positions
9 you're claiming in this suit that you should have
10 gotten?
11  A    I should have gotten the '06 package
12 car driver that was given to Ryan Brown as well.
13  Q    When in '06 are you referring to?
14  A    In '06, Chris Borden was our center
15 manager and a satellite position came available
16 in Eufaula, Alabama and at this time, everybody
17 had -- well, we all knew about the satellite
18 position because the PCIS employees -- well,
19 people were down there to install the system and
20 I did not submit a letter because it was a
21 package car, I did not submit a letter but Chris
22 did tell me -- I went and I asked Chris why
23 wasn't I considered for this position and Chris
24 told me because I didn't have a degree and he
25 said that you had to have a degree and not only

Page 211

1  Q    What other --
2  A    I'm sorry, management and specialist.
3  Q    Have you submitted prior to that any
4 written letter of intent for any kind of
5 management or supervisory position?
6  A    No.
7  Q    It's Exhibit 4?
8  A    4.
9  Q    Okay. We've talked about now the
10 positions up through the November of 2005
11 part-time office supervisor position. As I
12 understand from your amended complaint, is that
13 the last position that you claim in this suit
14 that you should have gotten?
15  A    Yes.
16  Q    Let me just run down the list one
17 more time just to make sure I've got them all.
18 All of the positions that you claim in this suit
19 that you should have gotten and didn't is the
20 2003 OMS position?
21  A    Yes.
22  Q    Early 2004, a part-time preload
23 supervisor position?
24  A    Yes.
25  Q    April 2004, full-time package car

Page 210

1 did he tell me that I had to have a degree, he
2 told Tammy Nelson and Jamie Stephens as well.
3  Q    Tammy Nelson is a white female?
4  A    White female.
5  Q    Jamie Stephens, is that a male?
6  A    Yes.
7  Q    White or black?
8  A    White.
9  Q    So you said this package car driver
10 position, is that what you were referring to when
11 you said the satellite position that came up in
12 Eufaula?
13  A    Yes.
14  Q    Satellite just means it's outside of
15 Dothan but close-by?
16  A    Yes.
17  Q    And this was a full-time package car
18 driver position?
19  A    Yes.
20  Q    Was Mr. Borden -- at that time, you
21 said Mr. Borden was the Dothan center manager?
22  A    Yes.
23  Q    Was he also the center manager for
24 Eufaula?
25  A    Well, Eufaula is part of Dothan.

Page 212

12  (Pages 209 to 212)

**Esquire Corporate Services**
**(888)486-4044**

1    Q    So he did manage Eufaula as well?
2    A    Yes.
3    Q    And tell me -- I'm sorry if you did
4 but did you tell me how you learned that that
5 satellite position for package car driver became
6 open in Eufaula?
7    A    Because the PCIS people were down
8 installing the new system and --
9    Q    And did one of those folks tell you
10 that this package car driver position --
11    A    Well, just hearing it from the --
12 also, when I asked the full-time managers was
13 this true and the full-time managers are Henry
14 Hall, Castellanos Williams and I think Badrig
15 Palanjian.
16    Q    When you heard this, you went to
17 Mr. Borden and told him you were interested in
18 it, in the position?
19    A    Well, after -- I asked him after the
20 fact why wasn't I considered for the satellite
21 office.
22    Q    You asked him after it was already
23 filled?
24    A    Well, he was getting ready to fill
25 it. It wasn't filled yet. He hadn't sent Ryan
                                            Page 213

1         THE WITNESS: Yes.
2         MS. JAMES: Okay.
3    Q    How do you know at the time you
4 talked with Mr. Borden that the position had not
5 been -- was still open, excuse me, was still
6 open?
7    A    Because Ryan was still at the local
8 sort with me.
9    Q    How do you know that Mr. Brown though
10 had not been awarded the position and had not
11 moved into it at that time?
12    A    Well, I don't know.
13    Q    This is the same Mr. Brown that was
14 previously a part-time local sort supervisor at
15 the building?
16    A    Yes.
17    Q    And this satellite package car driver
18 position in Eufaula is an hourly union position,
19 right?
20    A    Yes.
21    Q    It's not a supervisory position, is
22 it?
23    A    No.
24    Q    Did you only have one conversation
25 with Mr. Borden about the position, the package
                                            Page 215

1 to school yet so...
2    Q    When did you first --
3    A    When I first --
4    Q    -- tell Mr. Borden that you were
5 interested in the position, that's what I'm
6 trying to get at?
7    A    It was -- I don't quite remember the
8 time frame but it was after all of the talk and
9 commotion about the job, the satellite position,
10 everyone wanted the position and I don't remember
11 the exact time frame that I went to him and asked
12 him but at that time, Ryan -- he hadn't sent Ryan
13 to school or anything yet because Ryan went to
14 school around -- I don't know if it was March or
15 April but it was before he sent Ryan, he actually
16 made his decision.
17    Q    But your testimony from earlier is
18 that you didn't talk with Mr. Borden about this
19 position until the position had been awarded to
20 Mr. Brown, right?
21    A    No.
22         MS. JAMES: Objection,
23    mischaracterization of her former
24    testimony. You can answer if you can. Are
25    you finished?
                                            Page 214

1 car driver position in Eufaula?
2    A    Yes.
3    Q    And you don't remember what month but
4 you said it was 2006, right?
5    A    No, I don't remember what month.
6    Q    Was it 2006?
7    A    It was 2006.
8    Q    And this was a face-to-face
9 conversation with Mr. Borden?
10    A    Face-to-face in his office.
11    Q    Was anybody else present other than
12 you?
13    A    No.
14    Q    Tell me, to the best of your
15 recollection -- have you already told me then, to
16 the best of your recollection, what you and Mr.
17 Borden discussed on that one occasion?
18    A    I went upstairs and I asked him,
19 well, Chris, why wasn't I, you know, considered
20 for the satellite position in Eufaula and I don't
21 have a degree and he told me well, Tracy, you
22 have to have a degree to fill this position and
23 that was all that was said and I just turned
24 around and walked off.
25    Q    Are you paraphrasing that
                                            Page 216

13  (Pages 213 to 216)

**Esquire Corporate Services**
**(888)486-4044**

1 conversation or what you just said, the actual
2 words that Mr. Borden --
3    A    Paraphrasing.
4    Q    You're paraphrasing. Do you recall
5 exactly what words you used?
6    A    No, I don't.
7    Q    Okay. That was a 2006 package car
8 driver position, that's the next position after
9 the November 2005 part-time office supervisor
10 position that you believe you should have gotten?
11   A    Yes.
12   Q    Any other positions that you believe
13 you should have gotten?
14   A    None.
15   Q    Okay. So we've talked about all of
16 these positions you believe you should have
17 gotten and that you're claiming you should have
18 gotten in this suit. Is there any other evidence
19 that you haven't told me about that you're
20 relying on to support your claim regarding these
21 positions?
22   A    The only other evidence that I don't
23 have is I was going to go back and research my
24 days to give you the exact dates on these
25 allegations that I have made because I can't

Page 217

1 recall the dates on them.
2    Q    And that was the dates regarding the
3 early 2004 --
4    A    Yes, Brown.
5    Q    -- package car driver position?
6    A    No, that was --
7    Q    Preload supervisor?
8    A    Yes.
9    Q    And you were going to go back and
10 look at documents that you've got?
11   A    Yes.
12   Q    And these are documents you've given
13 to Ms. James?
14   A    Yes, and I was going to go back and
15 also ask one of our supervisors there.
16   Q    Who is that that you're --
17   A    Henry Hall.
18   Q    And what -- you're going to ask
19 Mr. Hall about the dates?
20   A    Yes, and Tammy Nelson.
21   Q    Why do you think Mr. Hall would
22 recall the dates for that early '04 part-time
23 preload supervisor position?
24   A    I just assume that -- well, he's
25 pretty good with remembering things.

Page 218

1    Q    And why do you think Ms. Nelson will
2 know about any of those dates?
3    A    She's the same way. She's good about
4 remembering things.
5    Q    But Ms. Nelson at that time in early
6 '04 was working in an OMS position, right?
7    A    Yes.
8    Q    She wasn't working in local sort, was
9 she?
10   A    No.
11   Q    She wasn't working in preload, was
12 she?
13   A    No.
14   Q    Is there anyone we have not talked
15 about who might have knowledge about your claims
16 regarding these job changes?
17   A    No.
18   Q    Is there anyone we haven't talked
19 about regarding written statements? Is there
20 anyone else that has given you a written
21 statement regarding these job changes?
22   A    No.
23   Q    Have you now told me everything that
24 you're complaining about in this suit regarding
25 your job changes?

Page 219

1    A    Yes.
2    Q    In case you need it, do you still
3 have your amended complaint in front of you,
4 Exhibit 3?
5    A    Yes.
6    Q    Let's refer to that. As I understand
7 it from your pay claim in your amended complaint,
8 Ms. Lampkin, you claim that you've received lower
9 pay raises than male employees and white
10 employees; is that right?
11   A    Yes.
12   Q    Tell me who specifically do you
13 accuse of discriminating against you regarding
14 pay raises.
15   A    Robert Icenogle.
16   Q    Anyone else?
17   A    No.
18   Q    Is Ryan Brown the employee to whom
19 you're comparing yourself regarding these pay
20 raises?
21   A    Yes.
22   Q    He's a white male?
23   A    Yes.
24   Q    Are you comparing yourself to anyone
25 else regarding pay raises?

Page 220

14  (Pages 217 to 220)

**Esquire Corporate Services**
**(888)486-4044**

1  A  No.
2  Q  And you contend that Mr. Brown
3 received a higher pay raise than you in 2004?
4  A  Yes.
5  Q  You contend that Mr. Brown received a
6 higher pay raise than you in 2005?
7  A  Yes.
8  Q  Is there any other years that you
9 claim Mr. Brown received a higher pay raise than
10 you?
11  A  No.
12  Q  Do you know how much formal education
13 Mr. Brown has?
14  A  No.
15  Q  Do you know what schools he's
16 attended?
17  A  No.
18  Q  Do you know what college degrees he
19 holds?
20  A  No.
21  Q  Do you know what training Mr. Brown
22 underwent before he began working for UPS?
23  A  No.
24  Q  Do you know where Mr. Brown worked
25 before he came to UPS?

Page 221

1 to him stating that we know what the chain of
2 command is.
3  Q  When you say "we" --
4  A  Robert, I mean, sorry, Ryan and
5 myself.
6  Q  The part-time preload supervisor or
7 local --
8  A  Local sort supervisor.
9  Q  Okay.  And you have seen -- are these
10 write-up memos?
11  A  Yes.
12  Q  And you've seen memos that Mr. Brown
13 has prepared?
14  A  Yes.
15  Q  When did you see those memos that Mr.
16 Brown prepared?
17  A  We were upstairs together and we both
18 write them up at the same computer.
19  Q  Did he give you a copy of any of
20 those?
21  A  Well, I put them on Robert's desk.
22  Q  Has Mr. Brown ever given you your own
23 copy?
24  A  No.
25  Q  You don't have any copies that Mr.

Page 223

1  A  No.
2  Q  I think you told me earlier, when we
3 were talking about Mr. Brown, that the only
4 documents you have seen either -- only employment
5 documents regarding Mr. Brown that you have seen
6 are the 2004 pay raise form which is Exhibit --
7  A  5.
8  Q  -- 5 and he showed -- or you saw a
9 scorecard?
10  A  A QPR.
11  Q  A QPR that Mr. Brown showed you in
12 2004?
13  A  Yes.
14  Q  And other than that, you have not
15 seen any other personnel records or employment
16 files for Mr. Brown?
17  A  No.  Let me rephrase that.  Personnel
18 records, it may not mean anything but the only
19 thing I've seen was write-up letters that he had
20 had to write-up, that's it.
21  Q  Tell me about what you mean by
22 "write-up letters".
23  A  We have to write like -- we have
24 written together where Robert wanted us to follow
25 a chain of command and we had to write a letter

Page 222

1 Brown prepared, do you?
2  A  No.
3  Q  Do you recall the content of any of
4 those memos that you saw that Mr. Brown prepared?
5  A  Just the chain of command, that we
6 understand what a chain of command is and
7 forecasting time of each trailer.
8  Q  So these memos you saw that Mr. Brown
9 prepared was just his acknowledgment that there
10 is a chain of command?
11  A  Yes.
12  Q  And his acknowledgment that he has to
13 forecast trailers?
14  A  Yes.
15  Q  Other than those memos that Mr. Brown
16 prepared and the QPR that you saw and then
17 Exhibit 5 that we've got here today, any other
18 employment records of any sort regarding
19 Mr. Brown that you have seen while at UPS?
20  A  None.
21  Q  And you told me that 2004 and 2005
22 are the only two years that you claim Mr. Brown
23 got a higher pay raise than you?
24  A  Yes.
25  Q  And in both of those years, Mr. Brown

Page 224

15 (Pages 221 to 224)

**Esquire Corporate Services**
**(888)486-4044**

1 was a part-time local sort supervisor?

2  A    Yes.

3  Q    The same position you hold?

4  A    Yes.

5  Q    Do you know how much Mr. Brown was
6 paid in his job as a part-time local sort
7 supervisor in 2004?

8  A    According to this paper right here,
9 the -- when you say "in 2004," 2004 will reflect
10 back (indicating).

11  Q    What do you mean "will reflect back"?

12  A    Are you saying do I know what his pay
13 increase was in 2004?

14  Q    Well, I'll ask you that, yeah.  Do
15 you know what his pay increase was in 2004, that
16 he received in 2004?

17  A    Seventy dollars, yes.

18  Q    And how do you know that?

19  A    I have his letter, his increase in
20 front of me (indicating).

21  Q    Exhibit 5?

22  A    Exhibit 5.

23  Q    Do you have any evidence other than
24 Exhibit 5 that leads you to believe that his pay
25 raise in 2004 was seventy dollars?

Page 225

1 your new salary was?

2  A    Around seventeen hundred, seventeen
3 ninety.

4  Q    Okay.  So you were making more after
5 that pay raise than Mr. Brown?

6  A    Yes.

7  Q    How much of a pay raise did you get
8 in 2005?

9  A    2005 was fifty dollars.

10  Q    How much was Mr. Brown's pay raise in
11 2005?

12  A    He told me ninety-eight dollars.

13  Q    Ninety-eight?

14  A    Ninety-eight.

15  Q    Mr. Brown told you that?

16  A    That's what Ryan told me.

17  Q    Is that the only evidence you have of
18 his pay raise in 2005?

19  A    Yes.

20  Q    After Mr. Brown received that pay
21 raise in 2005 that he told you he received, you
22 were still making more than he was, right?

23  A    Yes.

24  Q    You told me earlier that Mr. Brown
25 told you that his QPR score for 2003 was

Page 227

1  A    No.

2  Q    Do you know what Mr. Brown's actual
3 salary was after he got that seventy dollar pay
4 raise in 2004?

5  A    Yes.

6  Q    And what was it?

7  A    One thousand, three hundred and
8 forty-five dollars.

9  Q    Do you know that only because it's on
10 Exhibit 5?

11  A    Yes.

12  Q    Do you have any other evidence of his
13 actual pay?

14  A    No.

15  Q    Do you know what in 200 -- what your
16 pay raise was in 2004?

17  A    Yes.

18  Q    How much was it?

19  A    Seventeen ninety.

20  Q    Your pay raise.

21  A    I'm sorry, fifty dollars.

22  Q    Per month?

23  A    Yes.

24  Q    And next question, do you know what
25 your -- after you got that pay raise in 2004 what

Page 226

1 eighty-six, he told you that?

2  A    It was either his -- yes, it was --
3 well, I don't recall because I don't know if it
4 was my score.  I know we had discussed it.  I
5 don't know if it was my score or his score that
6 we were, you know, in the office talking about
7 because I actually put down my paper and I don't
8 remember it.  I know we discussed it but I don't
9 really, truly remember it.

10  Q    Okay.  Do you recall whether you saw
11 his QPR score on that piece of paper, on that QPR
12 that you looked at on that day?

13  A    It was on there because the QPR score
14 is on the piece of paper.

15  Q    Okay.  Do you know what Mr. Brown's
16 QPR was for 2005?

17  A    No.

18  Q    Have you ever seen any document
19 indicating what his QPR was for 2005?

20  A    Yes, because we did discuss it in '05
21 and I think his was a sixty.  Both of our scores
22 was sixty something.  I don't know exactly what
23 the scores were but they both were in the
24 sixties.

25  Q    And you know that -- you're saying

Page 228

16  (Pages 225 to 228)

**Esquire Corporate Services**
**(888)486-4044**

1 his was in the sixties based solely on what he
2 told -- Mr. Brown told you?
3    A    Right.
4    Q    But you did not see anything in
5 writing --
6    A    No.
7    Q    -- to suggest what his QPR profile
8 was?
9    A    No, I did not.
10    Q    And you saw your QPR for 2005?
11    A    Yes.
12    Q    And you don't remember the exact
13 number but you're pretty sure it was in the
14 sixties?
15    A    No, I don't remember.
16    Q    You think it was in the sixties
17 though for '05, yours?
18    A    Yes.
19    Q    Do you know who comes up with the QPR
20 score, what person or persons come up with that
21 number?
22    A    We do, our numbers and each manager
23 grades each other.
24    Q    So you get to set your own score?
25    A    Not my score, I get to set your

Page 229

1 score.
2    Q    So you're saying that you submit some
3 sort of peer review or you submitted in 2004,
4 2005 a peer review for Mr. Brown?
5    A    Yes.
6    Q    And on that peer review, you actually
7 put a number on it for him?
8    A    Yes.
9    Q    And what else besides the peer review
10 that you did is used -- was used to calculate
11 Mr. Brown's QPR scores?
12    A    How they calculate it is they go by
13 all of our elements that we -- as I told you once
14 before, on the ballot scorecard, they use -- they
15 weigh those elements and then they weigh the
16 elements of each employee, the reviewer that each
17 other supervisor gives you and they combine them
18 together and that's how they come up with the
19 score.
20    Q    And when you say "they weigh those
21 elements," who's they?
22    A    UPS.
23    Q    Do you know in particular who?
24    A    I don't know who does that. I just
25 know it's computer generated. You put it into

Page 230

1 the computer and as far as each supervisor puts
2 in whatever they think about you and your
3 elements are weighed and they combine the two of
4 them and that's how you get your QPR number.
5    Q    So the peer review score that you
6 submitted, for example, for Mr. Brown was just
7 part of the overall --
8    A    Yes.
9    Q    -- process of determining his overall
10 score?
11    A    Exactly.
12    Q    And you don't know who in UPS is
13 doing it that way?
14    A    I don't know.
15    Q    Was it Mr. Icenogle?
16    A    No.
17    Q    Tell me what makes you think that in
18 2004 Mr. Brown received a higher pay raise than
19 you because of his race or gender.
20    A    Basically, we're on the same sort.
21 He was new coming to the local sort. I had
22 already been there over a two year period and I
23 was more trained on the job. I was more senior
24 on the job that knew basically what was going on
25 on the local sort.

Page 231

1    Q    So he came to the local sort and you
2 had already been working there as a part-time
3 supervisor for two years?
4    A    I had to train Ryan, yes.
5    Q    And you trained Mr. Brown on the
6 local sort?
7    A    Yes.
8    Q    And because of the additional
9 experience you had and because of training him,
10 you assumed that when he got a higher raise in
11 2004 that that must have been because of his race
12 or gender?
13    A    Partly because of that and mainly
14 because of I knew what was going on on the local
15 sort. I basically ran the local sort because he
16 didn't know anything about it and when you just
17 come into a different position, a different sort,
18 you just don't run into that sort and just assume
19 you know what's going on because he didn't really
20 know what was going on on the local sort so in
21 order for him to come in this year and just get a
22 higher raise than me on this and he don't know
23 anything that's going on, that's why I assumed
24 what I -- your question.
25    Q    Do you have any other evidence to

Page 232

17 (Pages 229 to 232)

**Esquire Corporate Services**
**(888)486-4044**

1 suggest other than what you just said that his
2 pay raise in 2004 was higher than yours because
3 of his race or gender?
4   A   I have none.
5   Q   Nothing else.
6   A   Nothing else.
7   Q   Any other evidence that his pay raise
8 in 2005 was higher than yours because of his race
9 or gender?
10  A   No.
11  Q   Just again, your belief that because
12 you had two more years, you were more experienced
13 and you should have gotten a higher pay raise and
14 because you trained him?
15  A   Not just because I trained him,
16 because I knew the job. I mean yeah, he trained.
17 He had been there for some years but still he
18 wasn't equipped to, you know, run the local sort
19 and if he was more equipped to run the local
20 sort, when I go on vacation, I wouldn't get phone
21 calls. When I'm off, I wouldn't get phone calls
22 so that's why I feel like I was more access to
23 them and I should have gotten the raises that was
24 entitled for me than he did.
25  Q   You felt like you were a better

Page 233

1 part-time local sort supervisor than Mr. Brown?
2   A   Without -- yes.
3   Q   And your belief in that regard is
4 your basis for thinking that you should have
5 gotten a pay raise at least as high as his?
6   A   Not just that belief because I was
7 good at what I do, I did my job. I knew my job.
8 I mean with all the trainings I had, I was better
9 than he was.
10  Q   Okay. Ms. Lampkin, is there any
11 other evidence that you're relying on to support
12 your claim regarding your pay at UPS?
13  A   None.
14  Q   Is there anyone that we have not
15 mentioned who might have knowledge about your pay
16 claim?
17  A   None.
18  Q   Is there anyone from whom you have
19 gotten a written statement regarding your pay
20 claim?
21  A   None.
22  Q   Have you now told me everything
23 you're complaining about regarding your pay at
24 UPS?
25  A   Yes.

Page 234

1   Q   Looking back at your amended
2 complaint again, Ms. Lampkin, Exhibit 3, you
3 claim in your amended complaint that you have
4 been disciplined unfairly compared to white
5 employees, correct?
6   A   Yes.
7   Q   And here are you referring to the
8 write-ups that you have prepared on yourself as a
9 part-time supervisor?
10  A   Yes.
11  Q   Is there anything else you're
12 referring to here regarding this discipline --
13 unfair discipline claim?
14  A   No.
15  Q   Please take a few moments to look
16 over those, please, Ms. Lampkin.
17       (The document referred to was marked
18   as Defendant's Exhibit 6 and is attached
19   hereto.)
20       (Handing document.)
21       (Witness reviewing document.)
22  Q   Ms. Lampkin, do you recognize those
23 documents that are marked as -- collectively
24 marked as Exhibit 6?
25  A   Yes.

Page 235

1   Q   Are those copies of memos that you
2 prepared and signed?
3   A   Some, yes.
4   Q   Not all of them?
5   A   No, because a couple are missing.
6   Q   There are other memos that you have
7 in your possession?
8   A   I don't know if I have it or not but
9 I can go check my file because normally I do
10 print one and keep one for myself.
11  Q   You don't have any with you here
12 today, do you?
13  A   No.
14  Q   Have you given any memos like that to
15 Ms. James?
16  A   No.
17  Q   But you think you may have some in
18 your possession?
19  A   Yes.
20  Q   The ones that you got just there in
21 front of you though, are those copies of memos
22 that you prepared?
23  A   Yes.
24  Q   Do those appear to be true and
25 accurate copies of the memos?

Page 236

18 (Pages 233 to 236)

1  A    Yes.

2  Q    Did you address those memos to the
3 Dothan center manager or a person acting in that
4 role?

5  A    Yes.

6  Q    Isn't it true that, in these memos,
7 you documented performance issues that you had as
8 a part-time local sort supervisor?

9  A    Performance issues, no.

10  Q    What are you documenting in those?

11  A    I am documenting, for instance, like
12 one of the memos that's missing, when I was on
13 vacation, we had over six thousand missed toggles
14 that was miss toggled to the wrong trailer and I
15 had to come back and write myself up for it and
16 go through Montgomery when I was on vacation so I
17 had to write what happened and I wasn't there.

18  Q    When was that?

19  A    This is in '03.

20  Q    2003?

21  A    Yes.

22  Q    You went out on vacation and then you
23 came back and prepared one of these memos?

24  A    Yes.

25  Q    Would you flip over to the one in the

Page 237

1  A    No.

2  Q    Would you flip over to UPS-0059,
3 please?

4  A    Okay.

5  Q    That's also a memo that you prepared,
6 right?

7  A    Uh-huh.

8  Q    And in that memo, are you documenting
9 an issue where you did not log out all of the
10 package scanners on the scanner control log on
11 that occasion?

12  A    No, this is not what happened right
13 here (indicating).

14  Q    Tell me what that memo says.

15  A    Oh, yes.  Yes, this is.

16  Q    You're documenting that sometime in
17 January of 2005 --

18  A    Every scanner, yes.

19  Q    -- you did not properly log out all
20 of the package scanners; is that right?

21  A    I did not check that they were logged
22 out.  We didn't have a log control in place.

23  Q    Is it your responsibility to keep up
24 with the scanners?

25  A    Mine and Ryan, yes.

Page 239

1 stack in front of you there, Exhibit 6, that's
2 got a number down at the bottom of UPS-0054?

3  A    51?  You want 54?

4  Q    54, please, yes.  It should be in
5 order.

6  A    Yes.

7  Q    What is that memo about?

8  A    This right here is about you can't
9 work over twenty-seven point -- well, it's
10 twenty-seven and a half hours now and on this
11 one, I worked twenty-seven eighty-one hours
12 (indicating).

13  Q    Did you prepare that memo there,
14 0054?

15  A    Yes, I did.

16  Q    So you worked extra hours without
17 having prior authorization?

18  A    Well, in order to get the job done, I
19 could leave it there or do the job and at the
20 time I called him, it was too late.

21  Q    Were you supposed to have
22 authorization before working those hours?

23  A    Yes.

24  Q    And when you worked, you didn't have
25 that authorization at the time, did you?

Page 238

1  Q    And you're stating -- don't you state
2 in the first sentence of this memo, UPS-0059,
3 quote, I understand that I must use the scanner
4 control log every day, end quote?

5  A    Yes, talking about myself, I
6 understand it, yes.

7  Q    Okay.  But you don't consider that to
8 be, not logging out the scanners, a performance
9 issue?

10  A    No, it's not.

11  Q    Flip over to UPS-0072, please.  What
12 are you documenting in that memo, UPS-0072?

13  A    I didn't -- evidently, I didn't set
14 up the scanners this night.  I don't know if Ryan
15 set up the scanners and they were actually
16 scanning to a night box -- I mean a sunrise box
17 and not a night box and this would have nothing
18 to do with a performance review.  I don't know
19 who set it up.

20  Q    In February of 2003, Mr. Brown, Ryan
21 Brown was not a part-time local sort supervisor,
22 was he?

23  A    February 2003?

24  Q    Right.

25  A    I don't know.  I don't know.  I mean

Page 240

19  (Pages 237 to 240)

**Esquire Corporate Services**
**(888)486-4044**

1 he wasn't on the local sort with me at that time.
2 At that time, it was Max Reinhardt. Max was on
3 the -- Max Reinhardt, thank you.
4    Q    But you say in the first sentence of
5 this memo, 0072, you say you did not set up
6 scanners --
7    A    Scanners like --
8    Q    -- like I would usually do, right?
9    A    Yes, I said that.
10    Q    But then you say in the third
11 sentence that a mistake occurred because you
12 didn't set them up?
13    A    Yes.
14    Q    Ms. Lampkin, you were never suspended
15 for any of these issues that you've documented in
16 any of these memos, Exhibit 6, were you?
17    A    No.
18    Q    In fact, you've never been suspended
19 in your six years as a part-time local sort
20 supervisor, have you?
21    A    No, just verbally abused.
22    Q    Verbal abuse by who?
23    A    Robert Icenogle.
24    Q    How did Mr. Icenogle verbally abuse
25 you?

Page 241

1 told me.  In January of 2003, did you say you
2 called Mr. Icenogle?
3    A    At home.
4    Q    Okay.  So he was not at the center?
5    A    Uh-uh.
6    Q    You called him about an issue with
7 some --
8    A    Late trailers.
9    Q    -- late trailers coming in?
10    A    Going out.
11    Q    And you said you called him from his
12 office?
13    A    Yes.
14    Q    What do you mean by, on the last
15 sentence of 0074, you say I apologize for not
16 calling you but I did call Mark and we did our
17 best?
18    A    Okay, this is something different.
19 Yes, I thought this right here was the one but
20 this is another one over here.  This right here
21 is when we -- chain of command, we have a chain
22 of command we go to and we had to call Mark at
23 this time because Henry had -- they had moved
24 Henry for a moment and the chain of command is
25 always to call the full-time supervisor when we

Page 243

1    A    Harsh.  I mean just to come in, for
2 instance, let's turn back to -- on one of these
3 days you have in here.  For example, it was the
4 27th of August I think it was on your -- well,
5 like this one (indicating).
6    Q    Please give me the number at the
7 bottom if you're referring to a particular one.
8    A    Okay.  On 0074.
9    Q    Okay.
10    A    I called him at night at his home to
11 tell him about all of this volume that was
12 incorrectly told us and we're just upstairs, he
13 had me go upstairs in his office and it was just
14 harsh talk from him and it was just not this, I
15 mean it was always harsh talk from Robert on I'm
16 going to fire you or this or that, I mean the
17 verbal abuse was worse than being counseled.
18    Q    You're talking about 74, right?
19    A    0074, yes.
20    Q    And in this memo, you're referring to
21 something that happened on January 2, 2003?
22    A    Yes, and there's a couple in here
23 that --
24    Q    Let me stay on 74 just for a second
25 so I can make sure I understand what you just

Page 242

1 come into a problem so when we came to this
2 problem right here, I called Mark to let him know
3 that we got an issue going on, all of this volume
4 came here and you all didn't inform us that this
5 volume is coming in, that it's going to be going
6 out late, you're going to have late departures
7 and late departures is not tolerated within UPS
8 facility (indicating).
9    Q    Who is Mark?
10    A    Mark Schwartz.
11    Q    Mark Schwartz in January of 2003 was
12 a full-time supervisor?
13    A    Yes.
14    Q    So you didn't call Mr. Icenogle?
15    A    No, I didn't.  I said it the wrong
16 way.  I didn't call him on this one (indicating).
17    Q    You're referring to another one?
18    A    Yes.
19    Q    Which one?
20    A    I'm looking now.  It's not in here
21 (indicating).
22    Q    Ms. Lampkin, you've never had your
23 pay cut or docked as a result of any of the
24 issues documented in these memos that are in
25 Exhibit 6, have you?

Page 244

20  (Pages 241 to 244)

**Esquire Corporate Services**
**(888)486-4044**

1    A    No.
2    Q    And no one in the Dothan center
3 management has ever written you up for any of the
4 issues documented in those memos in Exhibit 6,
5 have they?
6    A    I can't answer that because I can't
7 be sure of that.
8    Q    You're not aware of that?
9    A    I'm not aware of that.
10    Q    Has anyone as a Dothan center manager
11 ever gave you a written write-up regarding any of
12 these issues in any of your memos?
13    A    They haven't given me a write-up, no.
14    Q    You don't know that any such
15 write-ups exist?
16    A    I don't know that for sure.
17    Q    Do you have any reason to believe
18 that there is such a write-up, a disciplinary
19 write-up against you by management?
20    A    Well, I have a reason to believe that
21 there may be one.  I don't know.  I'm not for a
22 hundred percent sure because all of my files were
23 sent to a higher manager in Birmingham and this
24 is when we had a scanner problem and I'm not for
25 sure that this write-up was actually done.

Page 245

1    Q    What write-up?  Tell me about the
2 time period you're talking about.
3    A    I don't know.  Let me rephrase this.
4 I'm not for sure that there is even one.
5    Q    But you've never had anybody in
6 management give you or show you a write-up?
7    A    No.
8    Q    Anything in writing against you
9 regarding discipline?
10    A    No.
11    Q    And just so I'm clear, in the six
12 years you've been a part-time supervisor, nobody
13 in UPS management at Dothan or otherwise has ever
14 disciplined you in writing?
15    A    No.
16    Q    Is Mr. Icenogle the only person
17 you're accusing of discriminating against you
18 regarding discipline?
19    A    Yes.
20    Q    Ms. Lampkin, you don't recall any
21 specific incident or conversation with
22 Mr. Icenogle where he was harsh with you?
23    A    Yes, Mr. Icenogle has been harsh with
24 me in his office.  I don't -- the write-up is not
25 in here, the documentation that I had to do is

Page 246

1 not in here but who was there was Max Reinhardt,
2 Max is no longer with UPS, Max was in the office
3 and it was harsh.
4    Q    When was this?
5    A    In '03.
6    Q    You and Mr. Reinhardt were in
7 Mr. Icenogle's office --
8    A    Upstairs, yes.
9    Q    -- in 2003?  Was anybody else in
10 there with you?
11    A    Just me and Reinhardt.
12    Q    What were you all in there talking
13 about?
14    A    Well, we had a late load.  I thought
15 it was these packages right here that's in 74 but
16 we had some outgoing packages that were -- the
17 volume intake was heavier than they had told us
18 and we had to call him and inform him on all of
19 this heavy volume, to get him in the boat with us
20 and it was heated up, that we had over sixty-five
21 packages left in the building.  It's not in here
22 (indicating).
23    Q    And what did Mr. Icenogle say in this
24 meeting with you and Mr. Reinhardt that you
25 considered harsh?

Page 247

1    A    The tone that he was talking.  We
2 were yelling.
3    Q    All of you were yelling?
4    A    No, he was yelling.
5    Q    Only Mr. Icenogle?
6    A    Yes.
7    Q    And he was yelling about these late
8 deliveries and this volume issue?  Was he yelling
9 to you and Mr. Reinhardt?
10    A    Yes.
11    Q    Other than you saying that he was
12 harsh and he was yelling during this meeting, do
13 you recall specifically what he said?
14    A    No.
15    Q    Any other specific incident that you
16 could remember where Mr. Icenogle was harsh with
17 you?
18    A    Yes.
19    Q    Tell me the next one.
20    A    The next one -- well, the next one
21 was when we was upstairs.  I mean he said it in a
22 harsh way when I had went in there and asked him
23 about the position of Blessman in '05 when he
24 told me that it was going to be a six hundred
25 dollar pay cut and this is his center, he'll put

Page 248

21  (Pages 245 to 248)

**Esquire Corporate Services**
**(888)486-4044**

1 whomever he want to put in there, he was talking
2 harsh then and it was harsh to me when he told me
3 -- well, they -- I would -- if you're doing wrong
4 and I come to you and you don't do anything about
5 it and then I'm going to go to the next level and
6 he told me that if you -- I know that you'll go
7 back and tell the next manager and I just want to
8 let you know that me -- I have friends in -- I
9 have me and Jimmy Holcomb are good buddies and we
10 were in a conversation and -- well, it was just
11 basically out there on the belt of a local sort.
12 I mean just the harsh talking that he did. You
13 could just basically go ask anybody that worked
14 at UPS on my local sort how harsh he was and the
15 main person that you could really, truly ask how
16 harsh he was was Henry Hall.
17    Q    So are you saying Mr. Icenogle, the
18 folks who were out working on the belt, he was
19 harsh with everyone out there?
20    A    Not everyone out there. They just
21 heard him and when I mean everyone out there, let
22 me rephrase that, certain people heard the harsh
23 -- how he was, they heard and they know him
24 basically.
25    Q    Anybody out there would have heard it

Page 249

1 though, right?
2    A    Yes, you have some out there that
3 have heard him, they have heard him.
4    Q    Let's go back to February 2005 when
5 you said -- when you were talking with him about
6 that OMS position that Angie Blessman got that he
7 was harsh with you. What specifically do you
8 recall him saying that you considered harsh,
9 specific words?
10    A    The tone that he said. I mean the
11 professional that he is, the tone he said. We
12 come upstairs and Henry is in there and I'm in
13 there and he's sitting across the desk and the
14 way he said it and the way he was talking to me.
15    Q    Was Mr. Icenogle raising his voice?
16    A    Well, it was just the strongness. It
17 wasn't raising. It was just I'll put whoever I
18 want in my center, this is my center and by the
19 way, it will be a six hundred dollar pay cut for
20 you. I mean he was -- he was talking harsh.
21    Q    And those are the specific words you
22 recall Mr. Icenogle saying?
23    A    Those specific words, I remember
24 those words.
25    Q    Do you remember any other specific

Page 250

1 words that he used in that February '05 meeting?
2    A    No.
3    Q    And he said that in a very
4 authoritative way?
5    A    Yes, in a harsh way to me, not
6 authoritative, it was harsh.
7    Q    And the next occasion after that
8 February 2005 meeting that you recall is -- with
9 Mr. Icenogle being harsh is when?
10    A    I don't actually remember the dates
11 on this stuff. It's just so much. I don't
12 remember all of the dates on it but I just know
13 it was always heated conversations and eventually
14 I just started, you know, just avoiding him.
15    Q    So on all of the other occasions, you
16 don't remember any of the specifics of when and
17 where those occurred?
18    A    I don't recall. It was on my sort
19 but I don't recall, you know, the time frame.
20    Q    Somewhere out in the center, in the
21 local sort area of the center?
22    A    It would be, you know, he's right
23 there and I'm right there or he's right there
24 saying stuff about me and my employees right
25 there hearing it (indicating).

Page 251

1    Q    Do you recall specific things that he
2 said about you to the other employees?
3    A    The -- gosh, I don't recall it.
4    Q    So it's accurate to say you don't
5 recall any specific words that he used on those
6 occasions out in the local sort?
7    A    I remember one specific call when he
8 told -- he was there talking, saying something
9 about look at her, she don't do nothing but just
10 standing up there and one of my workers heard him
11 and came back to tell me.
12    Q    You didn't hear him say it?
13    A    I didn't hear it, no, I didn't. I
14 didn't hear it.
15    Q    Who told you that --
16    A    Jennifer Wesley.
17    Q    And who did she tell you that he said
18 that to?
19    A    Castellanos Williams.
20    Q    And she told you that Mr. Icenogle
21 used her name?
22    A    Used my name.
23    Q    But you didn't hear it?
24    A    No, I did not hear it.
25    Q    Do you recall any other occasions

Page 252

22 (Pages 249 to 252)

**Esquire Corporate Services**
**(888)486-4044**

1 after February 2005 where you remember hearing
2 specific words from Mr. Icenogle?
3    A    No.
4    Q    You just remember it being harsh?
5    A    Yes.
6    Q    But Mr. Icenogle, again, never
7 formally wrote you up disciplining you, right?
8    A    No.
9    Q    He never suspended you, did he?
10   A    No.
11   Q    He never cut your pay, did he?
12   A    No, just -- no.
13   Q    Ms. Lampkin, is there any other
14 evidence you're relying on to support your claim
15 of unfair discipline in this suit other than what
16 you've just told me?
17   A    No.
18   Q    Is there anyone that we have not
19 talked about who might have knowledge about your
20 discipline claim?
21   A    No.
22   Q    Is there anyone from whom you have
23 gotten written statements regarding your
24 discipline claim?
25   A    No.

Page 253

1    Q    Have you now told me everything that
2 you're complaining about in this suit regarding
3 alleged unfair discipline at UPS?
4    A    Yes.
5    Q    Ms. Lampkin, as I understand it from
6 your amended complaint, the final claim you're
7 making is that you were retaliated against for
8 complaining about discrimination; is that right?
9 Is that a claim that you're making?
10   A    Retaliated against -- when you say
11 "retaliated against," merely just stating because
12 of the positions that I was overlooked on and I'm
13 trying to see how to word this, this is all I
14 have.
15   Q    You understand though that in your
16 amended complaint filed in this case that you've
17 asserted a claim for retaliation?
18   A    Yes.
19   Q    And do you still intend to pursue
20 that claim now?
21   MS. JAMES:  Let's take a break.
22   MR. TUCKER:  I would like an answer
23   to that question before we break though.
24   A    I don't know at this time.
25   Q    Okay.

Page 254

1    MR. TUCKER:  Let's take a break.
2    (Whereupon, a short recess was
3 taken.)
4    MR. TUCKER:  Back on the record,
5 please.
6    Q    Ms. Lampkin, before we broke, I was
7 asking you about your amended complaint and the
8 retaliation claim that's in it.  Is it correct
9 that you are asserting your retaliation claim in
10 this lawsuit?
11   A    Yes.
12   Q    And you claim that you were
13 retaliated against for complaining about
14 discrimination, right?
15   A    Yes.
16   Q    Who specifically do you accuse of
17 retaliating against you?
18   A    Robert.
19   Q    Mr. Icenogle?
20   A    Mr. Icenogle, yes.
21   Q    Anyone else?
22   A    Excuse me.
23   Q    Is there anyone else that you accuse
24 of retaliating against you?
25   A    No, sir.

Page 255

1    Q    Ms. Lampkin, was your EEOC charge in
2 November of 2005 the first time that you had
3 complained to anyone about discrimination at UPS?
4    A    No.
5    Q    When was the first time?
6    A    I have told Henry Hall.  I have
7 talked with Tommy Davidson and at that time, he
8 was HR but he's retired now.
9    Q    Is that Tommy Davis or Tommy
10 Davidson?
11   A    I think it's Tommy Davidson.
12   Q    Okay.  He was -- Mr. Davidson was HR
13 manager?
14   A    He worked in -- not HR manager.  He
15 was in HR because he came down to do an
16 investigation.
17   Q    And he was in Birmingham; is that
18 correct?
19   A    Yes.
20   Q    And he came down to do an
21 investigation after you filed your EEOC charge?
22   A    No.
23   Q    When did he come down to do an
24 investigation?
25   A    He came down to do an investigation

Page 256

23  (Pages 253 to 256)

**Esquire Corporate Services**
**(888)486-4044**

1 on Castellanos Williams.
2    Q    When was that, if you remember, when
3 Mr. Davis came to Dothan?
4    A    It was in -- I don't remember the
5 date but it was within the last two years. I
6 don't remember the date exactly but I can get
7 that for you.
8    Q    But you do remember that it was
9 before November '05 when you filed your EEOC
10 charge?
11    A    Yes.
12    Q    But if it was within the last two
13 years, it would have been sometime around August
14 of '05, between August '05 and November of '05?
15    A    Possible. I don't really remember
16 the date exactly but I do have it written down at
17 home.
18    Q    On notes that you've given to
19 Ms. James?
20    A    I have not given her the notes. I
21 just remember.
22    Q    These notes that you got this date
23 written down on, when did you make those notes?
24    A    The time it happened.
25    Q    Okay. Let me make sure before I ask

Page 257

1 the next question about Mr. Davis' investigation.
2 Let me make sure I've got all of the names of the
3 people that you say you complained to about
4 discrimination at UPS. You said Mr. Davidson,
5 Tommy Davidson, you said Henry Hall?
6    A    Yes.
7    Q    Anyone else that you complained to
8 about discrimination at UPS?
9    A    Not that I recall at this moment.
10    Q    And you say Mr. Davidson or Mr. Davis
11 came down to Dothan to do an investigation
12 regarding Castellanos Williams?
13    A    Yes.
14    Q    And what makes you think that Mr.
15 Davis came down to do an investigation regarding
16 Mr. Williams?
17    A    Because he questioned me.
18    Q    Mr. Davis did?
19    A    Yes.
20    Q    And what did he question you about
21 specifically?
22    A    He wanted to know exactly what was
23 going on at our center concerning Castellanos
24 Williams and I said well, you don't need to be
25 worried about Castellanos Williams, you want to

Page 258

1 hear about me, do you want to know what I have
2 endured here, the discrimination and set back
3 that I have had at UPS.
4    Q    Were you -- was this a one-on-one
5 meeting with you and Mr. Davis?
6    A    One-on-one with me and Mr. Davidson
7 in the training trailer.
8    Q    Do you recall specifically what it
9 was about Mr. Williams that he was asking you
10 about?
11    A    Workplace violence, not violence,
12 workplace -- it's dealing with the workplace
13 violence.
14    Q    Was it in some sort of allegation
15 against Mr. Williams regarding workplace
16 violence?
17    A    Yes.
18    Q    And that wasn't an allegation you
19 made against Mr. Williams?
20    A    No.
21    Q    So you talked with Mr. Davidson about
22 Mr. Williams?
23    A    Yes.
24    Q    And then you told him specifically
25 what about you and your employment?

Page 259

1    A    Yes.
2    Q    Tell me what you recall telling
3 Mr. Davidson about your employment.
4    A    I told him that I felt like I was
5 being discriminated against by Robert because
6 every time that I would come up and ask for a
7 position, he would always make up an excuse or
8 tell me no and fill it with someone else other
9 than myself and that I had always been there
10 longer than anyone that he filled all of the
11 positions with.
12    Q    And you complained to Mr. Davidson
13 only about Mr. Icenogle?
14    A    Yes.
15    Q    And only about Mr. Icenogle not
16 moving you into positions?
17    A    Yes.
18    Q    You didn't complain -- I'm sorry, go
19 ahead.
20    A    And I also told him about the pay
21 raise as well.
22    Q    What did you tell Mr. Davidson about
23 the pay raise specifically?
24    A    I asked him how could Ryan receive a
25 higher pay raise than myself and he specifically

Page 260

24   (Pages 257 to 260)

**Esquire Corporate Services**
**(888)486-4044**

1 told me that I need to get in contact with
2 someone in Birmingham and ask questions about
3 that.
4   **Q   Did he tell you who to get into**
5 **contact with?**
6   A   He did but I don't remember who he
7 told me.
8   **Q   Did he give you just a name or did he**
9 **give you a name and a number or --**
10   A   He told me the department to call.
11   **Q   You don't remember the name of the**
12 **department?**
13   A   I don't remember.
14   **Q   In addition to the department name,**
15 **did he give you a specific person's name?**
16   A   No.
17   **Q   Did you later attempt to contact this**
18 **department that he told you about?**
19   A   No, I didn't.
20   **Q   When you talked with Mr. Davidson on**
21 **this occasion, did you complain to him about the**
22 **2004 pay raise?**
23   A   I told him everything, yes, I did.
24   **Q   The 2004 pay raise?**
25   A   All of the positions that I had

Page 261

1   A   Right.
2   **Q   And you told him that Mr. Icenogle**
3 **denied you those positions?**
4   A   Yes.
5   **Q   Did you tell Mr. Davidson why you**
6 **believed Mr. Icenogle denied you those positions?**
7   A   Yes.
8   **Q   What did you tell Mr. Davidson?**
9   A   He was prejudice.
10   **Q   And did you tell him in what way you**
11 **thought Mr. Icenogle was prejudice?**
12   A   Well, I just explained to him that
13 the reason I felt like he was prejudice towards
14 me was and holding me back was because, that's
15 what I said before, that every time that I would
16 go to him and ask about a position and he would
17 always tell me no or come up with some excuse and
18 tell me no and I felt like he didn't like me
19 because I mean that's the pattern that I had got
20 from him and when someone else, my co-workers
21 come and ask or, you know, go to a different
22 position, they go there and they had the chance
23 to broaden their experience within the company
24 and I never had the chance to broaden my
25 experience within the company, I'm stuck in one

Page 263

1 inquired about I told him and I told him my pay
2 raise. I told him everything that was going on
3 at that center dealing with myself.
4   **Q   The pay raises that you told him**
5 **about that you told me about were only 2004 and**
6 **2005, right?**
7   A   2004.
8   **Q   You only told him about 2004?**
9   A   Yes.
10   **Q   And you only told him about Mr.**
11 **Brown's 2004 pay raise compared to your 2004 pay**
12 **raise?**
13   A   Yes.
14   **Q   And because you testified that this**
15 **meeting with Mr. Davidson occurred before**
16 **November of 2005, you couldn't have told him**
17 **about the position that Ms. Blessman got,**
18 **part-time office supervisor, in November of 2005,**
19 **right?**
20   A   Right.
21   **Q   It hadn't occurred yet?**
22   A   Right.
23   **Q   So you told him about the positions**
24 **starting with the February 2005 OMS backwards**
25 **that you told me about here today?**

Page 262

1 position and they have been, you know, basically
2 here and there learning different positions.
3   **Q   Did you tell Mr. Davis when you met**
4 **with him in 2005 that you believed Mr. Icenogle**
5 **denied you those positions because of your race?**
6   A   I just said that he was
7 discriminating me because I was black and he was
8 prejudice.
9   **Q   You did tell Mr. Davis that's what**
10 **you thought?**
11   A   Yes.
12   **Q   Did you tell Mr. Davis that you**
13 **thought Mr. Icenogle denied you those positions**
14 **because you were a woman?**
15   A   Again, just because I was black. I
16 don't recall saying that because I was a woman.
17 I have the notes that I have written down. I
18 don't know exactly what are written down. I
19 can't say that I did say that.
20   **Q   If you don't recall today --**
21   A   I don't recall it today exactly, you
22 know.
23   **Q   Okay. When you met with Mr. Davidson**
24 **on that date, did you put anything -- make any**
25 **kind of written statement and give it to him on**

Page 264

25 (Pages 261 to 264)

**Esquire Corporate Services**
**(888)486-4044**

1 that date when he was there?
2    A    I -- he asked me for a written
3 statement but I don't recall turning in the
4 written statement that he asked me for.
5    Q    Do you recall preparing a written
6 statement?
7    A    Gosh, I don't remember. I do not
8 remember. I don't remember.
9    Q    Do you recall at any point in time on
10 or after that meeting giving Mr. Davis a written
11 statement?
12    A    I don't remember.
13    Q    If you had given him one, would you
14 have kept a copy?
15    A    If I had given him one, I would have
16 kept a copy.
17    Q    Okay. Is that one occasion in 2005
18 the only time that you talked with Mr. Tommy
19 Davis from human resources about your complaints
20 regarding your employment at UPS?
21    A    That was the only time that I talked
22 with Tommy Davidson and the other person that I
23 had talked with is Guy Redd.
24    Q    You told me earlier that it was only
25 Mr. Davidson and Mr. Hall. Are you now saying

Page 265

1 there's another person?
2    A    Right. Well, Guy Redd, I just
3 basically asked him -- you're exactly right, I'm
4 remembering all of this stuff now. At the time,
5 Guy Redd was -- he was our district division
6 manager and when I went and I talked with Guy and
7 I basically told him about -- at that time, Ryan
8 was coming up for an interview and becoming a
9 package car driver. Ryan was coming up to the
10 interview to become a package car driver, I
11 remember now and Guy came to the center to
12 interview Ryan and I heard that he was going to
13 be there so I came up there to talk with him and
14 basically, you know, told him -- I told him how
15 Robert was holding me back. I told him every
16 time I go over and ask him for a position, he
17 would not, you know, give me the opportunity to
18 do something different, give me a different
19 experience, whatever, he would always hold me
20 back in that position, that's what I went up
21 there and talked with Guy with and he -- Guy
22 stated that he shouldn't have done that, he
23 should have gave me the chance to broaden my
24 experience within the company.
25    Q    Is this 2006 when you and Mr. Redd

Page 266

1 had this conversation?
2    A    I don't know. This was not in 2006.
3 I don't remember the date of this but it was -- I
4 don't remember the date. I got it at home.
5    Q    Have you described, to the best of
6 your recollection, what you and Mr. Redd
7 specifically said on that occasion when you met
8 with him?
9    A    Yes.
10    Q    Was anyone else present when you and
11 Mr. Redd met and talked about that?
12    A    No.
13    Q    And that meeting occurred at the
14 Dothan center?
15    A    Yes.
16    Q    You talked with Mr. Redd on this
17 occasion because the reason -- strike that. The
18 reason that Mr. Redd was in Dothan on that
19 occasion when you talked with him was because he
20 was interviewing Ryan Brown for package car
21 driver?
22    A    Yes.
23    Q    And Mr. Henry Hall, is he the only
24 other person that you talked with about alleged
25 discrimination at UPS?

Page 267

1    A    Yes.
2    Q    Tell me when you first talked with
3 Mr. Hall about that.
4    A    I talked with Henry on several
5 different dates. When it first happened, when he
6 first lied to me and told me about the OMS
7 position, I went to Henry and I asked, I said was
8 Robert prejudice and Henry didn't say anything
9 and then on the second job position that came by
10 and I asked for and he flat out just didn't give
11 it to me, I went to Henry and I told him Robert's
12 prejudice so Henry is very familiar of the
13 conversation and he's been treated the same.
14    Q    When you told Mr. Hall that you
15 believed that Mr. Icenogle was prejudice, did you
16 tell Mr. Hall why you believed he was prejudice?
17    A    Yes.
18    Q    What did you tell Mr. Hall?
19    A    And the reason I told him that, I
20 told him that, Henry, I'm not here to -- and I
21 actually said I'm busting my butt for him. I'm
22 making his numbers. I'm basically carrying the
23 Dothan center and he won't give me the
24 opportunity to go to the next level. Every time
25 I turn around, he wants to hold me back. He

Page 268

26  (Pages 265 to 268)

**Esquire Corporate Services**
**(888)486-4044**

1 don't ever want to push me up to the next step,
2 he wants to hold me back so I basically told
3 Henry he's prejudice, he don't want to help me or
4 put me to the next level, he's prejudice.
5    Q    And every time you just said "he,"
6 you're talking about Mr. Icenogle?
7    A    Right, Robert.
8    Q    Okay.  Is that all you told Mr. Hall
9 to your recollection?
10   A    Yes.
11   Q    Have you now told me everyone that
12 you have complained to at UPS about alleged
13 discrimination?
14   A    Yes.  Did I mention -- well, yes.
15   Q    Ms. Lampkin, is there any other
16 evidence that you're relying on to support your
17 retaliation claim against UPS other than what
18 you've just told me?
19   A    Not at this time.
20   Q    Are you aware of any other evidence?
21   A    No.
22   Q    Is there anyone that we have not
23 mentioned who might have knowledge about your
24 retaliation claim?
25   A    No.

Page 269

1    Q    Is there anyone from whom you've
2 gotten a written statement regarding your
3 retaliation claim?
4    A    Is there anyone?
5    Q    From whom you have gotten a written
6 statement regarding your retaliation claim.
7    A    No.
8    Q    Ms. Lampkin, are you seeking in this
9 lawsuit to recover compensatory damages; that is,
10 money from UPS?
11   A    Yes.
12   Q    And the money that you're seeking in
13 this suit is the pay differential between pay you
14 receive as a part-time local sort supervisor and
15 pay you believe you would have received if you
16 had gotten all of those positions you've told me
17 about today?
18   A    That and more.
19   Q    Okay.  Tell me what the more is or
20 what else money wise are you seeking.
21   A    Stress, mentally, physically, just
22 the abuse and the verbal abuse was more than
23 anything and I know I can't just come out and
24 give you dates, actual dates but there were
25 people there that just, you know, heard the abuse

Page 270

1 from him.
2    Q    Have you given me the names of all of
3 those people that you believe heard that language
4 from Mr. Icenogle?
5    A    No.
6    Q    What other folks have you not told me
7 about that have heard this alleged verbal abuse?
8    A    Well, Max is no longer there.  Max is
9 out of the country.
10   Q    Max Reinhardt?
11   A    Yes, he's not here any more and I
12 know there's drivers and my local sorters, my
13 local sorters and half of them are no longer
14 there with the company, they're gone but it would
15 be no problem to get them to come back.
16   Q    Are you claiming that all of the
17 people that you've worked with on local sort have
18 heard this alleged verbal abuse from Mr.
19 Icenogle?
20   A    How he talked to us, yes, they have.
21   Q    Your testimony is that the other
22 folks in the local sort that have worked with you
23 at UPS have heard Mr. Icenogle speaking harshly
24 to us, is that what your testimony is?
25   A    To management, yes.

Page 271

1    Q    Did he only speak harshly to
2 management?
3    A    Yes.  Well, let me rephrase that.
4 I've heard him only talk harsh -- well, me and
5 him and Henry Hall.  Well, Hall all the time for
6 sure.  Anyone else, I haven't heard him talk
7 harsh to.
8    Q    Are you aware of whether any of the
9 employees in the local sort that you mentioned
10 heard Mr. Icenogle talk harsh to anybody other
11 than you and Mr. Hall?
12   A    I don't know.
13   Q    Ms. Lampkin, you said that you are
14 seeking to recover for physical stress that
15 you've suffered?
16   A    Yes.
17   Q    Tell me about the physical stress.
18   A    Physically and mentally.  Have you
19 ever -- well, I have -- it has been so -- he has
20 been so stressful out there towards me until when
21 I get home, I go home, I drink and I'm not a
22 drinker and it got to the point that I would turn
23 to liquor just because, you know, all of the
24 stress and stuff dealing with him out there.
25 Dealing with him out there, it was very stressful

Page 272

27  (Pages 269 to 272)

**Esquire Corporate Services**
**(888)486-4044**

**Page 273**

1 and then you go home and you go to sleep and some
2 nights you're dreaming about boxes, then your
3 phone rings, it's him on the other end but he was
4 -- it was just so stressful, you just -- I turned
5 to a bottle instead of turning to, you know,
6 guidance and finally, I stopped this and turned
7 towards my pastor and he got me back on track.
8 Q    And this time when you're talking
9 about where you started drinking, that was all
10 2005 and earlier before Mr. Icenogle retired,
11 right?
12 A    Yes.
13 Q    Do you still drink today, alcohol?
14 A    Occasionally but not -- I won't --
15 not like the hard liquor. I was drinking gin,
16 tanquery gin. I don't drink that now.
17 Q    And you drank that, you said, at
18 home?
19 A    I drank the whole -- yes.
20 Q    Tell me how that -- that drinking
21 that you did at the time when Mr. Icenogle was
22 still employed, how did that cause you physical
23 stress?
24 A    It caused me physical stress because
25 when you're out there working with him and just

**Page 274**

1 his tone and the way he was talking to you, then
2 you want to go home and soothe it and you just go
3 to liquor to, you know, soothe it. I mean your
4 problems are still going to be there but then you
5 turn to liquor to think that it's getting rid of
6 your problem but it's still there.
7 Q    Why did you turn to liquor?
8 A    He was stressing me. He was just so
9 hard and verbally towards me.
10 Q    He was very -- Mr. Icenogle was very
11 demanding of you in your job duties?
12 A    Demanding, you could say demanding
13 but...
14 Q    Is that true, was he demanding you
15 in your job duties?
16 A    Yes.
17 Q    He had high expectations for his
18 supervisors, right?
19 A    Well, when you say "high
20 expectations," when you got a supervisor that's
21 out there and they're the only one that's making
22 the numbers, I mean the demand can't be too high
23 on that person because they're doing what they're
24 supposed to do out there and your numbers are
25 being met so you can't demand anything really,

**Page 275**

1 truly out of a person if they're already giving
2 you what, you know, your numbers and what needs
3 to be done.
4 Q    So he didn't expect any more of you?
5 A    I mean I don't know what he expected
6 because I did my job. I mean I did my job and I
7 did it very well. It was just always constantly
8 something with him. I can't say he demanded, you
9 know, high expectations of his supervisors
10 because I always done my job and he didn't really
11 have to demand anything out of me because I gave
12 it.
13 Q    But you said that he was harsh with
14 you regarding your job and what you were
15 specifically doing, right?
16 A    Yes.
17 Q    So he must not have been satisfied
18 with it, right?
19 A    I don't know why.
20 Q    Other than turning to drinking
21 alcohol at that time, what else do you claim
22 caused you physical stress?
23 A    Nothing else.
24 Q    Did the drinking that you did at home
25 at that time prevent you from performing your job

**Page 276**

1 duties at UPS?
2 A    It did not prevent me from doing my
3 job duties.
4 Q    Did you miss work because of the
5 drinking you were doing?
6 A    I missed getting up because of the
7 drinking but I didn't go to work -- I was
8 sluggish going in there.
9 Q    But did you get to work on time?
10 A    Some days I did, some days I didn't.
11 Q    Would you say you were late to work
12 often because of your drinking?
13 A    Actually, it always -- at one point,
14 it did. Normally, I would get there way ahead of
15 time until I started getting there just as my
16 sort was getting ready to start.
17 Q    Well, I'm asking you did you arrive
18 late after --
19 A    I arrived later than when I would
20 used to get there. Say, for instance, I would
21 get there forty-five minutes before my sort
22 starts, an hour before my sort starts, I started
23 getting there fifteen minutes before my sort
24 starts.
25 Q    But you arrived on time according to

28  (Pages 273 to 276)

**Esquire Corporate Services**
**(888)486-4044**

1 the time you were supposed to be there?
2    A    That's not on time because you're
3 supposed to actually be there an hour to thirty
4 minutes before time, the supervisor does.
5    Q    Okay. Tell me about -- you also said
6 mental stress that Mr. Icenogle caused you. Tell
7 me about the mental stress.
8    A    The mental stress, he -- it was just
9 getting so bad with him just always pondering and
10 he was pondering for no reason until I would
11 just, you know, take it out on someone else.
12    Q    What do you mean "take it out on
13 someone else"?
14    A    Because he -- when he comes and the
15 way he talk or yelling or complaining, I go to my
16 employees yelling and complaining and they're
17 like wait, Tracy, we didn't do it, Robert did it
18 and I had to -- okay, you're right so...
19    Q    So would you say you took it out on
20 your employees?
21    A    Yes, I did.
22    Q    Anybody else that you took it out on?
23    A    I would get attitudes at home but I
24 wouldn't let it really affect my home because I
25 had to realize I can't bring my work home really,

Page 277

1 only the drinking part I brought home.
2    Q    Were you ever treated by a
3 psychiatrist for any of this mental stress?
4    A    No.
5    Q    Were you ever treated by a
6 psychologist for any of this mental stress?
7    A    No.
8    Q    Were you ever treated by any kind of
9 a physician for this mental stress?
10    A    No, just my pastor.
11    Q    You're not claiming any type of
12 physical injury, are you, as a result of
13 Mr. Icenogle's actions?
14    A    I don't know.
15    Q    You don't know if you are or not?
16    A    I don't know.
17    Q    You don't know if you had any
18 physical injuries?
19    A    No, I haven't had any -- well,
20 besides -- no, emotionally, physically.
21    Q    Just the stress that you told me
22 about and that's it? Did your alcohol that you
23 were drinking, consuming at that time, did that
24 affect your health?
25    A    As far as -- not that I recall.

Page 278

1    Q    Did you see a physician or any health
2 care provider regarding your alcohol consumption?
3    A    No, what I did was just -- I didn't
4 see no physician, I just went and called my
5 pastor about it.
6    Q    So your pastor is the only person
7 that you consulted regarding this stress and the
8 drinking that you say was --
9    A    With Rob Icenogle.
10    Q    Only your pastor?
11    A    Yes.
12    Q    What is your pastor's name?
13    A    Bobby Frison.
14    Q    Could you spell his last name,
15 please?
16    A    F-r-i-s-o-n.
17    Q    And what church is he a pastor in?
18    A    First Holiness Church of Dothan.
19    Q    Did your alcohol consumption cause
20 any difficulty in your marriage?
21    A    It was more -- he was more like you
22 can't be doing all of this drinking. He was
23 basically trying to steer me away from it and I
24 was, you know, just at it.
25    Q    "He" being your husband?

Page 279

1    A    Yes, he would ask me what was the
2 problem, why was I doing all of this drinking.
3    Q    He didn't like you drinking, your
4 husband?
5    A    Uh-uh, he don't drink.
6    Q    And other than your husband telling
7 you that he didn't want you to drink, was there
8 any other effect on your marriage caused by your
9 drinking?
10    A    No.
11    Q    Would you consider that you were
12 happily married throughout that time while you
13 were drinking?
14    A    There were some arguments there
15 but...
16    Q    That just means you're married
17 though, right?
18    A    Yes.
19    Q    Ms. Lampkin, have you now told me
20 about all of the monetary damages that you are
21 seeking in this lawsuit from UPS?
22    A    Yes.
23    Q    Have you told me about all of the
24 emotional or mental harm that you claim you have
25 suffered as a result of your employment at UPS?

Page 280

29 (Pages 277 to 280)

**Esquire Corporate Services**
**(888)486-4044**

1    A    Yes.

2    Q    And you said that all of that stems,
3 as you contend, from Mr. Icenogle's actions?

4    A    Yes. I want to go back. You asked
5 me the question was there anyone else did Robert
6 talk harsh to, Jennifer Bass.

7    Q    How do you know Mr. Icenogle talked
8 harshly to Jennifer Bass?

9    A    She told me about it.

10    Q    When did Ms. Bass tell you about
11 this?

12    A    This was before I physically filed my
13 suit with the EEOC, it was before.

14    Q    So it was before November 2005?

15    A    Yes.

16    Q    Did Ms. Bass tell you this on -- at
17 work?

18    A    Yes.

19    Q    And what specifically did she tell
20 you?

21    A    I don't recall what happened but she
22 just told me it was a heated up conversation.

23    Q    That she had a heated up conversation
24 with Mr. Icenogle?

25    A    How he was talking harsh to her.

Page 281

---

1    Q    But you don't recall any specific
2 word that she said he used or anything like that?

3    A    No, I don't.

4    Q    And Ms. Bass is a white female,
5 right?

6    A    Yes.

7    Q    What about -- do you have any reason
8 to believe that Mr. Icenogle has ever spoken
9 harsh to Mr. Palanjian, the full-time supervisor?

10    A    I don't know. I have never heard him
11 talk harsh to Badrig. I just heard him talk
12 harsh to Henry, throw papers at Henry so that
13 much I know. I don't know about anyone else.

14    Q    Okay. Ms. Lampkin, I just have a
15 follow-up question regarding the package car
16 driver position we were talking about earlier.
17 You never submitted any letter of interest for
18 any package car driver position, did you?

19    A    No.

20    MR. TUCKER: Can we take just a brief
21 break? I think I'm about finished.

22    (Whereupon, a short recess was
23 taken.)

24    MR. TUCKER: Back on the record.

25    Q    Ms. Lampkin, with regard to your

Page 282

---

1 retaliation claims that we just discussed a few
2 minutes ago, you discussed three people with
3 whom you say you discussed your belief that you
4 were treated unfairly on the basis of either your
5 race or gender; is that right?

6    A    Yes.

7    Q    Have you fully described for me today
8 all of the communications you've had with those
9 three individuals regarding that topic?

10    A    Yes.

11    Q    Have we now covered all of the claims
12 that you've got in this lawsuit?

13    A    Except for one of the claims when you
14 asked me how was -- what am I seeking to have
15 done, my physical, what am I requiring to have
16 done.

17    Q    For damages?

18    A    Damages and I did not tell you about
19 my expense, my attorney's fees.

20    Q    Okay. So you're telling me that
21 you're seeking to recover from UPS your attorney
22 fees in this case?

23    A    Yes.

24    Q    And is that the fees you're paying
25 Ms. James?

Page 283

---

1    A    Yes.

2    Q    Any other attorney fees other than --

3    A    No.

4    Q    -- Ms. James? Do you know how much
5 that is to date?

6    A    No.

7    Q    Have you actually paid Ms. James any
8 money so far?

9    A    Yes.

10    Q    Do you know how much that is?

11    A    Yes.

12    Q    How much?

13    A    Are you saying today?

14    Q    As of through today.

15    A    Three thousand dollars at this time.

16    Q    Did you pay Ms. Crook anything?

17    A    No.

18    Q    Or Ms. Robertson?

19    A    No, I didn't.

20    Q    You didn't pay either one of them
21 anything?

22    A    No.

23    Q    But you paid Ms. James three thousand
24 dollars?

25    A    Yes.

Page 284

30 (Pages 281 to 284)

**Esquire Corporate Services**
**(888)486-4044**

1   Q     Anything else regarding damages that
2 you're seeking --
3   A     No.
4   Q     -- other than what we've talked about
5 today?
6   A     No.
7   Q     And as far as the claim then, have
8 you told me about -- have we covered all of the
9 claims that you've got in the lawsuit now?
10   A     Yes.
11   Q     And have you told me about all of the
12 facts that support those claims you're asserting
13 in this lawsuit, Ms. Lampkin?
14   A     Yes.
15   Q     Okay.
16       MR. TUCKER:  Thank you, ma'am.
17       MS. CASSILLY:  Do you have any
18 questions?
19       MS. JAMES:  Yeah, I do have a few.
20       MS. CASSILLY:  All right.
21       MS. JAMES:  So are you done?
22       MR. TUCKER:  Yes, ma'am.
23       MS. JAMES:  Okay, great.
24       MS. CASSILLY:  He needs to put
25 something on the record about the fact that

Page 285

1   Q     Okay.  So why is it in 2007 you
2 actually filled out this intent form?
3   A     Because Alicia Palauchi came to me
4 and told me that I needed to -- when I inquired
5 about the full-time position, she told me that I
6 needed to apply for this, submit a letter into
7 the company.
8   Q     To the best of your knowledge, the
9 positions that we've covered today, the persons
10 that actually filled those positions, do you know
11 if they actually made application for those
12 positions?
13   A     I don't actually know but I have
14 asked and they all have told me that -- well, not
15 they all.  Jason has told me that he didn't
16 submit a letter and it's more supervisors that
17 used to be -- drivers that used to be supervisors
18 that are driving now and I've asked them and they
19 told me they didn't submit a letter as well.
20   Q     And who are those people?
21   A     Erica Coward and Wayne Martin, he's
22 older.
23   Q     And who's the person again that told
24 you that you needed to submit this letter?
25   A     Alicia Palauchi.

Page 287

1 we're continuing it.
2       MS. JAMES:  Right, and we can -- I
3 can do some of my questions or I can wait
4 until we reconvene.  I don't know if other
5 people got some stuff to do in the city or
6 needs to --
7       MS. CASSILLY:  It's up to you,
8 Crystal.
9       MS. JAMES:  I'll be brief.  I just
10 want to cover a couple of things.
11       EXAMINATION
12 BY MS. JAMES:
13   Q     My name is Crystal James, an attorney
14 for Ms. Lampkin.  I just need to ask you a couple
15 of questions and then we'll cut you loose for
16 today.
17       I want you to describe for me, if you
18 could, the normal process for letting the company
19 know about your desire to be promoted.
20   A     Normally, what we would do is we
21 would go to Robert and ask him about the
22 position.  We have never had to apply for any
23 position and we just go to him and ask him about
24 the position and he will tell us -- well, he
25 would tell them yes and tell me yes, no.

Page 286

1   Q     And what is her position?
2   A     She is human resource, HR.
3   Q     Okay.  Were you ever discouraged from
4 seeking a position?
5   A     After the second time that I went to
6 him, went to Robert and he didn't give me the
7 position, yes, I was.  I mean I felt like Robert
8 was not going, you know, give me the opportunity
9 to broaden my experience, that he was just
10 discriminating against me.
11   Q     The OMS position that you applied
12 for, I think you applied for it on two separate
13 occasions --
14   A     Yes.
15   Q     -- the OMS position, would that have
16 been considered a promotion or a lateral move for
17 you?
18       MR. TUCKER:  Object to form.
19   Q     You may answer.
20   A     It would have been a lateral move and
21 the reason being that I wanted to do this
22 position is because when you're at work for UPS
23 and you're doing an OMS position, this right here
24 could help you for the next full-time position
25 because OMS has experience with all of the

Page 288

31  (Pages 285 to 288)

**Esquire Corporate Services**
**(888)486-4044**

1 drivers, anything that's incoming into the
2 center, they deal with everything basically in
3 the center, OMS does and OMS truly is the next
4 full-time supervisor to me (indicating).
5    Q    Did Mr. -- is it Jason Jones?
6    A    Yes.
7    Q    Do you know if he was hired before
8 you?
9    A    I was hired before him.
10    Q    So you worked for UPS longer than
11 Mr. Jones?
12    A    Yes.
13    Q    Earlier in your testimony, there was
14 a discussion about a hold being put on
15 supervisors moving into OMS positions.  Were you
16 saying that you were told that there was a hold
17 on supervisors being put in that position or on
18 anyone getting put into that position?
19    A    On anyone getting put into that
20 position.
21    Q    So it was not just supervisors being
22 moved but anyone --
23    A    No --
24    MR. TUCKER:  Object to form.
25    A    -- no, it was a hold on moving

Page 289

1 supervisors because I was a supervisor and I
2 wanted to go to that position, it was a hold on
3 him to move me to that position.
4    Q    Did he tell you why?
5    A    No, he --
6    MR. TUCKER:  Object to form.
7    A    -- didn't give me that information.
8    Q    I'm going to talk to you a little bit
9 about Defendant's Exhibit Number 6.  These are
10 memos that you would write to the center
11 supervisor; is that correct?
12    A    Center manager.
13    Q    And did you actually draft the
14 content of each of these?
15    A    Well, I would -- I would write -- on
16 my letters, I would actually tell what happened
17 and then Robert would say no, you can't write
18 this, this is how you write it, this is what you
19 say, it was just like he would tell us what to
20 put in our letters or tell me what to put in my
21 letters.
22    Q    And so was all supervisors required
23 to write these types of letters?
24    A    I was the only one that was doing all
25 of the writing up.

Page 290

1    Q    And when you say "writing up," how
2 did these letters get initiated?
3    A    From Robert.
4    Q    And so what would he say?
5    A    He would come in and say this right
6 here happened, this right here, you had six
7 thousand missed toggles and I need you to
8 write-up a letter stating why you had six
9 thousand missed toggles and I would do that or in
10 -- on one of them in there, it's a late upload on
11 one day that I was off and Ryan at the time was
12 running the center.  He was running -- he was
13 there and the scanner didn't upload until three
14 days later, I wasn't there but I had to write
15 myself up for it.
16    Q    So Ryan wasn't required to write
17 these types of letters?
18    MR. TUCKER:  Object to form.
19    A    I don't recall him writing one.  I
20 had to write one.
21    Q    So the language in here where you
22 would accept responsibility for the action, was
23 that something that you were required to do?
24    A    Yes.
25    Q    So although you signed these, these

Page 291

1 were not yours?
2    MR. TUCKER:  Object to form.
3    A    Not all of them, no.
4    Q    Did you ever keep a copy of the
5 original letter that you drafted?
6    A    There was -- I don't recall at this
7 time that I have it or not.  I know there was one
8 that I still have and it was on -- it was when I
9 -- he, Robert called me upstairs and wanted me to
10 do a write-up and I basically told him what
11 happened and he scribbled it out and wrote on the
12 paper what he wanted me to write myself up on.
13    Q    Okay.  I just want to understand that
14 as a local sort supervisor, you were responsible
15 for anything that happened on the sort?
16    A    The two supervisors that run that
17 sort are responsible for everything that go on on
18 that sort.
19    Q    And who were the two supervisors?
20    A    At the time -- well, it was -- at
21 different times or just whom -- whomever the two
22 supervisors are.
23    Q    Let's say on UPS-0062 of Exhibit
24 Number 6 is dated September 13, 2004, who would
25 have been the two supervisors at that time?

Page 292

32  (Pages 289 to 292)

**Esquire Corporate Services**
**(888)486-4044**

1     A     Tracy Debose and Ryan Brown.
2     Q     Okay.  So were the activities split
3 in such a way that you were responsible for
4 certain activities and he was responsible for
5 certain activities?
6     A     We did it as a whole.
7     Q     So if something went wrong on the
8 sort, did both supervisors have to then write
9 this type of letter?
10    A     Yes.
11          MR. TUCKER:  Object to form.
12          THE WITNESS:  Yes.
13    Q     Okay.  So, for instance, this Number
14 0062 which also has a signature of Tyrone
15 Baldwin --
16    A     Yes.
17    Q     -- would the other supervisor also
18 write a similar letter?
19    A     Yes.
20    Q     If you want, take a look at it.
21    A     Yes, let me take a look.  I don't
22 know if he wrote himself up but he was informed
23 on it and I had to write, you know, to do a
24 write-up on the back.  He could have just told me
25 you write it up or I don't know if he told Ryan

Page 293

1 know you've been asked a lot of different things
2 about what happened since '03 up through the
3 present today and so I'm sure your brain is
4 almost mush but is there anything that you have
5 not been asked today that you would like to say?
6          MR. TUCKER:  Object to form.
7     A     Yes, because I want to know when
8 actually, you know, I made the complaint with
9 EEOC, why didn't UPS come down and talk to me,
10 why did they wait til now to come and talk to me
11 about the situation, why wouldn't they want to
12 make this better when I gave them the opportunity
13 to make it better when I filed the complaint,
14 they could have came down and spoke with me and
15 asked me what was going on with me and also, why
16 did I have to -- I mean why did I have to go -- I
17 had to go in front of the district manager when
18 an incident happened when I was on vacation, I
19 had to go to Montgomery when I had no dealings
20 with the incident that happened and when they say
21 -- when UPS brought back the letter from the
22 EEOC, they stated that Jennifer Wesley was
23 already doing the duties and she wasn't doing the
24 duties because she was working on my sort doing
25 FDC -- doing FDC work so how could she have been

Page 295

1 to write it up or not (indicating).
2     Q     Okay.  Was it normal practice that
3 both of you wrote up each incident or one of you?
4          MR. TUCKER:  Object to form.
5     A     When an incident happened, both of us
6 had to write it up.  For instance, on a time out
7 of sequence, both of us on UPS-0066, both of us
8 should have written up a letter like this and on
9 Jane Cross, she wrote herself up.  On 0063, both
10 of us should have had a letter on this.
11 Actually, I shouldn't even have a letter in on
12 this.
13    Q     And why not?
14    A     Because I wasn't there.
15    Q     So why were you required to write a
16 letter?
17    A     Because I always had to write myself
18 up even though I wasn't there and this is not the
19 first time this happened.
20    Q     Okay.  You discussed a number of
21 different documents that you've been asked about
22 today and I just wanted to put on the record that
23 you will be bringing those records in to me --
24    A     Yes.
25    Q     -- as soon as possible.  Okay.  I

Page 294

1 already performing the duties when she had to be
2 trained by Tammy Nelson on doing the duties when
3 I already knew the duties to do.
4     Q     And you're referring to which
5 position?
6     A     OMS and why on the driver position
7 that only certain people are required to turn in
8 or apply for a letter when you have people out
9 there actually did not turn in, you know, letters
10 to become drivers.
11    Q     Did you ever have to take a
12 management test, the management placement test?
13    A     I had to take the management
14 placement test.
15    Q     And is that a pass, fail type of
16 test?
17    A     They determine if you pass or fail or
18 not.
19    Q     Did you pass that test?
20    A     I passed that test.
21    Q     If you do not pass that test, are you
22 given an opportunity to take it again?
23    A     You have to wait six months.
24          MR. TUCKER:  Object to form.
25    Q     Excuse me.

Page 296

33  (Pages 293 to 296)

1   A   Six months, you have to wait six
2 months.
3   Q   **How many times did you take the test?**
4   A   One.
5   Q   **You passed it on the first try?**
6   A   Yes.
7   Q   **When did you take the test, if you**
8 recall?
9   A   I don't recall but it was in '01.
10   Q   **So before you applied for each of the**
11 **positions that we're talking about?**
12   A   Yes.
13       MS. JAMES:  I think that's all I have
14   for right now.  Do you have anything else?
15       MR. TUCKER:  Could we take a quick
16   break?
17       MS. JAMES:  Okay.
18       (Whereupon, a short recess was
19   taken.)
20       MR. TUCKER:  Back on the record.
21       Ms. Lampkin, it is true, isn't it,
22   that within the last year the human
23   resource manager for UPS' entire Alabama
24   district came down to Dothan and personally
25   met with you; is that correct?

Page 297

1   today.
2       MS. JAMES:  Okay.
3       MR. TUCKER:  Thank you, Ms. Lampkin.
4       THE WITNESS:  Thank you.
5
6       (Whereupon, the deposition concluded
7   at 4:50 p.m.)
8
9
10          *  *  *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 299

1       THE WITNESS:  Yes.
2       MR. TUCKER:  And Mr. Guy Sciro, the
3   employee relations manager for UPS's entire
4   Alabama district came down with the human
5   resources manager; is that right?
6       THE WITNESS:  Yes.
7       MR. TUCKER:  And that human resource
8   manager is Jeff Poulter, right?
9       THE WITNESS:  Yes.
10       MR. TUCKER:  And they talked with
11   you when they came down about your interest
12   in other positions within UPS; is that
13   correct?
14       THE WITNESS:  Yes.
15       MR. TUCKER:  And it's true that you
16   were reluctant to talk with them, weren't
17   you?
18       THE WITNESS:  Yes.
19       MR. TUCKER:  Okay.  I think that's
20   it.
21       We will continue the deposition
22   until such time as we get the responses to
23   UPS' discovery request that we have not yet
24   received and with that reservation, we
25   don't have any other questions for her

Page 298

1
2 September 17, 2007
3 Crystal M. James, Esquire
   Crystal James & Associates, LLC
4 8451 South Cherokee Boulevard
   Suite F
5 Douglasville, Georgia 30134
6
7   RE:  Lampkin vs United Parcel Service
        Deposition of Tracy Debose Lampkin -
        Volume 2
8        Taken on August 30, 2007
9
10 Dear Ms. James:
11 Having received a copy of the deposition in the
     above-captioned matter, please have the deponent
12 execute the attached Errata Sheet.
13 Upon execution, please return same to our office
     so that we may furnish the Original deposition
14 transcript and the executed Errata Sheet.  If we
     do not receive an executed Errata Sheet within
15 thirty (30) days from the date of this letter,
     the Original deposition transcript will be
16 forwarded to counsel of record.
17 If you have any questions, please do not hesitate
     to contact me.
18
19 Sincerely,
20
   Mary Hanham
21 Esquire Deposition Services, LLC
22
23 cc:  Jeremy Tucker, Esq.
24
25

Page 300

34  (Pages 297 to 300)

ERRATA SHEET

1
2
3        Pursuant to Rule 30(7)(e) of the
   Federal Rules of Civil Procedure and/or Georgia
4  Code Annotated 81A-130(B)(6)(e), any changes in
   form or substance which you desire to make to
5  your deposition testimony shall be entered upon
   the deposition with a statement of the reasons
6  given for making them.
             To assist you in making any such
7  corrections, please use the form below. If
   supplemental or additional pages are necessary,
8  please furnish same and attach them to this
   errata sheet.
9
            ---
10
       I, the undersigned, TRACY DEBOSE
11 LAMPKIN, do hereby certify that I have read the
   foregoing deposition, and that to the best of my
12 knowledge, said deposition is true and accurate
   (with the exception of the following corrections
13 listed below).
14
15 Page_____ Line_____should read:_____
16 Reason for change:_____
17
18 Page_____ Line_____should read:_____
19 Reason for change:_____
20
21 Page_____ Line_____should read:_____
22 Reason for change:_____
23
24 Page_____ Line_____should read:_____
25 Reason for change:_____

                                    Page 301

DISCLOSURE

1
2
3 STATE OF GEORGIA    )    DEPOSITION OF:
4 FULTON COUNTY:      )    TRACY DEBOSE LAMPKIN
5
       Pursuant to Article 8.B of the Rules
6 and Regulations of the Board of Court Reporting
   of the Judicial Council of Georgia, I make the
7 following disclosures:
8
       I am a Georgia Certified Court
9 Reporter.  I am here as a representative of
   Esquire Deposition Services.
10
11     Esquire Deposition Services was
   contacted by the offices of Alston & Bird
12 to provide court reporting services for this
   deposition.  Esquire Deposition Services will
13 not be taking this deposition under any contract
   that is prohibited by O.C.G.A. 15-14-37(a) and
14 (b).
15
16     Esquire Deposition Services has no
   contract or agreement to provide court reporting
17 services with any party to the case, or any
   reporter or reporting agency from whom a
18 referral might have been made to cover the
   deposition.
19
20     Esquire Deposition Services will
   charge its usual and customary rates to all
21 parties in the case, and a financial discount
   will not be given to any party in this
22 litigation.
23
24     _____
       MARY ANN HANHAM, CCR-B-2109
25     Certified Court Reporter
       and Notary Public.

                                    Page 303

1 Page_____ Line_____should read:_____

2 Reason for change:_____

3

4 Page_____ Line_____should read:_____

5 Reason for change:_____

6

7 Page_____ Line_____should read:_____

8 Reason for change:_____

9

10 Page_____ Line_____should read:_____

11 Reason for change:_____

12

13 Page_____ Line_____should read:_____

14 Reason for change:_____

15

16 Page_____ Line_____should read:_____

17 Reason for change:_____

18

19

20

21 _____

22        Signature

23

24

25

                                    Page 302

1

2        C E R T I F I C A T E

3

4 STATE OF GEORGIA:

5 FULTON COUNTY:

6        I hereby certify that the foregoing

7 deposition was reported, as stated in the

8 caption, and the questions and answers thereto

9 were reduced to the written page under my

10 direction, that the preceding pages represent a

11 true and correct transcript of the evidence

12 given by said witness.

13        I further certify that I am not of

14 kin or counsel to the parties in the case, am not

15 in the regular employ of counsel for any of said

16 parties, nor am I in any way financially

17 interested in the result of said case.

18

19        Dated this 17th day of September,

20 2007.

21

22

23

24        _____
          MARY ANN HANHAM, CCR-B-2109
          Certified Court Reporter
25        and Notary Public.         Page 304

                   35  (Pages 301 to 304)



#4428


**UPS** United Parcel Service

| | OFFICE USE ONLY | | |
|---|---|---|---|
| R | P | D | |
| 2 | 0363630 | | |
| LFT | OR | NI | |

Region [1 1]   District [8 1 9]

# EMPLOYMENT APPLICATION

## Part Time Positions

| Social Security No. | Name (Last, First) | Middle Initial |
|---|---|---|
| | Debose    Tracy | B |
| | Please Print | |

### CURRENT ADDRESS INFORMATION

| Address | Apt. # | Phone # (include area code) |
|---|---|---|
| | | 334 793 7548 |

| City | State | Zip Code | Alternate Phone # |
|---|---|---|---|
| Dothan | AL | 36301 | 334 793 7548 |

PREVIOUS ADDRESSES: During the last three years, beginning with most recent.

Address  Same  Apt. #  ___  Address ___  Apt. #  ___

City, State  Same  Zip Code ___  City, State ___  Zip Code ___

### GENERAL INFORMATION

| | | |
|---|---|---|
| Are you employed now? | ☑Yes ☐No | When can you begin work at UPS? ___ |
| Would you accept night work? | ☑Yes ☐No | |
| Do you have relatives employed by United Parcel Service or any subsidiary? | ☐Yes ☑No | |
| Have you ever completed an application for employment at United Parcel Service or any UPS subsidiary? | ☑Yes ☐No | When ___  Where ___ |
| Are you under 18 years of age? | ☑Yes ☑No | If yes, date of birth ___ |
| Have you ever been employed by United Parcel Service or any UPS subsidiary? | ☐Yes ☑No | When ___  Where ___ Position ___ |
| Have you ever been convicted of a felony? | ☐Yes ☑No | NOTE: Disclosure of convictions does not automatically disqualify you from employment consideration. |

If yes, give details ___

I am a U.S. Citizen or National of the U.S., an alien lawfully admitted for permanent residence, or an alien authorized to work in the U.S. for United Parcel Service.   ☑Yes ☐No

NOTE: Upon request, prior to commencement of employment, you must provide documents which establish your identity and authorization to work in the United States.

Why are you applying for part-time work? _Because I want to better myself and if I_
_take on this job part-time. Something might come open permanent._

01610514 REV. 7/96


DEFENDANT'S EXHIBIT
1
MK 8/30/07
PENGAD-Bayonne, N. J.

## EDUCATION

| | NAME OF SCHOOL | ADDRESS (City, State, Zip) | GRADUATED YES/NO | TYPE OF DEGREE | COLLEGE MAJOR |
|---|---|---|---|---|---|
| HIGH SCHOOL | Rehobeth High | 109 Old Campbellton Hwy | Yes | N/A | |
| COLLEGE | N/A | N/A | | | |
| TECHNICAL, BUSINESS OR OTHER | | | | | |

Are you attending school?  ☐ Yes  ☑ No    If yes, # of credit hours? _____    Where? _____

Are you planning to attend school?  ☐ Yes  ☐ No

Total credit hours to date _____    Cumulative Grade Point Average _____

CLASS SCHEDULE: Mon ___am___pm to ___am___pm   Tue ___am___pm to ___am___pm   Wed ___am___pm to ___am___pm   Thu ___am___pm to ___am___pm   Fri ___am___pm to ___am___pm

## PREVIOUS EMPLOYMENT

List below the names of the last two employers, beginning with the most recent.

| a. COMPANY NAME, b. STREET, c. CITY, STATE, ZIP | COMPANY'S TELEPHONE NUMBER | EMPLOYED FROM MO | YR | TO MO | YR | POSITION | SALARY | NAME OF SUPERVISOR | REASON FOR LEAVING |
|---|---|---|---|---|---|---|---|---|---|
| a. Mardens Gold b. 100 W. Powel St c. Dothan, Al 36301 | 792-8211 | 1 | 96 | 4 | 97 | Machine Operator | 9.71 | Joe Langow Larry Watkins | Closed down |
| a. Aladan b. 161 Adevue c. Dothan, Al 36301 | 792-2573 | 1 | 96 | 1 | 96 | Operator | 6.19 | Rick Carr | |

Are there any employers whom you DO NOT wish us to contact?  NO

Have you ever been discharged by a previous employer?  ☐ Yes  ☑ No
If yes, when ___/___/___
Please explain the circumstances: _____

Have you collected Unemployment Compensation within the last five years?  ☑ Yes  ☐ No

Number of weeks collected:  20    When?  95

## U.S. MILITARY SERVICE

☐ Yes  ☑ No

Branch  N/A

Specialty  N/A    Service schools  N/A

NOTE: Upon request prior to commencement of employment you must provide a copy of DD214.

## APPLICATION AGREEMENT

I understand and agree that nothing contained in any UPS handbook, manual, rules or regulations, practice, policy, etc., creates an employment contract, express or implied, between myself and UPS.

I also understand and agree that, if I am offered a position with UPS, it will be offered on condition that my employment shall be at will and for no definite period, and that any employment may be terminated at any time with or without cause and with or without prior notice.

I represent that I am not relying upon any promises or representations regarding either the nature or duration of my employment in accepting employment if it is offered to me. I understand that no supervisor, manager or other representative of UPS has any authority to enter into any express or implied contract. I also understand and agree that no promise, representation, inducement or agreement contrary to the above is binding unless it is in writing, expressly states that it is a contract, and is signed by a member of UPS' Executive Committee.

My signature below certifies that I understand the foregoing agreement on at-will status in the sole and entire agreement between UPS and me concerning the duration of my employment and the circumstances under which my employment may be terminated and supersedes all prior arrangements, understandings and representations concerning my employment with UPS if employment is offered to me.

I authorize UPS to verify employment references in connection with my application for employment and subsequently as UPS deems appropriate. I hereby release from all liability or damages those individuals, corporations, or organizations who provide such information to UPS. I understand any such information provided shall become the exclusive property of the company.

If I am offered employment, I will, as a condition of employment, be required to submit proof of my identity and legal right to work in the U.S.

The facts set forth in this application are true and correct. I understand that if I employed, any false or misleading statements, omissions or failure to fully answer any questions may result in my dismissal, regardless of when such information is discovered.

This certifies that I have reviewed the above, understand and agree to it and that all entries made by me are true and correct.

APPLICANT'S SIGNATURE  Gracie Osborne    Date  1/13/97

United Parcel Service will provide reasonable accommodation during the employment process, as well as on the job, if such an accommodation is requested by an applicant or employee. UPS invites applicants with disabilities to voluntarily identify accommodations that may be required.

### FOR OFFICE USE ONLY

| | | | |
|---|---|---|---|
| Interviewer  Earls | Date  1/13/99 | Interviewer | Date  ___/___/___ |
| Employment Approved By  D Dehl | | Date  1/28/97 | |
| Payroll Center  3630 | Job Title  PT Odr | | DOE  1/29/97 |

UPS - 0041

**CHARGE OF DISCRIMINATION**

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on reverse before completing this form

ENTER CHARGE NUMBER
[ X ] EEOC
130-2006-00783

_____ and EEOC

(State or local Agency, if any)

| NAME (Indicate Mr., Ms., or Mrs.)<br><br>Tracey Lampkin | | HOME TELEPHONE NO.<br>(Include Area Code)<br>334-691-7272 |
|---|---|---|
| STREET ADDRESS | CITY, STATE AND ZIP<br>Cottonwood, AL 36320 | COUNTY<br>Houston |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below.)

| NAME<br>United Parcel Service | NO. OF<br>EMPLOYEES/MEMBERS<br>Over 15 | TELEPHONE NO. (Include<br>Area Code)<br>334-794-3886 |
|---|---|---|
| STREET ADDRESS<br>4116 N. Montgomery Highway | CITY, STATE AND ZIP<br>Dothan, AL 36303 | COUNTY<br>Houston |
| NAME | RECEIVED<br>EEOC<br><br>NOV 0 7 2005<br><br>BIRMINGHAM DISTRICT OFFICE | TELEPHONE NO. (Include<br>Area Code) |
| STREET ADDRESS | CITY, STATE AND ZIP | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es):<br>:] Race [x] Color [x] Sex [ ] Religion [ ] Age [ ] Disability<br><br>[] National Origin [x] Retaliation [ ] Other | DATE MOST RECENT OR<br>CONTINUING DISCRIMI-<br>NATION TOOK PLACE<br>(Month, day, year)<br>Continuous and Ongoing |
|---|---|

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s):

Social Security Number:_____  Date of Birth:  5-24-70   Sex:  Female   Race:  African American

    I, Tracey Lampkin, began working for United Parcel Service (UPS), in 1997 as a part time employee. In 2001, I was promoted to Local Sort, Part-Time Supervisor after passing the required management placement test. I worked for two different Center Managers and in 2002, Robert Icenogle became the third Center Manager at UPS. After Icenogle was hired, I began to suffer racial and sexual discrimination. I will not try to list everything, but will attempt to summarize the discrimination I have been and continued to be subjected to at UPS.

| [X] I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary to meet State and Local Requirements)<br><br>I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
|---|---|
| I declare under penalty of perjury that the foregoing is true and correct.<br><br>*Tracey Debose Lampkin*<br>11-08-05<br>Date    Charging Party<br>    (Signature) | SIGNATURE OF COMPLAINANT<br>*Tracey Debose Lamplin*  11-3-05<br>SUBSCRIBED AND SWORN TO BEFORE ME<br>THIS DATE *Marla D. Dykes*<br>(Day, month, and year)  My Commission<br>Expires 11-8-06 |

DEFENDANT'S
EXHIBIT
2

Page 2 EEOC Charge
Name: *[handwritten]*
Social Security #:
Date: 11-3-05

RECEIVED
EEOC     *[handwritten: B0-2006-00188]*

NOV 0 7 2005

BIRMINGHAM DISTRICT OFFICE

Since 2003, I have requested several different positions within the company however I have been overlooked and/or denied the positions because of my race. I have applied for two Pre-Load Supervisor's positions, and three Operational Management Services (OMS) positions. All of these positions have been filled by white employees, most of whom were not required to take the management placement test. Additionally, I have more seniority than any of the white employees who were given the positions over me.

During the summer of 2003, Icenogle promised me an OMS position, but did not follow through. Instead, when the position was to be filled, he told me that there was a hold on hiring supervisors. I called the District Manager's office, and asked about the hold on hiring. I was informed that there was no hold. Icenogle placed a white female in the position. I was as qualified or more qualified than the white female.

A Pre-Load Supervisor position also became available sometime in 2003. I applied, but Icenogle would not consider me for the position. The position was filled by a white male, who was not required to take the management placement test. Icenogle informed me that I was going to stay on Local Sort.

Another Pre-Load Supervisor's position became available around February 2004, and I applied for the position. Again, Icenogle would not consider me for the position and told me that I was going to stay on Local Sort because that was what I knew. I tried to explain that I wanted to learn more about the company so that I could advance; however, because of my race, he refused to consider me for the position. A white male was given the position, and again, this white employee was not required to take the management placement test.

A second OMS position became available in May 2005. Icenogle approached me and told me that he knew I wanted the position. When I confirmed that I did, he informed me that it was his Center and he would put me where he wanted me to be. Further, despite previously telling all of the supervisors that we were equals, he tried to discourage me from wanting this position by telling me that it would be a demotion and cut in pay. It is my understanding that this is not true. A white female was given the position although she was only a temporary employee and had only been with the company for a little over a year. She was not required to take the management placement test and has stated that she would have probably failed the test if she had been required to take it. I was more qualified for the position than the white female. Additionally, this same employee was hired through a temporary agency directly into an OMS position without taking the Management test. I had inquired about this OMS position before the white female was hired, but was not given the position.

A third OMS position became available in July 2005, and I applied for it. Another African American female also applied for the position. The position has been given to a white female that worked under my supervision. I am more qualified than the white female who is going to have to be trained to do the job. I would not have required training for the position. The white female was given the position even though the new Center Manager was well aware that I had asked for the position. He approached me when the position first became available and told me that he knew about the problems I had been having and that he knew I was interested in the position. Further, before the position was filled, the other black female had been acting as the OMS and will still be required to cover the position should the white female call in sick or otherwise not report to work. Again, as a deterrent, I was told the position would be a demotion. This could not be true if the supervisor positions are equal as Icenogle had told us before.

I did complain to a black full time supervisor several times. I told him that I felt Icenogle was prejudiced towards the black employees. This supervisor agreed that I was not getting the positions because of the color of my skin. It is also my understanding that Icenogle treated the black drivers differently than the white drivers. He continuously nagged them about issues that he did not address with the white drivers. It is my understanding that the black drivers filed discrimination charges against Icenogle, but UPS did not take action to address their complaints.

Page 3 EEOC Charge
Name: Tracy ~~Dibox Lamplin~~
Social Security #:
Date: 11-3-05

130-2006-00783

I have also suffered discrimination in pay due to both my race and sex. Ryan Brown, a white male, was hired in February 2003, and was quickly promoted to a supervisory position equal to mine. In the past two years, Brown has been given higher raises than me. In 2004, my raise for the year was less than Brown's despite my having a better job performance than Brown. This year, Brown and I are working in the same department and again, his raise was considerably higher than mine.

I have also suffered and continue to suffer discrimination in regards to discipline. I have been and continue to be forced to write myself up for the same or substantially the same errors the white supervisors make; however, the white supervisors are not required to write themselves up. I have, on several occasions, been required to do a write up on myself even when I was out of work on vacation or off for the day and was not responsible for the errors. On one occasion, I had to write myself up when I knew there was going to be a problem and called Icenogle ahead of time to let him know there was going to be a problem. Instead of helping me deal with the problem, he let the error occur and then instructed me to do a write up. Around May 2005, Icenogle tried to suspend me following a problem with the SCS machine, but could not justify the suspension. The two white supervisors working on the SCS machine with me were not threatened with suspension, instead the entire incident was blamed on me. I believe that Icenogle was trying to get me fired and that if I had been suspended, I would have been fired.

Sometime in June, Icenogle was moved to another department. While he was my supervisor, I was scared to report Icenogle's discrimination because he had informed us that he could and would get rid of anyone that he wanted out. Since Icenogle's transfer, I have complained to Human Resources and told them that I felt I had been discriminated against. Nothing has been done to remedy the discrimination I have suffered and continue to suffer.

Upon information and belief, it is my understanding that other black employees at United Parcel Services have been racially discriminated against and have complained about the racial discrimination and harassment.

I believe that I have suffered and continue to suffer from racial discrimination, sexual discrimination and retaliation while employed with United Parcel Services, and that I was and continue to be discriminated against because of my race, black and sex, female. I have been discriminated against because of my race and sex in job assignments, training, promotions, wages, discipline, discharge, and other terms, conditions, and privileges of employment; and retaliated against in that the conduct was wilful, malicious, and in wanton disregard of my federally protected rights. Moreover, I believe that UPS has engaged in a pattern and practice of race discrimination against myself and other African Americans. I believe, further, that UPS applied facially neutral job provisions in a way that has a disparate impact on African Americans. I believe that African Americans are discriminated against as a class in job assignments, training, promotions, wages, discipline, discharge, and other terms, conditions, and privileges of employment.

_Tracy Dibox Lamplin_
Charging Party

11-3-05
Date

RECEIVED
EEOC

NOV 0 7 2005

BIRMINGHAM DISTRICT O...

Enclosure with EEOC
Form 131 (5/01)

# INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14   Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

Case 1:06-cv-00538-WKW-CSC     Document 33     Filed 04/01/1997     Page 1 of 12
Case 1:06-cv-00538-WKW-CSC     Document 27     Filed 03/16/2007     Page 1 of 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTIRCT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| TRACY D. LAMPKIN | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION FILE |
| | ) |
| v. | ) NO: CV 1:06cv538-WKW |
| | ) |
| UNITED PARCEL SERVICE | ) |
| | ) |
| | ) |
| Defendant, | ) |

## AMENDED COMPLIANT

COMES NOW **TRACY LAMPKIN** (hereinafter "Ms. Johnson" or

"Plaintiff"), Plaintiff, by and through her undersigned counsel, and sets for her

amended compliant for damages against the above-named Defendant United Parcel

Service a duly incorporated company within the State of Alabama as follows:

## JURISDICTION

### 1.

This action is for discrimination based upon race, sex and retaliation arising

under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.

(hereinafter "Title VII") and violation of the Equal Pay Act Plaintiff seeks

declaratory and injunctive relief, back pay, front pay, compensatory damages,

1


DEFENDANT'S EXHIBIT

3

mH 8/30/07

punitive damages and attorney's fees and costs.  The claims herein present a

federal question thus jurisdiction is proper before this Court pursuant to 28 U.S.C.

§1331 and U.S.C. 1343.  Plaintiff further invokes pedant jurisdiction of this Court

to hear and decide claims arising under the laws of the State of Alabama.

## VENUE

2.

All parties to this action reside or are located within the boundaries of this

judicial district, and venue is proper pursuant to, *inter alia,* 28 U.S.C. Section 1391

(b) and 42 U.S.C. Section 2000e-(f) (3).  Moreover, all action alleged herein

occurred within the Middle District of Alabama. Venue in this district is proper

pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES

3.

Plaintiff, Ms. Lampkin, is a black female resident of the Middle District of

Alabama, and at all times relevant to this matter was employed by the Defendant

United Parcel Service

4.

This Court has personal jurisdiction over United Parcel Service  United

2

Case 1:06-cv-00538-WKW-CSC     Document 62-4     Filed 12/21/2007     Page 87 of 132

Case 1:06-cv-00538-WKW-CSC     Document 33     Filed 04/05/2007     Page 3 of 12
Case 1:06-cv-00538-WKW-CSC     Document 27     Filed 03/16/2007     Page 3 of 12

Parcel Service is now, and at all times relevant to this action is a corporation duly

incorporation in the state of Alabama and within the Middle District of Alabama of

the United States District Court.

## ALLEGATIONS

5.

The Plaintiff incorporates by reference her previous complaint and

paragraphs 1 through 4 of this compliant as if fully set forth herein.

6.

On or about 1997, Plaintiff was hired as a part-time employee and was

promoted in 2001 to Local Sort, Part-time supervisor after passing the required

management placement test by United Parcel Service, the Defendant.

8.

Plaintiff's immediate supervisor during times relevant to the present claims

while employed at Defendant United Parcel Service was Defendant's agent Robert

Icenogle.

9.

While employed as a supervisor for approximately six (6) years, Plaintiff

received very good performance reviews and had primary responsibility for a

number of employees under her supervision.  During execution of said duties,

Plaintiff was subjected unlawful discrimination in violation of the Title VII.

3

10.

Plaintiff made numerous requests for promotions to her immediate

supervisor, Robert Icenogle.

11.

The Plaintiff in her position for the Defendant United Parcel Service was

responsible for many different functions.   Plaintiff performed these functions

satisfactorily while employed by the Defendant and trained many Caucasian and

male co-workers who have gone on to be promoted over her.

12.

The Plaintiff made her immediate supervisor of her desire to be considered

for promotion and was told at each inquiry that the position sought would mean a

reduction in pay for her.  On or about February 2005, an OMS position became

available.  The Plaintiff indicated her interest in the position to her supervisor,

Robert Icenogle, who tried to dissuade her from seeking the position by telling her

it would mean lower compensation which was not true.  The Plaintiff continued to

show interest in the position and was looked over when a less qualified Caucasian

female who was working as a temporary employee was given the position without

being required to pass the management placement test.

13.

On or about November 2005 Plaintiff applied for an OMS position.  The

4

Case 1:06-cv-00538-WKW-CSC    Document 62-4    Filed 12/21/2007    Page 89 of 132

Case 1:06-cv-00538-WKW-CSC    Document 33    Filed 04/05/2007    Page 5 of 12
Case 1:06-cv-00538-WKW-CSC    Document 27    Filed 03/16/2007    Page 5 of 12

position was given to a less qualified Caucasian female trained by the Plaintiff and who reported to the Plaintiff. The Plaintiff was also required to fill in for the Caucasian female who received the position in her absence indicating her ability to the job. The Plaintiff has received lower pay raises than Caucasian and male co-worker who have been hired after her.

14.

The Plaintiff has been given lower pay raises than her Caucasian male counterpart, Ryan Brown, who was hired after the Plaintiff and promoted to a position equal to that of the Plaintiff. The Plaintiff has consistently had better job performance while working in the same department yet her pay raises were significantly lower.

15.

The Plaintiff complained internally to another supervisor as well as to Human Resources regarding her discriminatory treatment based upon her race and sex. Nothing was done to address her concerns. After making said complaints the Plaintiff was denied training opportunities, was subjected to discipline when other Caucasian employees were not, and continued to be passed over for promotion opportunities. Therefore, on or about November 3, 2005 the Plaintiff filed EEOC for violation of the Title VII based upon her race, sex, and retaliation.

Case 1:06-cv-00538-WKW-CSC     Document 62-4     Filed 12/21/2007     Page 90 of 132

Case 1:06-cv-00538-WKW-CSC     Document 33     Filed 04/05/2007     Page 6 of 12
Case 1:06-cv-00538-WKW-CSC     Document 27     Filed 03/16/2007     Page 6 of 12

16.

All conditions precedent to the institution of this lawsuit has been fulfilled
and this action is properly before this Court.

## FIRST CAUSE OF ACTION:

## VIOLATION OF TITLE VII-DISPARATE TREATMENT FAILURE

## TO PROMOTE and Racial Discrimination

19.

Plaintiff incorporates by reference paragraphs 1-18 of the Amended
Compliant as if fully set forth herein.

20.

Plaintiff was employed by United Parcel Service.

21.

Defendant United Parcel Service's had the ability to hire, fire, discipline,
demote, and/or lay off the Plaintiff.

22.

Defendant Robert Icenogle on behalf of United Parcel Service discriminated
against the Plaintiff due to her race and sex.

23.

Plaintiff has a claim for disparate treatment and racial discrimination

6

Case 1:06-cv-00538-WKW-CSC    Document 62-4    Filed 12/21/2007    Page 91 of 132

Case 1:06-cv-00538-WKW-CSC    Document 33    Filed 04/05/2007    Page 7 of 12
Case 1:06-cv-00538-WKW-CSC    Document 27    Filed 03/16/2007    Page 7 of 12

because (1) she is a member of a protected class; (2) her job performance and qualifications were sufficient to meet employer's expectations for positions applied for; (3) she was not promoted despite her qualifications; and (4) upon information and belief the employer hired someone not of her protected class for the position.

24.

United Parcel Service's is liable for the actions of the Defendants.

25.

The Plaintiff suffered damages as a result of this discrimination.

26.

As a direct and proximate result of United Parcel Service's abovementioned discriminatory actions, Plaintiff has suffered lost wages and benefits, significantly diminished future employment opportunities, and emotional distress consisting of outrage, shock, and humiliation.

## SECOND CAUSE OF ACTION:
## UNLAWFUL RETALIATION

27.

Plaintiff incorporates by reference paragraphs 1-26 of the Amended Compliant as if fully set forth herein.

28.

Plaintiff complained about the racial discrimination and hostile work

7

environment that she was subjected to while employed at United Parcel Service
and as a result of such complaints, Plaintiff suffered and adverse employment
action and was retalitorially issued disciplinary actions and denied training
opportunities.

29.

Plaintiff suffered damages as a result of United Parcel Service retaliatory
conduct.

30.

As a direct and proximate cause of United Parcel Service abovementioned
discriminatory actions, Plaintiff has suffered lost wages and benefits, significantly
diminished future employment opportunities, and emotional distress consisting of
outrage, shock, and humiliation in an amount to be determined at trial.

**THIRD CAUSE OF ACTION:**

**VIOLATION OF THE EQUAL PAY ACT**
31.

Plaintiff incorporates by reference paragraphs 1-30 of the Amended
Compliant as if fully set forth herein.

32.

The has claim of violation of the Equal Pay Act because she received less
pay than individuals of the opposite sex for equal work requiring equal skill, effort,
and responsibility, under similar working conditions within the same

8

establishment.

33.

Plaintiff suffered damages as a result of Computer Science's discriminatory

conduct regarding equal pay for equal work.

34.

As a direct and proximate result of United Parcel Service's abovementioned

discriminatory actions, Plaintiff has suffered lost wages and benefits, significantly

diminished future employment opportunities, and emotional distress consisting of

outrage, shock, and humiliation.

**WHEREFORE,** Plaintiff demands a **TRIAL BY JURY** and demands the

following relief :

1. The Court adjudge the Defendant United Parcel Service to have

    engaged in unlawful employment practices under *inter alia,* Title VII

    of the Civil Rights Act of 1964, as amended and the Equal Pay Act ;

2. the Court enjoin the Defendant United Parcel Service from engaging

    in unlawful employment practices under, *inter alia* Title VII of the

    Civil Rights Act of 1964, as amended and the Equal Pay Act;

3. an award of compensatory damages against Defendants joint and

9

severally, in an amount to be determined by the enlighten conscious of

a jury, including, but not limited to, back pay, loss of benefits,

emotional distress, pain and suffering, mental anguish, loss of

enjoyment of life ;

4. an award of punitive damages in an amount to be proven at trial and

sufficient to deter the malicious, willful, wanton and reckless conduct

by the Defendants herein ;

5. Recovery of the necessary expenses of litigation including reasonable

attorneys' fees under 42 U.S.C. 1988 ; and ;

6. Such other and further relief as this Court deems just and proper.

Respectfully submitted this 8th day of March, 2007.

CRYSTAL M. JAMES, ESQ.
Attorney for the Plaintiff
State Bar #515292

CRYSTAL JAMES & ASSOCIATES, LLC
8451 S. Cherokee Blvd.
Suite F
Douglasville, GA 30134
770-489-9898
770-489-5602 (FAX)

EMAIL: JAMESLLC@BELLSOUTH.NET

10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTIRCT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| TRACY D. LAMPKIN | ) |
| | ) |
| Plaintiff, | ) CIVIL ACTION FILE |
| | ) |
| v. | ) NO: CV 1:06cv538-WKW |
| | ) |
| UNITED PARCEL SERVICE | ) |
| | ) |
| | ) |
| Defendant, | ) |

## CERTIFICATE OF SERVICE

This is to certify that I have this 8th day of March served the Defendant United Parcel Service with a copy of this Amended Compliant by affixing appropriate postage and mailing to the following address:

William J. Baxley
Donald R. James, Jr.
BAXLEY, DILLARD, DAUPHIN, MCKNIGHT & BARCLIFT
2008 Third Avenue South
Birmingham, AL 35233

*(Signature on Following Page)*

11

Submitted this 8th Day of March 2007.

CRYSTAL JAMES, Esq.
Attorney for Plaintiff
Alabama Bar # 515292
8451 S. Cherokee Blvd. Suite F
Douglasville, Alabama 30339
770-489-9898

12

CJ AND ASSOCIATES

08/29/2007  16:09  7709845457          3347120043        To:7709845457          P.6/20
MAY-09-2007 08:59 From:COPIES

MANAGEMENT ASSESSMENT and PROMOTION PROCESS

LETTER OF INTEREST COVER SHEET

EMPLOYEE NAME: _Tracy Lampkin_____

EMPLOYEE ID: _0504959_____

MANAGER'S NAME: _____David Ray_____

SUPERVISOR'S NAME (IF APPLICABLE): _Henry Hall_____

---

I am submitting the attached letter of interest to be considered for
the following level of management. You may only select ONE of the
following options:

☐ PT management or ☐ FT specialist or ☐ FT supervisor or ☑ Both FT
specialist and FT supervisor

---

**PT Management:**
PT management employees typically work fewer than 30 hours per week,
may supervise others, may be rotated to other types of positions, and
are able to participate in the Earn and Learn program for tuition
assistance (where available) to continue their education.

**FT Specialist:**
FT specialist employees work 40 or more hours per week, typically do
not have direct reports, and may be asked to travel in some instances.

**FT Supervisor:**
FT supervisors work more than 40 hours per week, supervise others, may
be rotated to other types of positions, and may be asked to travel or
relocate.

---

Provide the requested information below.

Do you have any relatives employed by UPS?     ☐ Yes    ☑ No

If yes, provide their names, position, and location below:

Name: _____
Name: _____

Relationship: _____    Relationship: _____
_____

Location: _____
                    Location: _____



DEFENDANT'S
EXHIBIT
4
MH 5/30/07

ImpactOfAnIncrease

# Annualized Impact of Your Salary Increase

| | |
|---|---|
| Assigned Center | DOTHAN |
| Name | BROWN, RYAN |
| Employee ID | 1515188 |
| Grade | 099 |
| Current Salary | $1,275.00 |
| Increase | $70.00 |
| New Salary | $1,345.00 |
| Last Increase Date | 8/4/2003 |
| Pay Cycle | Monthly |

BROWN/2004
Increase
@ 70.°°

### Annualized Financial Impact

| | |
|---|---|
| Base Salary | $840.00 |
| Half Month | $35.00 |
| Potential UPS Savings Plan Match | $26.00 |
| **Total** | **$901.00** |

401K      Are you receiving your 401(k) match, an essential component of you total retirement income from UPS? In 2003, UPS matched over $75.8 million in pre-tax contributions to the UPS Savings Plan, which purchased over 1.2 million UPS class A shares for participants. If you're not in the Plan, go to the Web site at http://upssavings.uxplans.com to enroll today using our easy pinless process.

If you already participate in the Plan, now is a great time to think about increasing your contribution and reviewing your investments. You need your PIN to access your account, and can request a PIN reminder through the Web site.

DESPP     The Discounted Employee Stock Purchase Plan provides UPS employees the opportunity to purchase UPS "A" shares at a 10 percent discount through payroll deduction. There are two methods to enroll in the Discounted Employee Stock Purchase Plan:

- On the web at www.melloninvestor.com. Look for "MellonOne".
- On the phone at 1-888-663-8325

With either, you will need a Mellon personal identification number (PIN). Forgot your PIN? Call Mellon at the above number, enter your social security number, and then hit #0, to talk to a Mellon representative.

Financial   As part of your benefit package, UPS offers free financial education programs through PricewaterhouseCoopers. Take control of your financial future!
Planning    Learn how you can get the most from your income and finances by visiting https://www.pwcadvisor.com. Use your Employee ID plus the letters ups (lower case) as your user name, and your last name (in CAPITALS) as your password

## UPS... a great place to be



DEFENDANT'S
EXHIBIT
5
FINGAD-Bayonne, N.J.
MH 8/30/07

To: Cass Williams

From: Tracy Debose

Subject: Air Departure

On Tuesday November 29, 2005 Cass spoke with Ryan and myself about air departure. I understand that air must pull on time. The pull time for air is 19:50. If I have any concerns I will contact Cass or Henry immediately.

Tracy Debose
*Tracy Debose*
Local Sort Supervisor



DEFENDANT'S
EXHIBIT
6
MW 8/30/07

To: Cass Williams

From: Tracy Debose

Subject: Left in Building

On Thursday July 30, 2005 we had a part-timer checking off package cars to make sure all cars was unloaded. We had a package car left and not checked with 18 packages on it. To prevent this from happening in the future Ryan and I will check behind all part-timers to make sure this will not happen again.

Tracy Debose
*Tracy Debose*
Local Sort Supervisor

UPS - 0052

To: Robert Icenogle
From: Tracy Debose
Subject: Customer Counter


Paige Odom came to me last week and gave me a request off sheet to be off this past Thursday May 12, 2005. I asked Cynthia Debose about working on this day and I did tell her I will get back with her. Cass told me today that Paige has to report to Tammy or him if she wants to request off in the future. I do understand this was a inconvenience for our customers. I will never again be put in this matter not having the counter opening on time and having customers waiting.


Tracy Debose


Local Sort Supervisor


UPS - 0053

To: Robert Icenogle
From: Tracy Debose
Subject: 27:30 Hours


I understand that I must call Robert before I go over 27:30 hours in any week. I worked 27.81 hours the week ending 5/7/2005. This will not happen again. Robert will receive a phone call from me in the future if I am approaching the time line.


Tracy Debose

*Tracy Debose*

Local Sort Supervisor

UPS - 0054

To: Robert Icenogle
From: Tracy Debose
Subject: Internationals

On Monday May 2, 2005 about 8:00 P.M . Jennifer Wesley came to me and told me
Movie Gallery had a incorrect invoice. I asked her are you sure did you count each
package. She told me yes she did. I went to the location were the shipment was and
looked at some of the shipment to verify the shipment I.D. number and not the entire
labels. I called Robert and he said have you verified the packages. I said yes he then gave
me Tony Cooper number and I called Tony. The next day when Tony came in he looked
At the packages and found that we had 2 domestic packages in with the internationals. In
the future to keep this from ever occurring again Jennifer and I will verify all shipments
together. We need to get with Movie Gallery on putting their shipment in the loads. I do
apologize and this will never happen again.

Tracy Debose

*Tracy Debose*

Local Sort Supervisor

UPS - 0055

To: Robert Icenogle
From: Tracy Debose
Subject: Internationals


On May2, 2005 Jennifer did not verify an international shipment of 23 packages 3 were
domestic. I instructed Jennifer to make sure to verify the packages to avoid holds on
Movie Gallery. She said she did and we had a hold on the packages and her invoice was
correct as well as the packages. Jennifer understands she is responsible for all
internationals packages being accounted for. This will not happen again and she
apologizes for any inconvenience to our customers.




                                                    Tracy Debose


                                                    Local Sort Supervisor




Jennifer Wesley *  RTS




UPS - 0056

From: Tracy Debose

Subject: Concern


A request came in last night February 3, 2005 on a HWC on 1000 Edgewood
Dr. Adam King was the ECS clerk he was to pull this package and put it in
ECS as HWC. This package was not pulled and the customer came in today
to pick this package up we failed her in not pulling her package. I will
document Adam on this matter and let him know any occurrences like this in
the future will result in disciplinary action. I will OJS him again on all
HWC, and Delivery Requests of any kind.


                                        Tracy Debose
                                        Tracy Debose

To: Robert Icenogle
From: Tracy Debose
Subject: Part-Timers over 5


The procedure in place for part-timers is know one go over 5 hrs unless Henry Hall or Robert is notified. On Monday night the 24 of January we had every one to go over five hrs due to the SCS machine. Wednesday we also had employees over 5. Movie Gallery don't tell us if they trailers are double stacked so therefore if they told us 2 it's actually 4 trailers we have reported this before. We will notify Henry Hall before anyone go over or approach 5 hours.


Tracy Debose

Local Sort Supervisor

To: Robert Icenogle
From: Tracy Debose
Subject: Scanner Control Log


I understand that I must use the scanner control log every day. This is a procedure in place for a reason we have not being using it like we should be. There is no excuse for not checking out each scanner daily like we are supposed to do. I will no longer let this happen I also will make sure that Ryan is aware of this procedure as well. As of January the 20, 2005 every scanner will be logged out.


Tracy Debose


Local Sort Supervisor

UPS - 0059

**To: Robert Icenogle**
**From: Tracy Debose**
**Subject: Late Air**

On November 4, 2004 we had 2 drivers to come in with late volume. Chipley and Davis both came in late around 7:45 P.M. at this time air is already late. You can not bring in heavy volume at this time and some of it being international. Davis was very heavy and I made the discussion to send Greg on he left about 8:01. It was seven letters that needed to be processed I did not want to hold Greg any longer I know Mike is running the airport this week and he always expresses getting that air out on time. I also notified him to let him know we are sending a chaser. We need to notify Chipley and get Clarence In EARLY with all heavy volume.

Tracy Debose

Tracy Debose

**Local Sort Supervisor**

To Robert Icenogle
From: Tracy Debose
Subject: PT Over 5

On Monday October 4, 2004 Nancy Cross worked 5.42 hrs due to timecard errors from
the preload and tracking numbers. I was aware of the preload errors. I was checking the
local sort cards and notice that several of the preloaders and drivers were not coded. Jane
called Henry so she could put the right code in for the preloaders and got his voice mail
he later called back and she was over five at this time.

Tracy Debose
Tracy Debose
Local Sort Supervisor

UPS - 0061

September 13, 2004

To: Robert Icenogle
From: Tracy Debose
Subject: Air Bag Not Linked

On September 7, 2004 we had an air bag not linked to the container. Tyrone Baldwin was on air. Tyrone claims he did scan all bags he saw the green light and heard the beep. I talked with Tyrone and he understands that all bags must be initials and scanned in the present of a supervisor. Tyrone understands that any further occurrences will result in disciplinary action. I also explained to Tyrone why we must have all packages scanned and all bags linked. Tyrone assured me that this will not happen again and he will be more aware of his scanning.

Local Sort Supervisor

Tracy Debose

Tyrone Baldwin

UPS - 0062

To: Robert Icenogle
From: Tracy Debose
Subject: LATE UPLOAD


On Friday August 27, 2004 we a scanner not uploaded. I was not
here when this happen. We have certain procedures in place to
avoid this. Every night two tracking numbers is to be tracked out
of each scanner. We have not been tracking from smalls but from
the trailers. On this night this procedure didn't happen and we had
a scanner not to upload. This scanner didn't uploaded until (3) days
later. To prevent this from happening in the future we are now
tracking (10) numbers from each scanner. The diad clerk and a
supervisor will verify that all scanners are uploaded and turned in
nightly.


Local Sort Supervisor
*Tracy Debose*
Tracy Debose

UPS - 0063

To:       Robert Icenogle
From:     Jane Cross
Subject:  Trailer Forecasting
Date:     June 08, 2004

When I looked out the office window and saw the air trailer gone I forecasted it. The trailer had not actually pulled off the lot but had been pulled forward for packages to be off loaded on to it. As soon as I realized my mistake I brought it to Tracy's attention. In the future no trailers will be forecasted without Tracy or Ryan being in the office.

Jane Cross

*Jane Cross*

UPS - 0064

To: Robert Icenogle
From: Tracy Debose
Subject: Jane Cross

On Tuesday June 8, 2004 Jane Cross informed me immediately after she realized that the air trailer was not gone that she had forecast the trailer. Jane told me she saw the air trailer leaving so she went ahead and forecasted the trailer. The trailer did not leave we had Earl to move up the trailer so we could unload Chipley feeder into our feeder this just started with this new run. I talked with Jane and documented this talk-with that she must be present with me or Ryan when forecasting any loads and the scanners must be in the cradle per Tracy Debose and Ryan Brown.

Tracy Debose

*Tracy Debose*

Nancy Cross

*Jane Cross*

UPS - 0065

June 3, 2004

To: Robert Icenogle
From: Tracy Debose
Subject: Time Out of Sequence

On Tuesday June2, 2004 we had a time out of sequence error and I can sit and tell you excuses but I will not do this. The trailer was sealed at 21:67 and I forecasted it at 21:47 my paper work is the same 21:67. I hit the wrong button. This is a careless error and it should not have happen. I know we are to send our customer the right information and this will not happen because of what I did. I will look carefully over my screen before I press the enter key. This has been a ongoing process with Departure Error and we will get this problem fixed. In order to hold my people accountable I have to step up a notch my self and I will do this. I will take care of this problem. I am aware that we can not have any errors in Departure Scans.

Tracy Debose

*Tracy Debose*

To: Robert Icenogle
From: Tracy Debose
Subject: Left In Building
Date:  May 21,2004


On Thursday night we had a package car that was not checked. The pkg car number was 654100. Tyrone Baldwin checks each car and check it off on a check sheet each night. This car was not unloaded I talked with Tyrone about this matter. We just had a talk on last Wednesday about (lib) pkgs. We are not giving our customer the right information and they are service failures. He gave me his word that he will turn over every tote box and check each car thoroughly.


Tracy Debose

*Tracy Debose*

To: Robert Icenogle
From: Tracy Debose
Subject: Time Out of Sequence


On Friday, March 5, 2004 we had a Time Out of Sequence Error. We always go to break at 7:00 p.m. nightly so we always forecast N-1 and S-1 at 7:21 or 7:30 in hundreds 19:50 and on the report it showed 6:21. I talked with Robert and I explained to him that I did not forecast them in hundreds. I called Joel Elam and I got no answer. I came in Saturday to see if I could go back and correct this matter. I called Montgomery and Carolyn corrected the problem. This is my fault I did not have the right tools in place to prevent this matter. I will forecast each trailer nightly until we get back on the right path with Departure Scans. I understand this is a very important matter and it can not happen again. I have a check sheet I will go by nightly with each trailer time it is to be forecasted in hundreds. If I go by this check sheet and make sure all scanners are up and downloaded this problem will not occur again.


Tracy Debose

UPS - 0068

Date:       04/07/2003

To:         Karl Jones

From:       Robert Icenogle

Subj:       Packages Left In Building


On 04/02/03 33 packages were left in a red laundry basket form the small sort of the Local sort. In order to prevent further occurrence the following procedures will be followed:


AM - In the AM all excess bags will be hung on the appropriate small bag holders to their capacity by Freeman Jackson(Porter) and James McCallister (22.3 EAM driver). All other bags left for the local sort small sort will be visually inspected to insure there are no packages left in the small bags. Excess bags from the AM will have 9 bags placed in one bag after checking for smalls by the unloaders and placed in the Night outbound load. The count will be given to the preload supervisor to annotate the number on the center statistics report at the top of the page so they can be reported to the hub by the local sort.


PM- In the PM all bags left at the end of the night in the laundry basket will be visually inspected and hung on the appropriate small bag holders. There will be no bags (Zero) left in the laundry basket by the PM. This task must be completed prior to 8:35 to make sure all smalls for Tifton have been processed prior to departure of that load. The local sort supervisors until further notice will complete the daily car check audit and building check audit to include the small sort, customer counter, clerk ECS Station and all other areas of the building to insure there are no packages left from the local sort.


Jason Jones
Henry Hall
Max Reinhardt
Tracey Debose.

To: Robert Icenogle

From: Tracy Debose

Subject: Left In Building (LIB)


April 2, 2003 a red cart was left in the building with 32 packages in it. This will not happen any more no red cart will be used for anything but RNC bags each night all bags will be sent out. I have discussed this matter with Josh Akins and Stacy Smith. I will check small sort myself, I will make sure there are no bags left with any packages in them. This will not happen again if I do what I am putting on this paper. Stacy Smith is also the small sort last look person she will inspect all bins and etc also. We as a team apologize for the 32 service failures of our customer and we will make sure this will not happen again. I am responsible for this area every night. My word is my bond.


Tracy Debose
*Tracy Debose*
Local Sort Supervisor


Reviewed by,

*S. Smith*

To: Robert Icenogle
From: Tracy Debose
Subject: Left In Building (LIB)


On Wednesday April 2, 2003 a red cart was used for all of Montgomery Hub pkgs. We were out of labels so the cart was used so we could put the packages back on the belt but instead the cart was left and the packages were not put on the belt. I did not go behind Josh or Stacy this night. I have talked with Stacy and Josh and explain how serious this is because we have failed our customers with 32 service failures and this can not happen again . The red carts are to be used for one purpose only and that is for RNC bags. They have been instructed on what to do each night in the small area. Every item over in the small area will be checked by  the small sorts and myself to prevent this from occurring again.


Tracy  Debose

*Tracy Debose*

Local Sort Supervisor

To: Robert Icenogle
From: Tracy Debose
Subject: IPLD Set Up

On Monday February 17,2003 I did not set up scanners like I would usually do. We had a set up on a night box and it was actually a sunrise box. I am sorry for this mistake if I would have sat up all scanners this would not have happen. I did not look at any scanners to make sure everything was in order. I let each employee set up their on scanner and I grab a scanner and did not look at it to make sure it was a sunrise scanner. To prevent this from happening again I PCM everyone on making sure they check behind me and make sure their scanners are sat up right. Everyday I am responsible for setting up all scanners and this will never happen again.

Tracy Debose

Local Sort Supervisor

UPS - 0072

To: Robert Icenogle
From: Tracy Debose
Subject: IPLD Set Up


On Monday February 17,2003 I did not set up scanners like I would usually do. We had a
set up on a night box and it was actually a sunrise box. I am sorry for this mistake if I
would have sat up all scanners this would not have happen. I did not look at any scanners
to make sure everything was in order. I let each employee set up their on scanner and I
grab a scanner and did not look at it to make sure it was a sunrise scanner. To prevent this
from happening again I PCM everyone on making sure they check behind me and make
sure their scanners are sat up right. Everyday I am responsible for setting up all scanners
and this will never happen again.




                                                      Tracy Debose


                                                      Local Sort Supervisor

UPS - 0073

To: Robert Icenogle
From: Tracy Debose
Subject: Volume Availability

On January 2, 2003 we were expecting 6,500 pkgs but instead we had right at 8,500. We were told this is what we had and cut back on staff. I always give 110% and make the right decision on my job. Tonight was not our fault what so ever we utilize everyone we had. We could not use any drivers we had so much volume on the belt until it would not pull we had to stop the belt and pull pkgs off the belt so what do you do we did right. We called Mark we did what we were told to do we utilize everyone we had. We made it happen the only thing that killed use was we started late. We should have started at 4p.m. The first Movie Gallery came in at 7 100% and the second 70% we were not prepared for this volume. I understand about having more than one trailer going we did that we had that belt running and it could not take it. I wish you could have been a fly on the wall and watching. I apologize for not calling you but I did call Mark and we did our best.

Tracy Debose

*Tracy Debose*

Local Sort Supervisor

To: Robert Icenogle
From: Tracy Debose
Subject: Volume Availability


On January 2, 2003 we were expecting 6,500 pkgs but instead we had right at 8,500. We were told this is what we had and cut back on staff. I always give 110% and make the right decision on my job. Tonight was not our fault what so ever we utilize everyone we had. We could not use any drivers we had so much volume on the belt until it would not pull we had to stop the belt and pull pkgs off the belt so what do you do we did right. We called Mark we did what we were told to do we utilize everyone we had. We made it happen the only thing that killed use was we started late. We should have started at 4p.m. The first Movie Gallery came in at 7 100% and the second 70% we were not prepared for this volume. I understand about having more than one trailer going we did that we had that belt running and it could not take it. I wish you could have been a fly on the wall and watching. I apologize for not calling you but I did call Mark and we did our best.


Tracy Debose

*Tracy Debose*

Local Sort Supervisor

To: Robert Icenogle
From: Tracy Debose
Subject: Communication

To prevent any problems or any situations COMMUNICATION is the source. The situation we had on Wednesday December 18, 2002 was not handle correctly we had know communication what so ever. I will always make sure each Feeder Driver tractor is on the yard. I will also make sure I am communicating with Max and any other management person in any problems. I will also inform all employees we don't know unless we are informed on any situations.

Tracy Debose,

Local Sort Supervisor

UPS - 0076

To: Robert Icenogle
From: Tracy Debose
Subject: Communication

To prevent any problems or any situations COMMUNICATION is the source. The situation we had on Wednesday December 18, 2002 was not handle correctly we had know communication what so ever. I will always make sure each Feeder Driver tractor is on the yard. I will also make sure I am communicating with Max and any other management person in any problems. I will also inform all employees we don't know unless we are informed on any situations.

Tracy Debose,

Local Sort Supervisor

UPS - 0077

To: Jimmy Holcomb
From: Tracy Debose
RE: Action Plan

On Monday April 1, 2002 we had a business meeting at the center. We discussed several things and Action Plan was one. Why I was late turning in my action plan I have know excuse. We had discussed the plans earlier at the meeting. Everything was in order all I had to do was to put it on a new action plan. I will not give you any excuses. I apologize for my tardiness and I will be more aware of my responsibilities.

Tracy Debose

*Tracy Debose*

Local Sort Supervisor

March 20, 2002

To: Robert Icenogle  Dothan Center Manger

From: Tracy Debose Local Sort Supervisor

RE : P.M.  L.I.B

    I Tracy Debose  had 5 (LIB) Left In Building packages on  3-19-02. I need to insure that my personnel  are properly checking all package cars thoroughly and hold them accountable as you are holding me accountable. I feel these procedures will drastically reduce the possibility of another occurrence  of  this type.

Tracy Debose

*Tracy Debose*

Local Sort Supervisor

**UPS - 0079**

TALK WITHS AND MENTIONS DETAIL REPORT  03/20/02
ALL CODES
DATE RANGE: 03/01/01 - 03/20/02

NAME:    BURCHETT,G                     HIRE DATE: 04/02/01
ADDRESS:                                PHONE:     1800-000-0000
CITY:                                   STATE: 00  ZIP: 0000000000

| Date | Code | Type | Stroke Count | Key Ent. | Remarks |
|------|------|------|--------------|----------|---------|
| 04/02/01 | 84 | MEN | 1 | | |
| 05/08/01 | 70 | MEN | 1 | | |
| 05/28/01 | 22 | MEN | 1 | | |
| 09/03/01 | 22 | MEN | 1 | | |
| 09/07/01 | 26 | MEN | 1 | | |
| 09/14/01 | 84 | MEN | 1 | | |
| 10/11/01 | LT | MEN | 1 | | |
| 10/19/01 | 21 | MEN | 1 | | |
| 11/06/01 | 84 | MEN | 1 | | |
| 12/06/01 | LT | MEN | 1 | | |
| 12/10/01 | LT | MEN | 1 | | |
| 12/24/01 | 21 | MEN | 1 | | |
| 12/25/01 | 22 | MEN | 1 | | |
| 12/31/01 | 22 | MEN | 1 | | |
| 01/01/02 | 22 | MEN | 1 | | |
| 01/02/02 | LT | MEN | 1 | | |
| 01/04/02 | LT | MEN | 1 | | |
| 02/01/02 | 27 | MEN | 1 | | |
| 02/26/02 | LT | MEN | 1 | | |
| 03/12/02 | LT | MEN | 1 | | |
| 03/20/02 | TW | TW | 1 | Y | On 3/19/02, employee was responsible for checking all pkg cars for outbound pkgs.  5 pkgs was found in a pkg car.  This is a serious service failure. Future occurances of this nature will result in futher disciplinary action up to and including termination. T.Debose |

**UPS - 0080**

To: Robert Icenogle
From: Tracy Debose
Subject: SCS Machine

Monday I arrived at work about 4:35 and I went to set up my scanners and Looked at my left hand corner to make sure the date is correct. I then paged down and I did notice my create so I printed the screen. I then went to start up the sort the belt would not start so I was side tracked until Ron Orcutt called me and asked me if I did my checklist I told him I did and I printed it. I called the help desk and spoke with Chad and we had to run a end of day. The beginning of day was not ran correct this morning so we will have have arrivals error along with departure errors. If you looked at the screen every thing looked correctly the 24 was in every left hand corner on each page. The scanners all had the right date.

Tracy Debose

Local Sort Supervisor

To: Jimmy Holcomb
From: Tracy Debose
RE: Promptness

Why I will not be late any more. I hate getting in trouble and further more writing myself up. When I took this position I did not know it came with so much. Nothing I can't handle I love my job most people think management don't do any work they are wrong. Promptness is very important to me and It will be the same for my job. I will be better with turning in plans and I will get my numbers up on Revenue Recovery. I understand everything has to be done on time and in order. Promptness is a must and being on time with any future reports will be on time .

Tracy Debose

*Tracy Debose*

Local Sort Supervisor

UPS - 0082

TO: ROBERT ICENOGLE
FROM: TRACY DEBOSE
SUBJECT: PROCESS OF CALLING

Any emergency or any situation that is occurring daily on UPS grounds we are to first contact Mark Schwarz or any other full time supervisor. If we can't get in contact with Mark or any other full time supervisor then we notify Robert Icenogle of any events that is occurring at 4116 Montgomery Hwy. If I don't follow this process of calling I will be held accountable for my actions.

Tracy  Debose,

Local Sort Supervisor

TO: ROBERT ICENOGLE
From: TRACY DEBOSE
SUBJECT: DEPARTURE TIMES

It is my duty to make sure each Feeder Driver come in get the right Seal Control make sure his load is sealed and he pulls on time. Unfortunately I don't see each driver do their pre-trip of their tractor. I know some time there have been problems that have caused departure delays. I do my very best to make sure the sort is running and the drivers are pulling on time. I know each Feeder Driver must pull on time to make his/her destination on time.

Departure Times As Follows

N-1 19:28
S-1 19:28
N-2 20:22
S-2 20:22
N-3 21:28
TIF 20:47
S-3 22:30
AIR 19:50

Tracy Debose,

Local Sort Supervisor

UPS - 0084